## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cr-244 (TNM) |
| | ) | |
| HATCHET SPEED, | ) | |
| Defendant. | ) | |
| _____ | ) | |

### MR. SPEED'S MOTION TO DISMISS COUNT ONE
### OF THE INDICTMENT

Hatchet Speed, through counsel and pursuant to Fed. R. Crim. P. 12(b)(3)(B)(v), respectfully requests that this Court dismiss Count One of the Superseding Indictment charging him with obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2) & 2. *See* ECF No. 38 at 1.

Count One of the Superseding Indictment alleges that Mr. Speed, within the District of Columbia and elsewhere,

> attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution and 3 U.S.C. §§ 15-18.

*Id.* This Court should dismiss Count One for the following reasons:

*First*, Mr. Speed's alleged acts cannot qualify as conduct that "otherwise obstructs, influences, or impedes" an official proceeding, within the meaning of Section 1512(c)(2).

*Second*, Section 1512(c)(2) prohibits the corrupt obstruction of tribunal-like proceedings before Congress related to the administration of justice. It does not prohibit the obstruction of ceremonial proceedings, like the certification of the

1

electoral college vote. Accordingly, any alleged obstruction of the electoral college certification is not a crime under 18 U.S.C. § 1512(c).

*Third*, Section 1512(c)(2) is unconstitutionally vague.

## ARGUMENT

## I.    COUNT ONE FAILS TO ALLEGE CONDUCT THAT "OTHERWISE OBSTRUCTS, INFLUENCES, OR IMPEDES AN OFFICIAL PROCEEDING"

Count One fails to allege an *actus reus* contemplated by 18 U.S.C. § 1512(c)(2). *See United States v. Miller*, No. 1:21-cr-119 (CJN), 2022 U.S. Dist. LEXIS 45696, at *40 (D.D.C. Mar. 7, 2022) [hereinafter "*Miller* Mem. Op."], *on appeal*, No. 22-3041 (D.C. Cir. 2022) (dismissing obstruction count in January 6 case where indictment did not allege or imply that Miller "took some action with respect to a document, record, or other object in order to corruptly obstruct, impede, or influence Congress's certification of the electoral vote").

Section 1512(c) of Title 18 provides:

> (c) Whoever corruptly—
>
> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
> (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,
>
> shall be fined under this title or imprisoned not more than 20 years, or both.

Section 1512(c)(2) prohibits only acts "with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding." *Miller* Mem. Op. at *39-40. This is so because the use of the word "otherwise"

demands that subsection (c)(2) "be interpreted as limited by subsection (c)(1)" due to the text, structure, and context of § 1512(c) as a whole, as well as the provision's place within the broader context of the statute. *Id.* Supreme Court case law requires such a conclusion, as explained by Judge Nichols in *Miller* and former Attorney General Barr in a 2018 memorandum. Relying on *Begay v. United States*, 553 U.S. 137 (2008), and *Yates v. United States*, 574 U.S. 528 (2015), the former Attorney General explained:

> [I]t is clear that use of the word "otherwise" in the residual clause [of Section 1512(c)(2)] expressly links the clause to the forms of obstruction specifically defined elsewhere in the provision. Unless it serves that purpose, the word "otherwise" does no work at all and is mere surplusage. [An] interpretation of the residual clause as covering any and all acts that influence a proceeding reads the word "otherwise" out of the statute altogether. But any proper interpretation of the clause must give effect to the word "otherwise"; it must do some work.

Memorandum from William Barr to Deputy Attorney General Rod Rosenstein and Assistant Attorney General Steve Engel of June 8, 2018 [hereinafter "Barr Memo"] at 4 (emphasis omitted).[1] Noting that *Begay* and *Yates* emphasize that "specific examples enumerated prior to the residual clause are typically read as refining or limiting in some way the broader catch-all term used in the residual clause," he continued,

> Consequently, under the statute's plain language and structure, the most natural and plausible reading of 1512(c)(2) is that it covers acts that have the same kind of obstructive impact as the listed forms of obstruction—i.e., impairing the availability or integrity of evidence—but cause this impairment in a different way than the enumerated actions do. Under this construction, then, the "catch all" language in clause (c)(2) encompasses any conduct, even if not specifically described in

---

[1]   Available at William Barr Senate Questionnaire Attachment 12(c).pdf (documentcloud.org) (last visited Jan. 25, 2023).

1512, that is directed at undermining a proceeding's truth-finding function *through actions impairing the integrity and availability of evidence.*

*Id.* at 4-5 (emphasis omitted) (emphasis added).[2]

The Barr Memo also noted that case law reflects this application of the residual clause as only applying to "attempts to interfere with, or render false, evidence that would become available to a proceeding" or "to prevent the flow of evidence to a proceeding." *Id.* at 5 (collecting cases). *See United States v. Volpendesto*, 746 F.3d 273 (7th Cir. 2014) (soliciting tips from corrupt cops to evade surveillance); *United States v. Phillips*, 583 F.3d 1261 (10th Cir. 2009) (disclosing identity of undercover agent to subject of grand jury drug investigation); *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009) (involving false testimony to a grand jury); *United States v. Jefferson*, 751 F.3d 314, 321 (5th Cir. 2014) (involving intentional false statements to court during preliminary injunction hearing); *United States v. Lucas*, 499 F.3d 769, 780-81

---

[2] Although *Yates* was a plurality opinion, Justice Alito's concurring opinion also supports the former Attorney General's and Mr. Speed's position. According to Justice Alito, the statute's list of nouns, its list of verbs, and its title all highlighted that the statute did not reach the conduct of the defendant in that case. *Yates*, 574 U.S. at 549 (Alito, J., concurring). As to the nouns, Justice Alito considered the application of both the *noscitur a sociis* and *ejusdem generis* canons of construction to find that the term "tangible object" should refer to "something similar to records or documents." *Id.* at 549-50. Here, Section 1512(c)(1) refers to "a record, document, or other object." The Government does not allege that Mr. Speed interfered with any such item, much less any evidence. As to the verbs, Justice Alito noticed the impossibility of applying them to *any* tangible object. *Id.* at 551 ("How does one make a false entry in a fish?"). Because there was no evidence with which Mr. Speed interfered, the verbs in Section 1512(c) have no object to reference. As to the title of the statute, Justice Alito noted that it "point[ed] toward filekeeping, not fish." *Id.* at 552 (referencing the title "Destruction, alteration, or falsification of records in Federal investigations and bankruptcy"). As Mr. Speed explains here, the title of Section 1512 similarly supports a finding that it was not intended to apply to *all* forms of obstructive conduct.

(8th Cir. 2007) (involving defendant having others falsely claim ownership of firearm); *United States v. Mintmire*, 507 F.3d 1273, 1290 (11th Cir. 2007) (involving defendant's "attempt[s] to orchestrate" grand jury witness's testimony by sending notes to attorney who in turn "coached" the witness); *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) (involving false statements in a court proceeding); *United States v. Pugh*, 945 F.3d 9, 28 (2d Cir. 2019) (involving destruction of several USB drives and deletion of data); *United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013) (involving false answers to interrogatories provided in civil suit filed by person seeking damages for mistreatment while in police custody, explaining that § 1512(c)(1) "covers obstructive conduct in the form of physical destruction of documents and records" whereas § 1512(c)(2) covers "otherwise" obstructive behavior to include giving false statements in interrogatories relating to civil lawsuit). As the former Attorney General correctly observed, "the natural and plausible reading of 1512(c)(2)" requires some conduct that impairs the integrity and availability of some *evidence*. Barr Memo at 4.

This interpretation is entirely consistent with the legislative history of Section 1512(c)(2), as noted by former Attorney General Barr and Judge Nichols in *Miller*. *See Miller* Mem. Op. at *23; Barr Memo at 5-6. Congress enacted Section 1512(c) as part of the Sarbanes-Oxley Act of 2002, "[a]n Act to protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to securities laws, and for other purposes." Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745. The amendments to Section 1512 in the Sarbanes-Oxley Act were included in

part to ensure liability for those who destroyed records before an "official proceeding" had convened even if they did not foresee one coming (so long as their intent was to ensure that the records would be unavailable), and even if they acted alone (rather than causing others to act in ways that obstructed justice, as Section 1512 originally contemplated). The amendments came in the wake of the Enron scandal, in reaction to the accounting firm Arthur Andersen LLP's evasion of criminal liability for destroying documents, because Section 1512 at that time criminalized only "causing or influencing 'another person' to take improper action," and "did not make it illegal to do [the same conduct] by oneself." *Miller* Mem. Op. at \*31, \*38; *see also Arthur Andersen LLP v. United States*, 544 U.S. 696, 703-07 (2005).

The Senate Judiciary Committee Report on the Sarbanes-Oxley Act described the Act's purpose as "provid[ing] for criminal prosecution and enhanced penalties of persons who defraud investors in publicly traded securities or alter or destroy evidence in certain Federal investigations." S. Rep. No. 107-146, at 2 (2002). The Committee Report noted that much of Arthur Andersen's document destruction was "undertaken in anticipation of a SEC subpoena to Andersen for its auditing and consulting work related to Enron." *Id.* at 4. Congress, adamant that "[w]hen a person destroys evidence with the intent of obstructing any type of investigation and the matter is within the jurisdiction of a federal agency, overly technical legal distinctions should neither hinder nor prevent prosecution and punishment[,] changed the law." *Id.* at 6-7. The Committee Report makes clear, then, that Section 1512(c)(2) "was expressly designed to 'clarify and close loopholes in the existing criminal laws *relating*

*to the destruction or fabrication of evidence* and the preservation of financial and audit records.'" Barr Memo at 5-6 (quoting S. Rep. No. 107-146 at 14-15) (emphasis added). Judge Nichols echoed this analysis, explaining, "[I]n the wake of the Enron scandal, Congress was faced with a very specific loophole: that then-existing criminal statutes made it illegal to case or induce another person to destroy documents, but it did not make it illegal to do by oneself." *Miller* Mem. Op. at *28. "[N]othing in the legislative history suggest[s] a broader purpose" for subsection (c) than closing that loophole. *Id.*

Interpreting Section 1512(c)(2) to cover the conduct alleged in the Indictment — as an all-encompassing catch-all to include something so unique as protesting election certification proceedings —would render clause (c)(1) surplusage, and would "introduce something of an internal inconsistency" by covering an extremely broad category of conduct, contrary to and swallowing up the "narrow focus" on "fairly discrete conduct" found in subsections (a), (b), and (d). *Miller* Mem. Op. at *16-17, *27-29. Indeed, Section 1512(c)(2) "would subsume virtually all other obstruction provisions in Title 18. . . . It is not too much of an exaggeration to say that, if § 1512(c)(2) can be read as broadly as being proposed, then virtually all Federal obstruction law could be reduced to this single clause." Barr Memo at 5; *see also Marx v. General Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

In sum, the canons of construction employed by the Supreme Court in *Begay* and *Yates*; the text, structure, and practical application of Section 1512(c)(2) as

demonstrated in case law; and the provision's legislative history all support the conclusion that the "otherwise" clause in Section 1512(c)(2) must be construed as referring to different *means* by which a defendant "obstructs, influences or impedes" "a record, document, or other object" related to "any official proceeding." Thus, in order for Count One to sufficiently allege a violation, it must allege that Mr. Speed took "some action with respect to a document, record, or other object in order to corruptly obstruct, impede, or influence an official proceeding." *Miller* Mem. Op. at *28. Because no such allegation exists in the Superseding Indictment here — nor can one ever exist — this Court should adopt Judge Nichols' reasoning as applied in *Miller* and dismiss Count One of the Superseding Indictment alleging a violation of Section 1512(c)(2).

## II.    THE CERTIFICATION OF THE ELECTORAL VOTE IS NOT AN "OFFICIAL PROCEEDING"

Congress provided a definition for the term "official proceeding" as used in Sections 1512 and 1513, which reads:

> (A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;
>
> (B) a proceeding before the Congress;
>
> (C) a proceeding before a Federal Government agency which is authorized by law; or
>
> (D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce[.]

18 U.S.C. § 1515(a)(1).

This language suggests that the term "official proceeding" refers to tribunal-like proceedings related to adjudication, deliberation, and the administration of justice, all features which the electoral count lacks. Accordingly, though the counting of the electoral vote takes place in Congress, it is not an "official proceeding," and obstruction of it is not prohibited by Section 1512(c)(2).

## A. The text in and around Sections 1512 and 1515 support this view.

The "plain meaning of § 1512(c)(2) and § 1515(a)(1)(A) is unambiguous — an informal, routine agency action like clearance-adjudication does not fall within the statutory definition of an 'official proceeding.'" *United States v. Guertin*, 581 F. Supp. 3d 90, 97 (D.D.C. 2022). Instead, as this Court found in *Guertin*, an "official proceeding" must "resemble a formal tribunal." *Id.* at 98. By the same rationale, the electoral count cannot qualify as an "official proceeding."[3]

In *Guertin*, this Court began by noting that "official proceeding" can have a broad or narrow definition—referring either broadly to "[t]he carrying on of an action or series of actions" or narrowly to "[t]he business conducted by a court or other official body; a hearing." *Id.* at 97 (quoting *Proceeding*, Oxford English Dictionary (3d ed. 2007); *Proceeding*, Black's Law Dictionary (11th ed. 2019). Finding the narrow definition must be applied here, the Court then analyzed the text of 1512(c)(2), observing that "official" appears before "proceeding," thus "textually limiting covered

---

[3] Mr. Speed recognizes that despite the quoted language in *Guertin*, the Court has denied motions to dismiss the obstruction count in other January 6 cases. *See, e.g.*, *United States v. Hale-Cusanelli*, No. 21-cr-37 (D.D.C. May 6, 2022).

proceedings to those bearing indicia of officiality." *Id.* The Court found that the definitional provisions in 1515(a)(1) also support that reading, observing that the "word 'before' suggests an 'official proceeding' would typically entail convening a formal tribunal or adjudicative body before which parties are compelled to appear." *Id.* (emphasis omitted).

This careful textual analysis led the Court to find that taken together, Sections 1515(a)(1) and 1512 require a "covered 'proceeding before a Federal government agency'" to "resemble a formal tribunal." *Id.* at 98 (quoting *United States v. Ermoian*, 752 F.3d 1165, 1171 (9th Cir. 2013)); *see also Ermoian*, 752 F.3d at 1172 (analyzing the text in and surrounding Sections 1515 and 1512 to determine that the phrase "a proceeding before a Federal Government agency which is authorized by law" in Section 1515(a)(1)(C) does *not* include FBI investigations); *United States v. Ramos,* 537 F.3d 439, 462-63 (5th Cir. 2008) (stating that "use[ of] the preposition 'before' in connection with the term 'Federal Government agency' . . . implies that an 'official proceeding' involves some formal convocation of the agency in which parties are directed to appear, instead of any informal investigation conducted by any member of the agency."). Section 1515(a)(1)(B) therefore does not include the counting of electoral votes.

## B. The electoral count is not an official proceeding because it is a ceremonial event.

Just as the "criminal investigation" in *Ermoian* and the "routine certification" in *Guertin* did not meet the definition of an "official proceeding" under the obstruction of justice statute, neither do the election certification proceedings here. The Twelfth

Amendment and the Electoral Count Act of 1887, later codified in 3 U.S.C. § 15, make plain that Congress's role in counting electoral votes is a ceremonial and administrative event, bearing no resemblance to a tribunal. The Twelfth Amendment and 3 U.S.C. § 15 vest Congress with the responsibility of counting electoral votes — but only *after* the states have already heard disputes and certified the vote. *See Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring) (noting the "State's selection of electors shall be conclusive, and shall govern in the counting of the electoral votes."). The Constitution does not vest the Joint Session with the authority to reject the votes of any State, making its role strictly ministerial, rather than adjudicative or adversarial in any way. *See* Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*?, 80 N.C. L. Rev. 1653, 1709 (2002) [hereinafter Kesavan].

Although the election certification proceedings may be "official," no one is "before" Congress in those proceedings; the proceedings entail no formal investigation or consideration of facts; and neither the Joint Session of Congress nor its Presiding Officer have any discretion to exercise. No parties are summoned to attend the proceedings; no witness or evidence is produced, offered, or taken; and nothing is adjudicated by Congress. The certification proceedings are unlike tribunal proceedings and have nothing in common with the "business done in courts," or acts "done by the authority or direction of the court, express or implied." *See Ermoian*, 752 F.3d at 1170 ("'Proceeding' is a word much used to express the business done in courts and "is an act done by the authority or direction of the court, express or implied."

(quoting Black's Law Dictionary commentary, cited *supra*)). Instead, the vote count is entirely ministerial and ceremonial.

The history of "objections" lodged at the Electoral Count further demonstrate the ceremonial nature of the proceeding. Past objections were mostly made in the 1800s due to the confusion arising from the admission of new states to the union and uncertainty over whether the electoral votes of those states should count. *See* Kesavan, *supra* at 1680-90. Objections were ultimately rejected based on the determination that the Joint Session did not have the authority to judge or vitiate the proceedings already undertaken by the states. *Id.* In 1876, one of the most tumultuous elections in American history, Samuel Tilden and Rutherford Hayes were separated by one electoral vote, and four states sent Congress multiple electoral returns. *Id.* Congress recognized that the Joint Session lacked authority to resolve the issue, so instead, it formed a separate commission to evaluate the situation and decide the issues of fact and law presented. *Id.* Subsequently, Congress enacted the Electoral Count Act of 1887 to address issues like this one should they arise in the future. Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 Fla. L. Rev. 541, 543-44 (2004). The Act granted the states, not Congress, the responsibility to resolve disputes about electors and their appointments and certifications. *Id.* at 584-86.

In 1969, the election proceedings saw an objection that a vote from North Carolina should not be counted because it reflected a "faithless" elector who had refused to give his vote to Richard Nixon despite Nixon's popular vote victory in that

state. *See* Kesavan, *supra* at 1692-94. The objection was rejected and the vote at issue counted due to the rebuke of certain congresspeople, such as Rep. Rarick, who said:

> We are not election supervisors nor given the discretion to re-compute the vote received from a sovereign state. The Constitution clearly proscribes our duty as to 'count the electoral votes,' the ***ministerial*** function of a central collecting agency and a tabulating point.

*Id.* at 1694 (emphasis added).

For all these reasons, the Electoral Count is not "a proceeding" akin to a formal hearing and it is not "tribune-like," as the *Guertin* Court found to be required here. Rather, the Joint Session dedicated to counting electoral votes is a ceremonial meeting of both houses of Congress. While steeped in tradition, it decides nothing. It is a political performance conducted to give the country and its voters a feeling of finality over the already final election results. Accordingly, the Electoral Count is not an "official proceeding" such that its obstruction violates Section 1512(c) and Count One of the Superseding Indictment must be dismissed.

## III.   SECTION 1512(C)(2) IS UNCONSTITUTIONALLY VAGUE

The Court should dismiss Count One for a separate yet related reason: Section 1512(c)(2) as applied to congressional proceedings fails to provide fair notice of what the statute prohibits, in violation of the Due Process Clause of the Fifth Amendment, because the meaning of the term "corruptly" is impermissibly vague. In the alternative, the only understanding of "corruptly" that might enable the statute to pass constitutional muster would be "acting with the intent to obtain an unlawful advantage for oneself or an associate contrary to the due administration of justice."

But because Count One fails to allege anything relating to the administration of justice, the Court must dismiss the count.

To satisfy the constitutional requirements of Due Process, a statute must give fair warning of the conduct it prohibits. *Bouie v. City of Columbia*, 378 U.S. 347, 350-51 (1964). A statute is unconstitutionally vague and therefore violative of the Due Process Clause if "it fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595-96 (2015); *see also Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983) ("[A] penal statute must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct it prohibits, and do so in a manner that does not invite arbitrary and discriminatory enforcement by which 'policemen, prosecutors, and juries ... pursue their personal predilections.'"); *Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."). The allegations against Mr. Speed in Count One of the Superseding Indictment fails to comport with Due Process.

## A. The term "corruptly," as used in Section 1512(c)(2), is unconstitutionally vague.

The D.C. Circuit held in *United States v. Poindexter,* 951 F.2d 369 (D.C. Cir. 1991), that the word "corruptly" is prone to causing vagueness. *Poindexter* considered 18 U.S.C. 1505, which criminalizes

> [w]hoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States, or the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress . . . .

18 U.S.C. § 1505.

After *Poindexter*, Congress added the definition of "corruptly" now applicable to the statute via Section 1515(b), but in the *Poindexter* decision, the D.C. Circuit analyzed the text of the provision without that added context. The Court stated that the word "corruptly" in the text "must have some meaning, because otherwise the statute would criminalize *all* attempts to 'influence' congressional [proceedings] — an absurd result that Congress could not have intended in enacting the statute." *Poindexter*, 951 F.2d at 377-78 (analyzing application of § 1505 as applied to making false statements to Congress) (emphasis added). The Court also found that the dictionary alone did not make clear the meaning of "corruptly":

> "Corruptly" is the adverbial form of the adjective "corrupt," which means "depraved, evil: perverted into a state of moral weakness or wickedness . . . of debased political morality; characterized by bribery, the selling of political favors, or other improper political or legal transactions or arrangements." A "corrupt" intent may also be defined as "the intent to obtain an improper advantage for [one]self or someone else, inconsistent with official duty and the rights of others."

*Id.* at 378 (quoting *United States v. North*, 910 F. 2d 843, 881-82 (D.C. Cir. 1990)).

*Poindexter* thereby found that "so defined, 'corruptly' is vague as used in section 1505." *Id.* As a result, the D.C. Circuit held that such vagueness precludes the statute

from "provid[ing] constitutionally adequate notice that it prohibits lying to the Congress," deeming the provision void for vagueness. *Id.* at 379.

Just as the D.C. Circuit acknowledged that "on its face, the word 'corruptly' is vague," so should this Court — "that is, in the absence of some narrowing gloss, people must 'guess at [the word's] meaning and differ as to its application.'" *Id.* And as the D.C. Circuit found that "corruptly influencing" a congressional inquiry "does not at all clearly encompass lying to Congress, which is, by way of contrast, clearly a violation of § 1001," *id.*, this Court must acknowledge that the conduct alleged in the Superseding Indictment — which similarly would violate another statute (40 U.S.C. § 5104) — is not clearly subject to the statute's prohibition of "corruptly . . . otherwise obstructing, influencing, or impeding" an official proceeding, using the dictionary definitions of "corruptly." This conclusion is required because, like in *Poindexter*, "[t]he various dictionary definitions of the adjective 'corrupt'" as used in its adverbial form in Section 1512(c) are themselves vague. *Id.* "Words like 'depraved,' 'evil,' 'immoral,' 'wicked,' and 'improper' are no more specific — indeed they may be less specific — than 'corrupt.'" *Poindexter*, 951 F.3d at 378-79.

Applying the logic of *Poindexter*, the only way the use of the word "corrupt" in Section 1512 can be deemed not unconstitutionally vague is if the text of the statute, its structure, or some other relevant context "clearly indicates a more specific meaning of the term 'corruptly,'" and if Mr. Speed's "conduct comes within that meaning." *Id.* at 379 (considering whether use of the word, legislative history of Section 1505, or judicial gloss on the statute provided a clear indication of a more

specific meaning of the word in that statute, and ultimately concluding that it did not).

In *Poindexter*, the D.C. Circuit first considered whether the provision's usage of the word "corruptly" gave it more definition. *Id*. at 379. That Court noted:

> the verb "corrupt" may be used transitively ("A corrupts B," i.e., "A causes B to act corruptly") or intransitively ("A corrupts," i.e., "A becomes corrupt, depraved, impure, etc."). So too, the adverbial form "corruptly" may have either the transitive or the intransitive sense. *See* 3 Oxford English Dictionary 974 (2d ed. 1989) ("corruptly" may mean either "by means of corruption or bribery," i.e., by means of corrupting another, or acting oneself "in a corrupt or depraved manner").

*Id*. at 379. But the Court found that this analysis did not evade the vagueness in the word itself, because "[e]ither a transitive or an intransitive interpretation would still be unconstitutionally vague . . . if specific content is not given to the word 'corruptly.' Reading 'corruptly' to prohibit one from influencing another to act 'immorally' or 'improperly' provides no more guidance than does reading it to prohibit one from acting 'immorally' or 'improperly' oneself." *Id.*

The same issue is presented here: No matter how "corruptly" is used in Section 1512(c)(2) — transitively or intransitively — the word lacks definition and context, and therefore remains too vague to provide the fair notice demanded by the Due Process Clause of the Fifth Amendment.

## B. The emerging definitions of "corruptly" in this District demonstrate the vagueness of the term.

The judges of this District recognize that the D.C. Circuit found the word "corruptly" to be somewhat vague as applied in *Poindexter* and acknowledged that many of the words often used to define it are of little help, such that a "narrowing

gloss" is required to determine the meaning and application of the word. *Poindexter*, 951 F.2d 379 (recognizing that "on its face, the word 'corruptly' is vague," requiring people to "guess at its meaning and differ as to its application"). *See, e.g.*, *United States v. Caldwell*, 581 F. Supp. 3d 1, 17 (D.D.C. 2021); *United States v. Bingert*, No. 1:21-cr-91, 2022 U.S. Dist. LEXIS 93790, at *15 (D.D.C. May 25, 2022). Judges in this District therefore have proposed varying "narrowing gloss[es]" on the word as used in Section 1512(c).

Judge Friedrich appears to conclude that judicial gloss provides notice that proof that a defendant acted "corruptly" also must include proof that he acted "wrongfully." *United States v. Sandlin*, 575 F. Supp. 3d 16, 32-33 (D.D.C. 2021). *Sandlin* explains that "[i]n considering the meaning of 'corruptly' (or wrongfully), courts have drawn a clear distinction between lawful and unlawful conduct," drawing "a line that is consistent with the definition of 'wrongful': that is contrary to law, statute, or established rule." *Id.* at 32. The judicial opinions interpreting and applying this definition "identify a core set of conduct against which § 1512(c)(2) may be constitutionally applied — 'independently criminal' conduct . . . that is 'inherently malign,'" in addition to being intended to obstruct a proceeding with which it has a nexus. *Id.* at 33. Thus, the *Sandlin* court concluded that the statute is not vague *as applied* against the defendants accused of illegal conduct intended to obstruct an official proceeding, at least so long as it is inherently malign. *Id.* at 31, 33.

In *United States v. Nordean*, Judge Kelly appears to follow the logic of *Sandlin*, concluding that "corruptly" means at least "intentionally" and "wrongfully" and that

the defendants in the case are alleged to have so acted because they allegedly used "unlawful means." *United States v. Nordean*, 579 F. Supp. 3d 28, 51 (D.D.C. 2021). However, Judge Kelly appears more open to the notion that unlawful purposes, as opposed to unlawful means (such as breaking the law), can satisfy the "wrongfulness" prong perceived as a limitation on the meaning of "corrupt" in Section 1512(c)(2). *Id.* at 50-51.

Judge Boasberg also closely follows this rationale in *United States v. Mostofsky*. However, *Mostofsky* interprets *Sandlin* to stand for the proposition that "corruptly *requires* "that defendants acted '*unlawfully*, and with the intent to obstruct[,]' impede, or influence an official proceeding." *United States v. Mostofsky*, 579 F. Supp. 3d 9, 26 (D.D.C. 2021) (emphasis added).

Judge Mehta takes yet another view of what the "judicial gloss" provides. In *Caldwell,* Judge Mehta concludes that case law provides notice that "corrupt" action involves "consciousness of wrongdoing" undertaken with specific intent to obstruct a congressional proceeding. *Caldwell*, 581 F. Supp. 3d at 19. But apparently not all "conscious wrongdoing" suffices, per *Caldwell*: Whereas preplanning to obstruct, wearing paramilitary gear, forcible trespass and assault, and coordinated movement through the Capitol would qualify, "mere . . . trespass" apparently would not. *Id.* at 22. Thus, here Judge Mehta perceives an additional limitation on what it means to act corruptly (*i.e.*, it includes the conscious commission of crimes at least more serious than trespass).

In *United States v. Montgomery*, Judge Moss appears to track Judge Mehta's reasoning, finding case law preceding and following *Poindexter* provides notice that, to prove a defendant acted corruptly, the Government must prove intent to obstruct an official proceeding as well as "consciousness of wrongdoing." *United States v. Montgomery*, 578 F. Supp. 3d 54, 83 (D.D.C. 2021). However, Judge Moss understands that there could be even further requirements, such as proof that the defendant used "some unlawful method" and acted "with the hope or expectation of a benefit to oneself or a benefit to another person." *Id.* at 84 n.5.

These varying interpretations of what it means to act "corruptly" under Section 1512(c)(2) demonstrate that the defendants in each of these cases are correct: The law is *not* clear about what "corruptly" means, and neither the statutory text nor any "judicial gloss" provided them with sufficient notice that the statute could be applied to criminalize their conduct.

## IV.   THE RULE OF LENITY CONFIRMS THAT THE COURT SHOULD DISMISS COUNT ONE

Finally, if recourse to any of the "traditional tools of statutory construction leaves any doubt" about the meaning of "corruptly obstructing, influencing, or impeding a proceeding before Congress," as Section 1512(c)(2) provides, this Court should invoke the rule that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Yates*, 574 U.S. at 547-48 (quoting *Cleveland v. United States*, 531 U.S. 12, 25 (2000)). Another doctrine grounded in the Due Process notice right, the rule of lenity "ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance

between the legislature, the prosecutor, and the court in defining criminal liability." *Id.* at 548 (quoting *Liparota v. United States*, 471 U.S. 419, 427 (1985)).  The rule of lenity embodies the "notion," accepted in early Supreme Court jurisprudence with an extensive common law history, "that 'penal laws should be construed strictly.'" *Wooden v. United States*, 142 S. Ct. 1063, 1082 (2022) (Gorsuch, J., concurring) (quoting *The Adventure*, 1 F. Cas. 202, 204, F. Case No. 93 (CC Va. 1812) (Marshall, C.J.)). This principle is particularly important here where the Government urges a reading of Section 1512(c)(2) that exposes individuals to 20-year prison sentences for obstructing any proceeding before Congress in any manner that the Government deems "corrupt," based on an ambiguous and arbitrarily applied term. *See Liparota*, 471 U.S. at 426 (resolving statutory ambiguity in favor of lenity where "to interpret the statute otherwise would be to criminalize a broad range of apparently innocent conduct").

In determining the meaning of Section 1512(c)(2), the rule of lenity requires the Court, "before [choosing] the harsher alternative [interpretation], to require that Congress should have spoken in language that is clear and definite." *Id.* (quoting *Cleveland*, 531 U.S. at 25). Because Congress failed to do so, this Court should construe the provision in accordance with Mr. Speed's interpretation, thereby requiring a conclusion that Count One of the Superseding Indictment fails to include allegations that make it "clear and definite" that Mr. Speed's conduct violates Section 1512(c)(2).

## **CONCLUSION**

For all the above stated reasons, Mr. Speed respectfully moves this Court to dismiss Count One of the Superseding Indictment.


Dated: February 3, 2023.


Respectfully Submitted,

/s/ Courtney Dixon
Courtney Dixon, #1766415
Brooke S. Rupert, VA Bar 79729
Assistant Federal Public Defender
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0800
(703) 600-0880 (fax)
Courtney_Dixon@fd.org
Brooke_Rupert@fd.org