# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 22-cr-244 (TNM)** |
| **v.** | : | |
| | : | |
| **HATCHET M. SPEED,** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT FOR VINDICTIVE PROSECUTION

Hatchet Speed was charged initially with misdemeanors and turned down an early offer to resolve his case. As the government began marshalling its evidence and preparing for trial in earnest, it determined that it could prove beyond a reasonable doubt that Speed had obstructed an official proceeding, in violation of 18 U.S.C. § 1512(c)(2). The government superseded with the new charge, as it has in many cases in a similar posture. *See, e.g.,* Superseding Indictment, *United States v. Barnett,* 21-cr-38 (CRC), ECF No. 96 (superseding indictment adding felony charge brought less than three weeks before trial); Third Superseding Indictment, *United States v. Miller,* 21-cr-119 (CJN), ECF No. 111 (same, just over one month before trial)*;* Second Superseding *United States v. Irwin,* 21-cr-589 (RDM), ECF No. 48 (same, 15 days before trial). This sequence of events, where the government files charges after a defendant exercises his right to go to trial, is both legal and unremarkable, as the Supreme Court recognized in *United States v. Goodwin,* 457 U.S. 368, 382 n.15 (1982), a decision that squarely forecloses Speed's vindictive-prosecution claim.

Speed's motion also fails because his only evidence of alleged vindictiveness is "that the additional charge was brought at a point in time after his exercise of a protected legal right"—that the government charged him with a felony after he went to trial in another district and set a

trial date here. *Goodwin,* 457 U.S. at 382 n.15. Under *Goodwin,* that is insufficient. That his initial trial on firearms charges in another district resulted in a deadlocked jury and a mistrial does not change the analysis; jury deadlock is not the "exercise of a protected legal right," and numerous cases hold that no presumption of vindictiveness attaches when a prosecutor increases charges following an unopposed mistrial (let alone a mistrial in another district).

Presenting neither objective evidence showing actual vindictiveness nor evidence suggesting a realistic likelihood thereof that would lead to a presumption of vindictiveness, Speed fails to make out even the prima facie case required to shift the burden to the government to produce evidence of a lawful motivation for the charges. *United States v. Slatten*, 865 F.3d 767, 799 (D.C. Cir. 2017) (quoting *United States v. Meyer*, 810 F.2d 1242, 1245 (D.C. Cir. 1987)). Even were the Court to disagree, the government can point to multiple facts in the record that would readily satisfy that "admittedly minimal" burden, including the strong evidence of Speed's corrupt intent on January 6, 2021. *United States v. Meadows*, 867 F.3d 1305, 1312 (D.C. Cir. 2017) (citation omitted). This is not a vindictive prosecution. It is a well-founded one. The Court should deny Speed's motion.

## FACTUAL BACKGROUND

### I.   Speed's Criminal Conduct

On January 6, 2021, Hatchet Speed went to the Capitol "on the day of the count" to "pressure" Congress to "do the right thing, because if they don't they won't like what happens next." He wore a tactical version of a "Make America Great Again" cap with a hard-shell lining. Speed wanted Vice President Pence to swing the election to his preferred candidate by presenting an alternate slate of electors for six contested states. He trespassed on to Capitol Grounds, passed multiple layers of barriers, and came to the Lower West Terrace, where, amid a battle between rioters and police, Speed got "hit" with multiple clouds of tear gas and saw rubber bullets fly. He

breached scaffolding in place for the inauguration and climbed the stairs to the Upper West Terrace, where he saw more violent behavior—and more tear gas. At the Upper West Terrace, Speed then learned that "Pence just—just validated all of the invalid ballots from—he—he just ignored all the state legislature electors, like, and did exactly what the Democrats wanted," which he considered "absolute treason." He then joined a mob that had breached the Senate Wing Door for the second time. As Speed explained, "we all went in, and we took control," and Congress "evacuated through the tunnels." He bragged, "we made it to the Crypt with sheer force of numbers." He called the mob's efforts "impressive."

After spending approximately 40 minutes inside the building, Speed exited through a window. "[T]he reason we left," he said, "was because they started passing around a lie that said Nancy Pelosi has agreed to attend a delay of the vote." In other words, Speed believed he had achieved his objective: obstructing the certification of the electoral vote.

Speed was deeply worried about a Biden presidency. As he later explained in conversations recorded by an undercover FBI agent, Speed believes President Biden is operated by Jews, whom he believes want to destroy Christianity and kill Christians. In February 2021, Speed started "panic buying" firearms, including three illegal silencers. As he later explained to an FBI undercover agent, he had a plan to kidnap and disappear his enemies after mock trials, and he thought the silencers could come in useful for the effort. He outlined a plan to enlist Christians to wipe out the country's entire Jewish population and described his aspiration to improve upon the efforts of Ted Kaczynski and Eric Rudolph.

## II.   Initial Charges and Plea Offer

On June 22, 2022, Speed was arrested on a complaint charging him with four misdemeanors in connection with his role in the breach of the Capitol. ECF No. 5. During the search of his residence and a storage unit that day, law enforcement also seized items including

clothing consistent with what Speed had worn at the Capitol, firearms, and three unregistered silencers. On July 18, 2022, Speed was charged by information with the same four misdemeanors alleged in the complaint. ECF No. 20.

The next day (July 19), the Court entered its Standing Order for Misdemeanor Cases and set an initial status hearing for July 21. ECF No. 22. The Court's Standing Order stated (in part) that "[t]he Government is also expected to provide any plea offer that it intends to make no later than the Initial Status Conference." *Id.* ¶ 2. The Standing Order further noted that "The Court will typically schedule a second status conference approximately 60 days after the Initial Status Conference." *Id.* ¶ 3. "If the parties have not reached a plea agreement by the time of this Status Conference, the Court will set a trial date." *Id.*

Accordingly, the government issued a plea offer on July 19. The offer allowed Speed to plead guilty to the charge of parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), a six-month misdemeanor. The government gave Speed more than 45 days to consider the offer, setting a deadline for September 6, which, assuming the second status conference was set approximately 60 days out from the initial status on July 21, would allow the parties adequate time to exchange wet-ink copies of the plea agreement and submit them to the Court by the time of the second status conference.

Government counsel also called Speed's counsel to discuss the plea offer. The government explained that it had been a close call not to charge Speed with obstructing an official proceeding initially, that the investigation was continuing, and that the government might revisit the charges if and when the case went to trial. Defense counsel did not ask the government about any potential firearms charges, even though National Firearms Act statutes had been listed on the search warrant.

Prosecutors in the Eastern District of Virginia later received a report from the Bureau of Alcohol, Tobacco, and Firearms regarding three devices seized during the execution of the search warrant on June 22. The report concluded that the devices were silencers, establishing the basis for Speed's Virginia-based prosecution under the National Firearms Act.

In early September, the government and Speed exchanged comments on the proposed plea. Then, on September 6, a grand jury in the Eastern District of Virginia indicted Speed on three felony counts of possession of an unregistered firearm (a silencer). Indictment, *United States v. Speed,* 22-cr-165 (MSN) (E.D. Va. Sept. 6, 2022) ("E.D. Va. Silencer Case"). Government counsel in the District of Columbia did not have control over the charging decision or the grand jury calendar in the Eastern District of Virginia. Despite being on notice (from the search warrant) of an investigation relating to National Firearms Act charges for approximately six weeks, Speed's counsel claimed he was surprised by the indictment.

Recognizing that Speed's interest in its plea offer might change in light of the new charges, the government did not shut down plea negotiations on September 6, its original deadline. Rather, the government called defense counsel and asked, on September 12, if Speed was still interested in its original plea offer. That same day, Speed rejected the offer.

On September 22, Speed was arraigned on the firearms indictment in the E.D. Va. Silencer Case. Minute Entry, *Speed,* 22-cr-165 (MSN), ECF No. 17.  On September 30, 2022, at the second status conference in this case, the Court set a February 14, 2023 trial date (which the Court later reset to February 6).  By October 18, Speed had rejected a plea offer in the E.D. Va. Silencer Case.

### III.   Trial Outcomes in Other Cases, Trial Preparation, and Speed's Trials and Conviction in the Eastern District of Virginia

During the fall, in preparation for trial, the government added a second attorney to the case. Undersigned counsel turned her attention to preparing for trials set for December 2022 and January 2023 in *United States v. Worrell,* 21-cr-292 (RCL) and *United States v. Southard-Rumsey,* 21-cr-387 (APM), and preparing detailed sentencing memoranda for three felony defendants in *United States v. Tenney,* 21-cr-640 (TFH), and *United States v. DeCarlo et al.,* 21-cr-73 (BAH), who were sentenced on December 2 and December 9. The *Worrell* trial date was later vacated and, after the sentencing proceedings concluded and *United States v. Southard-Rumsey* reached a pre-trial resolution in early December, the government began devoting more time to trial preparation for this case. The government also obtained additional video evidence showing the defendant at the Lower West Terrace during a time when violent battles between police and rioters took place, in the Northwest Courtyard witnessing the violent breach of the Parliamentarian Door, and inside the Capitol. After issuing the plea offer in this case, the government also tried several other January 6 defendants for violations of 18 U.S.C. § 1512(c)(2), including in *United States v. Bledsoe,* 21-cr-204 (BAH), *United States v. Herrera,* 21-cr-619 (BAH), *United States v. Fitzsimons,* 21-cr-158 (RC), *United States v. McCaughey,* 21-cr-40 (TNM), *United States v. Jensen,* 21-cr-6 (TJK), *United States v. Strand,* 21-cr-85 (CRC), *United States v. Rhodes,* 22-cr-15 (APM), *United States v. Brock,* 21-cr-140 (JDB), *United States v. Schwartz,* 21-cr-178 (APM), *United States v. Egtvedt,* 21-cr-177 (CRC), *United States v. Weeks,* 21-cr-247 (TFH), *United States v. Grider,* 21-cr-22 (CKK), and *United States v. Sandoval,* 21-cr-195 (TFH).

Meanwhile, Speed's trial in the E.D. Va. Silencer Case began on December 12. Minute Entry, *Speed,* 22-cr-165 (MSN), ECF No. 87. Speed was represented by the same counsel who

represent him here. Undersigned counsel, who had not previously seen the defendant or defense counsel in person, was present in the gallery on December 13 for the conclusion of the presentation of evidence and closing arguments. The jury deliberated for the next three days without reaching a verdict. Dec. 14, 2022-Dec. 16, 2022 Minute Entries, *Speed,* 22-cr-165 (MSN), ECF Nos. 90, 92, 93. During this time, one juror had to be excused after he did outside research, and there was a delay before an alternate could be seated and the jury could resume deliberations. *See* Dec. 14 and 15, 2022 Minute Entries, *Speed,* 22-cr-165 (MSN), ECF Nos. 90, 92. On December 16, the court declared a mistrial, which the government did not oppose. *Speed,* 22-cr-165 (MSN), Dec. 16, 2022 Trial Tr. at 26-29 (attached as Exhibit 1). The government immediately requested a speedy retrial, which the court set for January 17. *Id.* at 29, 34.

Trial preparations for this case continued. For example, the government gathered and summarized certain evidence regarding Speed's intent on January 6, 2021, as part of the Rule 404(b) notice it disclosed on December 27, 2022. In early January 2023, the prosecutors received approval to seek Speed's indictment on charges of obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2). On January 4, 2023, a week before the January 11 grand jury sitting, government counsel informed Speed's attorneys of the pending indictment and schedule, describing the January 11 indictment date as "potential" because the materials had not been finalized and approved, and the indictment had not yet been signed. Defense counsel did not at that point request an opportunity to reconsider the original plea; in fact, defense counsel did not respond at all. The grand jury did return the indictment on January 11. ECF No. 38. Trial preparations continued.

Speed's retrial in the E.D. Va. Silencer Case occurred on January 17 and 18. Minute Entries 138, 140, *Speed,* 22-cr-165 (MSN). After a brief deliberation, the jury convicted Speed on all three counts, and the court remanded him to custody pending sentencing. *Id.* On January

19, over two weeks after the government had disclosed the pending indictment, defense counsel asked whether the government would reissue its original offer—the offer to a Class B misdemeanor that it had made at the outset of the case. The next day, the government told Speed it would not re-issue the offer and offered a plea to the obstruction charge at offense level 14 (after acceptance of responsibility) instead. Speed rejected the offer and filed a motion to continue his trial. At a hearing on January 27, the Court granted Speed's motion to continue. During the hearing, defense counsel acknowledged that it was legal for the government to bring additional charges against Speed. Nonetheless, one week later, Speed filed the instant motion.

## ARGUMENT

The standard for a motion to dismiss for vindictive prosecution is high, and Speed does not make out even a prima facie case. The law is settled that the government is not beholden to its initial charging decision; nor does the early plea offer here, issued in accordance with the Court's standing order and offering the benefits of a swift resolution of the case, set the outer bounds for the charges the government can ultimately bring. As the government prepares for trial and the evidence crystallizes, it is well within its rights to revisit its charging decision and determine whether additional charges were warranted. Here, the additional count clearly was.

The fact that a mistrial occurred after a jury deadlocked on other charges in another district also does not establish a "realistic likelihood" that Speed was indicted solely because he exercised a protected right. Among other issues with this theory, which has been rejected by numerous circuits, a jury deadlock is not the defendant's exercise of any "legally protected right."

Even were Speed to establish a presumption of vindictiveness, his motion would fail. Numerous objective reasons support the government's decision to indict, including (1) the verdicts in numerous trials on the same charge, which occurred after the initial plea offer was

made; (2) additional video evidence the government obtained that supported the obstruction charge; (3) the government's concern that Speed posed a danger to the community; and (4) the strength of the evidence of Speed's corrupt intent. All these are more than enough to make the "minimal" showing that Speed was not indicted "solely" to punish him for exercising a legal right. *Meadows*, 867 F.3d at 1312; *Goodwin*, 457 U.S. at 380 n.11.

## I.      Legal Standard

"Prosecutorial vindictiveness' is a term of art with a precise and limited meaning." *Meyer*, 810 F.2d at 1245 (citing *Goodwin*, 457 U.S. at 372). The doctrine "precludes action by a prosecutor that is designed to penalize a defendant for invoking any legally protected right available to a defendant during a criminal prosecution . . . ." *United States v. Safavian*, 649 F.3d 688, 692 (D.C. Cir. 2011). It is traditionally seen in cases in which the prosecution adds additional charges after the defendant successfully appeals. *Id.*

Prosecutors have "broad discretion to enforce the law, and their decisions are presumed to be proper absent clear evidence to the contrary." *Slatten*, 865 F.3d at 799 (citing *United States v. Armstrong*, 517 U.S. 456, 464 (1996)). To succeed on a claim of vindictive prosecution, a defendant must show "that the increased charge was 'brought *solely* to "penalize" [him] and could not be justified as a proper exercise of prosecutorial discretion.'" *Id.* (quoting *Goodwin*, 457 U.S. at 380 n.12) (emphasis in *Slatten*).

There are two ways a defendant may make this showing: "through objective evidence showing actual vindictiveness, or through evidence 'indicat[ing] a "realistic likelihood of vindictiveness,"' which gives rise to a presumption that the government must then attempt to rebut." *Id.* (quoting *Meyer*, 810 F.2d at 1245). "The mere possibility that [a] second indictment was vindictively motivated does not suffice." *United States v. Gary*, 291 F.3d 30, 34 (D.C. Cir. 2002). If defendant's evidence raises a presumption, the government may then overcome it "with

'objective information in the record justifying the increased sentence [or charges].'" *Maddox v. Elzie*, 238 F.3d 437, 446 (D.C. Cir. 2001) (quoting *Goodwin*, 457 U.S. at 374). "That burden is 'admittedly minimal -- any objective evidence justifying the prosecutor's actions will suffice.'" *Meadows*, 867 F.3d at 1312 (quoting *Safavian*, 649 F.3d at 694)).

"To prove actual vindictiveness requires objective evidence that the prosecutor's actions were designed to punish a defendant for asserting his legal rights. Such a showing is normally exceedingly difficult to make.'" *Gary*, 291 F.3d at 34 (quoting *Maddox*, 238 F.3d at 446).

The second route—identifying evidence establishing a "realistic likelihood of vindictiveness"—requires "something more" than an increase in charges that followed the exercise of his constitutional or statutory rights. *Meadows*, 867 F.3d at 1313; *see also Safavian*, 649 F.3d at 692 ("[A] prosecutorial decision to increase charges after a defendant has exercised a legal right does not alone give rise to a presumption in the pretrial context"). This principle applies even where the evidence supporting the new charge was in the government's possession at the time of the initial indictment. "An initial indictment—from which the prosecutor embarks on a course of plea negotiation—does not necessarily define the extent of the legitimate interest in prosecution." *Goodwin*, 457 U.S. at 380. Even where the government has full knowledge of the facts, it can initially exercise its discretion to bring lesser charges." *Slatten*, 865 F.3d at 800. And, as the Supreme Court has observed, "a prosecutor may"—as part of a plea agreement— "forgo legitimate charges already brought in an effort to save the time and expense of trial." *Goodwin,* 457 U.S. at 380. The converse is likewise true: "a prosecutor may file additional charges if an initial expectation that a defendant would plead guilty to lesser charges proves unfounded." *Id*.

In the pretrial context, prosecutorial vindictiveness claims based on the addition of charges rarely succeed. "A defendant must show that the prosecutor's action was 'more likely

than not' attributable to vindictiveness." *Safavian*, 649 F.3d at 692 (quoting *Gary*, 291 F.3d at 34) (quoting *Alabama v. Smith*, 490 U.S. 794, 801 (1989))). This is a difficult showing to make in a pretrial posture, where "'the prosecutor's assessment of the proper extent of prosecution may not have crystallized,' so an increase in charges may be the result of additional information or further consideration of known information, rather than a vindictive motive." *Slatten*, 865 F.3d at 799 (quoting *Goodwin*, 457 U.S. at 381). Moreover, the "routine exercise of many pre-trial rights also weakens any inference of vindictiveness, *i.e.*, that a prosecutor would retaliate simply because a defendant sought a jury trial or pleaded an affirmative defense." *Id.* In addition, "'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.'" *Meadows*, 867 F.3d at 1313 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)). Thus, in the pretrial context, "there must be something more" than an increase in charges following the exercise of rights "for a presumption to arise." *Id.* (citation omitted).

In *Goodwin,* the Supreme Court addressed a situation where the government initially charged a defendant with misdemeanors and then added a felony charge after the defendant requested a jury trial. *Goodwin*, 457 U.S. at 370. The Court declined to apply a presumption of vindictiveness. It explained, "[t]here is good reason to be cautious before adopting an inflexible presumption of prosecutorial vindictiveness in a pretrial setting. In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution *or he simply may come to realize that information possessed by the State has a broader significance.*" *Id.* at 381 (emphasis added). The Court found that

> the timing of the prosecutor's action in this case suggests that a presumption of vindictiveness is not warranted. A prosecutor should remain free before trial to exercise the broad discretion

> entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct. As we made clear in *Bordenkircher*, the initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution.

*Id.* at 381-82. "[T]he mere fact that a defendant refuses to plead guilty and forces the government to prove its case is insufficient to warrant a presumption that subsequent changes in the charging decision are unjustified." *Id.* at 382-83. The Court thus declined to presume vindictiveness simply because the government brought additional or greater charges after the defendant made a pretrial demand for a jury trial. *Id.* at 384.

## II.    Speed's Motion Establishes Neither Actual Vindictiveness Nor a Realistic Likelihood of Vindictive Prosecution

Speed fails to point to either objective evidence of actual vindictiveness or evidence indicating a realistic likelihood of vindictiveness. He therefore cannot establish a presumption of vindictiveness, and his motion must fail.

Speed identifies no direct evidence that the government acted "solely" to punish him for exercising a legal right. *Goodwin*, 457 U.S. at 380 n.11.  His incorrect characterizations of this prosecution (*i.e.* that the government has "paraded" him around as a "puppet" (ECF No. 49 at 1)) are not "evidence," let alone evidence that government's actions were "designed to punish [him] for asserting his legal rights." *Meadows*, 867 F.3d at 1311 (quotation marks omitted).[1]

### A. A Decision to Add Charges After a Defendant Exercises His Right to Go to Trial Does Not Support a Presumption of Vindictiveness

Instead, Speed attempts to establish facts showing a realistic likelihood that the government's indictment was vindictive. Speed's claim relies on the timing of the indictment in

---

[1]    Even if true (which it is not), this type of allegation would not demonstrate *vindictiveness*.  *Meadows*, 867 F.3d at 1311-12 ("our concerns over alleged vindictiveness do not relate to whether a prosecutor has acted maliciously or in bad faith, but whether a prosecutor's actions are designed to punish a defendant for asserting her legal rights.") (citation omitted).

this case: that the government brought a felony charge after Speed rejected a plea offer in this case and exercised his right to go to trial in this district and in the Eastern District of Virginia. Mot. at 7 ("Put plainly, the timing of the government's superseding indictment soundly rebuts any presumption of regularity in this prosecution.") As defendant does not acknowledge, that is the precise argument that the Supreme Court rejected in *Goodwin*. *See Goodwin* at 457 U.S. at 382 n.15 (rejecting vindictiveness claim where "the only evidence [the defendant] was able to marshal in support of his allegation of vindictiveness [was] that the additional charge was brought at a point in time after his exercise of a protected legal right"); *see also Meadows*, 867 F.3d at 1312 (affirming district court's finding that no presumption of vindictiveness attached where defendant was indicted on six felony counts after rejecting two plea offers and refusing to cooperate with the government).

In *Goodwin*, as here, the defendant was charged originally with misdemeanors; after he exercised his right to go to trial, he was indicted on felony charges. The observations that led the Supreme Court to reject Goodwin's vindictiveness claim are equally dispositive of Speed's. As in *Goodwin,* "the initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution." *Id.* at 382. Such was the case here. The government first charged Speed with misdemeanors, and, in compliance with the Court's expectations, offered Speed a plea to a misdemeanor charge, which gave consideration for a prompt acceptance of responsibility. The government made this offer at a time that only half a dozen obstruction cases arising from January 6 had proceeded to verdict. As the government

made clear in July 2022, months before Speed was even charged in Virginia, a felony obstruction charge was on the table based on the facts of the case.[2]

*Goodwin* recognized that, early in a case, before extensive trial preparation is complete, "the prosecutor's assessment of the proper extent of prosecution may not have crystallized,' so an increase in charges may be the result of additional information or further consideration of known information, rather than a vindictive motive." *Slatten*, 865 F.3d at 799 (quoting *Goodwin*, 457 U.S. at 381). It was entirely appropriate for the government to revisit its charging decision (as it disclosed to defense that it would) as it formed a trial team and the evidence increasingly "crystallized," particularly viewed in light of the government's trial record. In addition, the government identified additional video evidence that strengthened its case. As *Goodwin* observed, "[a]n initial decision should not freeze future conduct."

Recently, Judge Moss rejected a prosecutorial vindictiveness claim based on the filing of additional charges after the defendants elected to go to trial, relying on *Goodwin. United States v. Allgood,* No. 21-cr-416 (RDM), -- F. Supp. 3d ---, 2022 WL 2643555 (D.D.C. July 7, 2022)*.* In *Allgood,* five days after the defendants exercised their speedy trial rights and the court set a trial date, the government notified defendants of its intent to bring additional charges, including mandatory minimum terms of incarceration. *Id.* at *7. Soon thereafter, the government superseded with additional charges and a provision providing for a twenty-year mandatory minimum sentence. *Id.* Defendants moved to dismiss, arguing that the government acted vindictively to punish them for asserting their speedy trial rights. *Id.* at *4. They argued that they had established a "realistic likelihood" of vindictiveness based on (1) the timing of the government's decision to supersede, (2) the fact that the government "long knew" the

---

[2]    The Supreme Court in *Bordenkircher* held that a warning (or even a "threat") during plea negotiations to indict on more serious charges if the defendant does not plead guilty to the offense charged does not support a vindictiveness claim. *Bordenkircher,* 434 U.S. at 362-65.

information justifying the additional charges, (3) the lack of a prior warning about the additional charges, and (4) the absence of a nexus to plea negotiations.[3] Judge Moss found defendants' argument "at odds" with *Goodwin,* where the same facts were present, but did not create a presumption of vindictiveness. *Id.* at *7. *See also United States v. Simmons,* No. 18-cr-344 (EGS), 2022 WL 1302888, at *18 (D.D.C. May 2, 2022) (rejecting prosecutorial vindictiveness claim where "there is 'no fact beyond the mere sequence of events to support any presumption of improper motivation.'") (citing *United States v. Mills*, 925 F.2d 455, 463 (D.C. Cir. 1991), *overruled on other grounds by United States v. Mills,* 964 F.2d 1186, 1193 (D.C. Cir. 1992).

The facts here are even less compelling than those Judge Moss found unpersuasive in *Allgood* and which the Supreme Court held did not establish a presumption of vindictiveness in *Goodwin.* In *Goodwin,* the prosecutors added the felony charges approximately six weeks after the defendant exercised his right to a jury trial; in *Allgood,* only five days elapsed between defendants' exercise of their rights and the government notifying them of its intent to supersede. *Goodwin,* 457 U.S. at 371, *Allgood,* 2022 WL 2643555, at *7. Here, Speed rejected a plea offer in this case on September 12, 2022, and in the E.D. Va. Silencer Case by October 18, 2022; both cases were set for trial at hearings in September 2022. Thus, the government knew Speed was exercising his right to go to trial 3-4 months before it indicted Speed in this case on January 11, 2023. And, unlike in *Goodwin* and *Allgood,* the government warned Speed of the possibility of a felony charge at the outset of the case (and before he had even been charged in Virginia); it did not wait until after Speed exercised his right to go to trial.

---

[3]     The *Allgood* defendants also made an "actual vindictiveness" argument, based on a supervisor's comments to a defense attorney. *Allgood,* 2022 WL 2643555, at *5. Judge Moss rejected this claim, finding that defendants failed to show that the supervisor's comments were motivated by defendants' assertion of their speedy trial rights. *Id.*

Moreover, and again unlike in *Goodwin* and *Allgood*, Speed's claim is largely premised on proceedings in another jurisdiction (the Eastern District of Virginia), not his exercise of rights in this case. The AUSAs in this district had no authority over charges, plea offers, or the trial in that case, and vice versa. It is even less likely that the government would punish a defendant for exercising a right in another case over which it had no control or authority.

While defendant points to no analogous cases, the D.C. Circuit did recognize a presumption of vindictiveness pre-trial in *Meyer,* 810 F.2d at 1245*. Meyer* however, is readily distinguishable, and its holding was "limited to the precise circumstances of this case." *Id.* at 1248; *see also Meadows*, 867 F.3d at 1314 ("[T]he facts in *Meyer* were unusual."). *Meyer* arose out of the arrest of 200 defendants, each of whom had the chance to pay $50 to resolve his or her charges. *Id.* at 1243. Those who chose to go to trial were charged with an additional crime, as they learned at their arraignments (all of which took place on three days). *Id.* at 1244. Judge Moss recently had "little difficulty concluding that *Meyer* [was] inapposite" in *Allgood,* 2022 WL 2643555, at *8, and similar reasons distinguish *Meyer* here. For example, here there is no allegation of disparate treatment (*i.e.*, unlike in *Meyer,* Speed does not and cannot allege that all non-pleading defendants are charged with additional crimes); the government has not offered to drop the felony charge; the case does not involve the "simplicity and clarity of both the facts and law underlying [the] prosecutions" present in *Meyer,* and the felony charge was not added to avoid the "annoyance and expense" of a "potentially drawn out trial"; and the addition of a felony charge against Speed made a trial more likely. *Meyer,* 810 F.2d at 1246-47.  Finally, in *Meyer,* the government "never attempted to rebut the presumption." *Id.* at 1249. Assuming such a presumption exists here, the government does (see Section III, *infra*).

**B.   A Decision to Bring Additional Charges After a Mistrial Resulting from Jury Deadlock in Another District Does Not Support a Presumption of Vindictiveness**

Speed also claims that the government acted vindictively because it added a charge following the result of his first trial in E.D. Va. Silencer Case, where the jury deadlocked and the Court declared a mistrial, without opposition from the government. Mot. at 6-7. Speed asserts that the mistrial "embarrassed" the government and that the government sought to "punish" Speed for "challenging" its case in chief. *Id.* at 2. There are zero facts suggesting that "embarrassment" or retaliation motivated the government, and Speed's recounting of the circumstances regarding the mistrial and subsequent indictment contains inaccuracies.[4] In any event, precedent again forecloses Speed's claim.

Whenever a jury deadlocks and the government then files new charges, the defendant could make the same allegations Speed raises here: that the government has brought the new charges because it was "embarrassed" by a mistrial or because it was angry at the defendant for challenging its case. Many circuits have considered such claims, and found that, when a jury deadlocks and the government does not oppose a mistrial, there is "no realistic likelihood of vindictiveness" where the government then brings additional charges. *See, e.g., United States v. Perry,* 335 F.3d 316, 324 (4th Cir. 2003); *see also United States v. Whaley*, 830 F.2d 1469, 1478-79 (7th Cir. 1987), *abrogated on other grounds by United States v. Durrive*, 902 F.2d 1221 (7th Cir. 1990)); *see also, e.g., United States v. Khan*, 787 F.2d 28, 32–33 (2d Cir. 1986); *United States v. Mays*, 738 F.2d 1188, 1190 (11th Cir. 1984)). When the jury deadlocks, the mistrial occurs for a neutral reason, not because of some right the defendant exercised.  The mistrial is based on "trial events largely beyond [the defendant's] control," *Perry,* 335 F.3d 316, 324; *Mays,*

---

[4]      For example, Speed accuses the government of "last-minute gamesmanship" by making the decision to indict "less than one week before Mr. Speed's Virginia retrial." ECF No. 49 at 2. The government informed Speed of its decision to seek indictment on January 4, nearly two weeks before the retrial.

738 F.2d at 1190 ("The mistrial follows as a matter of course from the jury's inability to agree upon a verdict. It does not result from an attack upon a conviction.") In such a situation, "there is no reason to presume that the United States Attorney was 'punishing' [the defendant] by filing a new charge against him." *Id.* After "a mistrial occurring for neutral reasons, such as a hung jury, and without objection from the government, no presumption of vindictiveness is raised because there is no reason why the prosecutor would consider the defendant responsible for the need for a new trial." *United States v. Contreras,* 108 F.3d 1255, 1263 (10th Cir. 1997) (citations omitted).

In *Contreras,* the government filed additional charges after the Court declared a mistrial following more than six weeks of jury deliberations; neither the government nor the defense objected. *Id.* After the mistrial declaration, the government received negative publicity. *Id.* It then obtained a superseding indictment with additional charges based on facts of which it was aware before defendant's first trial. *Id.* The Tenth Circuit found that these facts did not create a presumption of vindictiveness. *Id.* The mistrial had been declared for "neutral, uncontrollable reasons" (the deadlocked jury), and the new charges were not filed because the defendant had exercised "a specific legal right." *Id.* Adverse media coverage did not change the equation. Here, Speed's bare allegation that the government was "embarrassed" by the mistrial is an even thinner basis.

Likewise, in *Khan,* 787 F.2d at 32–33, the Second Circuit considered and dismissed the possibility that a prosecutor might conceivably have a vindictive attitude because he was "forced to do something over again that he thought he had done correctly the first time." The Fifth Circuit has similarly observed that "[a]bsent evidence of actual retaliation, mere reindictment after a mistrial due to a hung jury is insufficient to demonstrate the realistic likelihood of

prosecutorial vindictiveness." *United States v. Ruppel*, 666 F.2d 261, 267 (5th Cir.), cert. denied, 458 U.S. 1107, (1982).[5]

If there is no presumption of vindictiveness when a prosecutor adds charges after a mistrial in his or her *own case*, surely there cannot be one when a prosecutor in another district, who played no role at the first trial (and is not "embarrassed" by the result) and does not bear the burden of retrying the defendant, does so.[6]  And, unlike in a mistrial in a prosecutor's own case, which occurs, obviously, once the government has assembled and put on its case at trial, the

---

[5]      The D.C. Circuit's decision in *United States v. Jamison*, 505 F.2d 407 (D.C. Cir. 1974) does not require a different result. That case appears to no longer be good law and, in any event, is readily distinguishable. In *Jamison*, the court found "the fact that a prosecutor may not in fact have acted out of vindictiveness" to be "not determinative" because of the possible "*apprehension* on the defendant's part of receiving a vindictively-imposed penalty for the assertion of rights." 505 F.2d at 415. But *Goodwin* made clear that it *is* "determinative" if the prosecutor did not act out of vindictiveness: the question is whether "additional charges were brought *solely* to 'penalize' the defendant," 457 U.S. at 380 n.12 (emphasis added), and a presumption of vindictiveness may "be overcome by objective evidence justifying the prosecutor's action," *id.* at 376 n.8. Moreover, as the Circuit subsequently recognized, *Jamison* required that the government justify its charging decision at the time of the superseding indictment, 505 F.2d at 416, which is inconsistent with *Goodwin*'s declaration that "'the prosecutor is not required to sustain any burden of justification' until after the defendant comes forward with evidence of vindictiveness," *Slatten*, 865 F.3d at 801 (quoting *Goodwin*, 457 U.S. at 384 n.19, and rejecting argument based on *Jamison*).

     The mistrial in *Jamison* is also factually unlike the situation here. In *Jamison,* the court declared a mistrial over the government's objection, and based on the actions of the defense, not because of a deadlocked jury. 505 F.2d at 409. This gave the government a possible retaliatory motive that does not exist when the government does not object to the mistrial, as other courts have recognized when distinguishing *Jamison*. *See United States v. Doran*, 882 F.2d 1511, 1520 (10th Cir. 1989); *United States v. Marrapese*, 826 F.2d 145, 149 (1st Cir. 1987); *Khan*, 787 F.2d at 33; *United States v. Alviles-Sierra*, 578 F. Supp. 2d 235, 238-30 (D.P.R. 2008). Moreover, *Jamison* involved the addition of charges in the same case which had ended in a mistrial, not in a different case brought by different prosecutors in a different district, further diminishing the likelihood of any alleged retaliatory motive.

[6]      *Perry* recognized that "a presumption of prosecutorial vindictiveness is generally warranted only in a post-conviction setting," and that "Courts have been extremely cautious in applying the presumption in the pretrial context." *Perry,* 335 F.3d 324. In *Perry,* the court treated a decision following a mistrial as falling between the two. *Id.* Unlike in *Perry,* this case is still pre-trial, during which, under *Goodwin,* the government may generally permissibly increase charges after a defendant elects to go to trial or declines to take a plea. And yet, even under the more forgiving standard applied in *Perry,* the mistrial did not raise a presumptive of vindictiveness.

mistrial in the E. D. Va. Silencer Case came when the government's own trial preparations in this case had just begun. The prosecution here is not being "asked "to do over what it thought it had already done correctly." *Goodwin,* 457 U.S. at 383 (citation omitted). The prosecutors in this district were squarely in the pre-trial posture during which, as *Goodwin* recognized, the government may permissibly reassess the facts as they "crystallize" and decide that additional charges are appropriate. And, as noted above, the prosecutors in the Eastern District of Virginia had no authority to compel prosecutors in this district to charge Speed with a felony, let alone dictate charging decisions pertaining to Speed's D.C-based conduct.

Speed's own citation to *United States v. Wilson,* 262 F.3d 305 (4th Cir. 2001), demonstrates that the Court should not presume that any animus against a defendant in one district transfers to another. In *Wilson,* Fourth Circuit refused to apply a presumption of vindictiveness to an Eastern District of North Carolina prosecution that occurred after the defendant's conviction on another crime in the District of South Carolina was reversed on appeal, even though the District of South Carolina had asked the Eastern District of North Carolina to prosecute the defendant. *Id.* at 310. Because Wilson offered no evidence that one district's alleged "animus" was "transferred" to another—that the District of South Carolina was "required to act on the request [from the first district] or felt any compunction to act for any reason other than the duty to prosecute cases in the public interest," the Fourth Circuit rejected his claim. *Id.* Speed's case is even weaker. As explained above, unlike an appeal, a mistrial is not an exercise of a legal right or the kind of event held to create "animus." Speed has no evidence that D.D.C. prosecutors indicted at E. D. Va.'s command or request.

Moreover, the government should not be barred from considering the outcome of the trial in the first E. D. Va. Silencer Case as a factor its charging decision. Just as the government can decide to forgo charges if another jurisdiction (or sovereign) is holding a defendant accountable

for his or her criminal conduct, the government may also validly consider the reverse situation. "A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution." *Goodwin*, 457 U.S. at 382. Here, the "societal interest" in prosecuting Speed for a felony charge could be different where he has been recently convicted of three other felonies elsewhere than where he has not. *See United States v. Taylor*, 749 F.2d 1511, 1514 (11th Cir. 1985) (finding no vindictiveness where government brought charges for possession of hashish after defendant's cocaine distribution charge was reduced to simple possession and holding that "the prosecutor's motivation for indicting Taylor on additional charges was to secure a conviction and sentence commensurate with his assessment of Taylor's criminal conduct"). The desire to protect the community from a dangerous person—a person who had breached the Capitol, stockpiled weapons, and described a plan to kidnap and kill his political enemies—is a permissible motive. Mot. for Cond'ns of Release, ECF No. 6, at 5–6. The government announced its concern that Speed posed a danger from the outset, taking the rare step of filing a detention-related memorandum in a misdemeanor case and requesting that Speed be placed on home detention, a request that the magistrate judge granted. *Id.*; June 23, 2022 Minute Entry. Charging Speed with a crime he committed out of concern that he might go free and threaten the community, and not in retaliation for the exercise of a political right, is legal. *See, e.g., Wilson,* 262 F.3d at 320 (prosecutor's "concern that the defendant might soon be on the street and would thus pose a danger to the community" following a successful appeal was a "legitimate prosecutorial motive"). "[S]uch a motivation is in furtherance of the public interest, not in vindication of the personal interests of the prosecutor to punish" Speed, especially when Speed's mistrial did not even occur in this district. 262 F.3d at 317.

Here, even if the government's sole motive were to ensure that Speed sustained a felony conviction somewhere (as Speed insinuates), the government would ostensibly have accepted

Speed's proposal to plead guilty to a misdemeanor once he had been convicted of felonies in the Eastern District of Virginia. The jury's swift conviction of Speed at his retrial also would likely have purged any alleged "embarrassment" (that supposedly transferred from the prosecutors in the E.D. Va. Silencer Case to the prosecutors here), again leading the government to accept Speed's offer. But the government declined to revive its original plea proposal, and instead issued a plea offer to the felony charge. This fact demonstrates the government's belief in the "societal interest" of the new charge, rebutting a claim that the government added the charge solely to ensure Speed was convicted of some felony somewhere.

## III.   Even Had Speed Established a Presumption of Vindictiveness, He Would Not Prevail

Even if Speed had met his burden to establish a presumption of vindictiveness, the government could readily overcome that presumption with "'objective information in the record justifying the increased sentence [or charges].'" *Maddox*, 238 F.3d at 446 (quoting *Goodwin*, 457 U.S. at 374)." The government could point to multiple developments between the initial charging decision and the indictment. After the initial plea offer was issued in this case, verdicts in many obstruction trials involving January 6 defendants shaped the government's understanding of the type of evidence that persuades at trial. The government also identified additional video evidence showing Speed on the Lower West Terrace and the Northwest Courtyard, where he witnessed acts of property destruction and police resistance. These facts are more than enough to satisfy the "minimal" burden on the government, demonstrating that the new charge was not brought "solely" to penalize Speed. *Meadows*, 867 F.3d at 1312 (quoting *Safavian*, 649 F.3d at 694)).

The government's decision, however, need not rest on developments that post-date the original charging decision; the prosecutors also "simply may come to realize that information possessed by the State has a broader significance." *Goodwin,* 457 U.S. at 381. Here, as outlined

above, the evidence of Speed's corrupt intent is compelling. While still on Capitol Grounds, Speed texted a friend: "We made it to the crypt with sheer force of numbers. Then we heard that the capital had been evacuated, the vote postponed. So I backed out, but some are still in there, riot cops are streaming in on the south side." This single text message shows that Speed used illegal means—joining a mob that breached the Capitol through "sheer force of numbers"—and demonstrates that Speed's objective was to obstruct the proceeding. He left the Capitol Building only once he thought the mob had successfully obstructed the certification. Speed's other text messages, emails, and recorded statements corroborate these admissions and establish the many red flags Speed witnessed and disregarded on his path to the Capitol Building, including downed barriers, tear gas, rubber bullets, other rioters damaging property, alarms, and police in riot gear. This evidence further demonstrates that Speed acted with consciousness of wrongdoing. Speed's statements also include lengthy, detailed descriptions of both the certification process and alleged fraud and improprieties in the 2020 presidential election, leaving no question that he acted knowingly.

This strong evidence of Speed's corrupt intent, which further "crystallized" as the government prepared for trial (for example, as the government prepared its Rule 404(b) notice), demonstrates that the new charge does not "solely" result from the defendant's exercise of a protected legal right but reflects "the prosecutor's normal assessment of the societal interest in prosecution." *Goodwin*, 457 U.S. at 380 n.11. *See, e.g.*, *Meadows*, 867 F.3d at 1315 (observing that "the government's evidence regarding the severity of Meadows' fraudulent conduct—which continued for approximately a year, involved two separate false filing schemes, and resulted in approximately 49 false claims—was sufficient to satisfy this court's admittedly minimal requirement of any objective evidence") (internal quotation marks and citations omitted); *United States v. Johnson*, 171 F.3d 139, 141 (2d Cir. 1999) (bringing weapons charge based on evidence

that predated defendant's acquittal on RICO charge "is entirely legitimate, and certainly cannot be considered vindictive.") The government's procurement of an indictment was lawful and appropriate. *See Gary*, 291 F.3d at 34 (government's effort to prevent defendant from "escape[ing] punishment for her criminal conduct" not vindictive).

## IV.     Speed is Not Entitled to Discovery

Because Speed fails raise even a presumption of vindictiveness, he is not entitled to discovery on his claim. As Chief Judge Howell recently observed, while the Supreme Court and D.C. Circuit have yet to establish the standard for ordering discovery on a vindictive prosecution claim, "other courts to address this issue have adopted the standard articulated in *Armstrong* for selective prosecution claims, holding that a defendant must provide some objective evidence tending to establish the vindictive prosecution defense in order to obtain discovery." *United States v. Oseguera Gonzalez*, 507 F. Supp. 3d 137, 175 (D.D.C. 2020) (citing *United States v. Bucci*, 582 F.3d 108, 113 (1st Cir. 2009); *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000); *Wilson*, 262 F.3d at 315). "This approach is sensible. The presumption of regularity applied to prosecutorial judgments applies equally in both contexts, as do the concerns about "divert[ing] prosecutors' resources and ... disclos[ing] the Government's prosecutorial strategy." *Id.* (citing *Armstrong*, 517 U.S. at 468). Defendant's allegations, which do not support even a presumption of vindictive prosecution—fall short of this standard. *Cf. United States v. Judd,* 579 F. Supp. 3d 1, 5-9 (D.D.C. 2012) (finding by the Court that defendant failed to make the "rigorous" and "demanding" showing required to support discovery on selective prosecution claim, even though he raised "troubling questions" about certain charging decisions).

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court should deny defendant's motion.

Respectfully submitted,

Matthew M. Graves
United States Attorney
D.C. Bar No. 481052

By:   /s/*Alexis J. Loeb*
Alexis Loeb, CA Bar No. 269895
(Detailed)
Kyle M. McWaters, D.C. Bar No. 241625
Tighe Beach, CO Bar No. 55328
Assistant United States Attorneys
601 D Street NW
Phone: (202) 252-6983
Email: alexis.loeb@usdoj.gov