**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-244 (TNM)** |
| **v.** | : | |
| | : | |
| **HATCHET SPEED** | : | |

## GOVERNMENT'S TRIAL BRIEF

The United States, by and through its attorneys, respectfully submits this brief summarizing the government's evidence at trial and legal issues that may be brought before the Court. As described below, the government's evidence will include videos, testimony from law enforcement witnesses, and admissions made by the defendant in the form of statements made to an undercover FBI agent, text messages, and other communications. In an effort to streamline its presentation for this bench trial and focus on the matters in dispute, the parties have agreed in principle to certain stipulations. The parties have also reached agreement on the admission of some exhibits. Based on these stipulations and agreements, the government expects to rest its case Friday, March 3, 2023.

## I.      THE JANUARY 6 CAPITOL RIOT AND THE DEFENDANT'S ACTIONS

Hatchet Speed believed that massive fraud had occurred during the 2020 presidential election and that it had been "stolen." Speed held this belief so fervently that, when he learned that Vice President Pence had not intervened during the certification of the Electoral College vote in President Trump's favor, he breached the U.S. Capitol building, joining a raucous and violent mob that overran the police – an effort he called "impressive." He did so despite many indicators that his actions were illegal. The defendant stayed inside the building for 40 minutes and left only when he believed that Speaker Pelosi had agreed to stop the certification vote.

On January 6, Speed drove to Washington D.C. from his residence in Vienna, Virginia. Over text, he had touted that residence as a "Suburban environment, but close enough to the city for those days when I just wanna be part of a riot." Speed's plan on January 6 was always to go to the Capitol, but first, he attended the "Stop the Steal" rally.[1]

After attending the rally at the Ellipse, Speed traveled to the U.S. Capitol. According to Speed, he observed toppled fencing as he entered Capitol Grounds. He approached the Capitol from the west, and arrived at the West Plaza, near the Lower West Terrace by approximately 1:30 p.m. While there, Speed stated that "[law enforcement] spent a good hour hitting us with tear gas, hitting us with rubber bullets and all kinds of things." *See* Figure 1 (Speed observing a cloud of tear gas on the Lower West Plaza) and Figure 2 (Speed in the crowd of rioters on the Lower West Terrace). This area was the scene of a brutal battle between rioters and officers.

---

[1] The January 6 rally was not the defendant's first protest. With members of the Proud Boys, he had attended other rallies with a similar theme in preceding months.



*Figure 1*



*Figure 2*

Speed also observed that "there was this staircase leading up to the Senate side, where like we knew it was 'off limits' because that was, also the staircase was covered by the structure they'd set up the inauguration…and so, we were like we don't need to go up there. We're not here to go in the building. We're just here to make a statement 'we are here and we are paying attention.'" He was referring to a staircase that led from the Lower West Terrace to the Upper West Terrace, which was partially covered in scaffolding for the inauguration.

Speed, however, did decide to climb the stairs and reached the Upper West Terrace and the Northwest Courtyard, which he described as "this huge portico porch thing which can hold a

couple thousand people." There, he saw more tear gas and violence. Once at the Northwest Courtyard, Speed heard that Vice President Mike Pence had "validated" certain ballots he considered "invalid." To Speed, Pence's act was a betrayal. No longer content to stay outside, he said "I was like, 'I'm going in there. Like I have no respect for people in this building. They have no respect for me. I have no respect for them.'" Speed stated, "[S]o we all went in and we took control. Like, when you have that many thousands of people, like there's nothing the cops can do…it's impressive."

At approximately 2:51 p.m., Speed entered the building through the Senate Wing Door, which rioters had violently breached only two minutes earlier. As he entered, an alarm rang out. He walked up to a line of police in riot helmets, surrounded by angry chants and yells from the crowd. Speed then continued to the Crypt. Around 3:02 p.m., Speed made his way briefly through a hallway leading toward the House side of the Capitol, where a line of police was stationed. He then returned to the Crypt for about 25 minutes more, until just before 3:30 p.m. At that time, Speed walked back to the Senate Wing Door area, briefly removed and replaced his face mask, and hoisted himself out a window to leave the building. In total, Speed was inside the Capitol for over 40 minutes, from approximately 2:51 p.m. to 3:34 p.m.

Even after leaving the U.S. Capitol Building, Speed remained within the restricted area for at least another 40 minutes. Minutes after climbing out through the window, Speed took photos of rioters in the northwest courtyard outside the U.S. Capitol building, then proceeded to walk around to the East Front, where he took photos of more rioters on the steps. From there, Speed continued south, where he took more photos of riot police as they entered the U.S. Capitol Building to clear and secure it. He next photographed the Lower West Terrace, where the inaugural stage was now completely overrun by rioters.

While still on Capitol Grounds, Speed texted an acquaintance who was not present on January 6 that "We made it to the crypt with sheer force of numbers. Then we heard that the capitol [sic] had been evacuated, the vote postponed. So I backed out, but some are still in there, riot cops are streaming in on the south side." Speed stated that, "Some people made it to the senate [sic] chambers. America spoke today. I hope washington [sic] listens." When asked by the acquaintance if the reports that some of the rioters wanting to start a "civil war" was an exaggeration, Speed replied, "Well, if they steal the election, that's the only other place to go. We came on the day of the count to out [sic] pressure on congress [sic] to do the right thing, because if they don't they won't like what happens next."

About 45 minutes after he had left the Capitol Building, another rioter texted Speed and asked if Speed was at the U.S. Capitol. Speed responded, "Haha yep, I got some tear gas too. We made it to the crypt, then heard the vote had been postponed. So I backed out."  In other words, because Speed thought he succeeded in obstructing the certification, he left the U.S. Capitol Building.

Later on January 6, Speed continued to text Redding about his views of the stolen election, how the election was tainted with fraudulent registrations and ballots, the role of state electors, and how he believed the electoral vote count worked—sending nine long messages in a row. Speed stated that "Yesterday's vote count was the last opportunity to stop the Steal, we thought the count had been delayed and a 10 day Investigation would happen. . . ." Speed later claimed that Speaker Pelosi had promised to postpone the certification as a ruse to get rioters out of the U.S. Capitol building so the certification could proceed—she "evacuated and claimed the vote was postponed and we believed her."

On January 12, 2021, Speed sent an email recounting his experience on January 6. He stated, "I've played Wednesday back in my head a dozen times, trying to think of what we could have done differently. . . . What if we'd been less violent? What if we'd been more violent?"  He complained that Trump "surrendered on Wednesday after some people in the media called him an instigator and blamed him for some broken windows."

During its subsequent investigation of Speed, an FBI undercover employee ("UCE") met Speed, posing as a like-minded individual. During at least three different meetings with the UCE, Speed made multiple statements concerning his motive, intent, and actions on January 6. Speed explained that he had hoped that more and more people would have shown up on January 6, and "It should have gotten to the point where Nancy Pelosi should have resigned out of fear for her life. That's what should have happened." He also observed that "there are too many Americans that have this idea that we have to be peaceful all costs."

When discussing why he went into the U.S. Capitol Building, Speed stated that he did so after he learned that Vice President Pence had not put forward alternate electors. He thought this was "absolute treason" against the country. When Speed and the other rioters learned of Pence's decision, Speed said, the "mood changed. . . we just didn't even know who we were fighting for. Who were we trying to support?" Pence's "treason" motivated Speed to change his mind and decide, "I'm going in there. . ." because "I have no respect for the people in this building. . . . They have no respect for me, I have no respect for them. . . ." Speed also described how the mob "controlled the entire building," and that "Congress and Senate had evacuated through the tunnels, so nobody was there except us." Once Speed heard that the Nancy Pelosi had ordered "a delay of the vote," he left, because "that was what we wanted anyway." Speed believed he had achieved

his goal because, "'we got—we got what we needed.' All . . . we wanted was for somebody to admit that this was not an honest election and look into it. That's all we want. So we all left."

In these communications, and others, Speed demonstrated extensive knowledge of the electoral vote count slated for January 6, 2021, that it was still in progress when he entered the building, and that it was "delayed" or obstructed because of his actions in conjunction with the rest of the rioters. Further, Speed admitted that he entered the building because he heard that Pence was not going to put forward alternate electors, which meant that Congress was going to certify what he believed to be a stolen election. Speed wanted to stop that certification. He left the U.S. Capitol only because he believed he succeeded in that effort. Speed's conduct while on the U.S. Capitol Grounds and inside the U.S. Capitol Building, together with the evidence of his intent, is the principal evidence establishing that he violated 18 U.S.C §§ 1512(c)(2), 1752(a)(1), and 1752(a)(2), and 40 U.S.C. §§ 5104(e)(2)(D) and 5014(e)(2)(G).

## II.  THE GOVERNMENT'S PROOF

### A.  Stipulated Testimony

The government anticipates presenting both stipulated and live testimony at trial, as described below.

#### 1.  USSS Inspector Lanelle Hawa

In *United States v. Couy Griffin*, 21-cr-00092-TNM (March 21-22, 2022), this Court heard the testimony of United States Secret Service (USSS) Inspector Lanelle Hawa. The government will present this trial testimony from Inspector Hawa that will be relevant to prove key elements of the some of the charged offenses. Counts One and Two, which charge violations of 18 U.S.C. §§ 1752(a)(1) and 1752(a)(2), require proof that the defendant entered or remained within a restricted building or grounds. Grounds may be restricted, under this statute, if a USSS

protectee is temporarily visiting. 18 U.S.C. § 1752(c)(1)(B). Here, the former Vice President was visiting the U.S. Capitol in his capacity as President of the Senate for the proceedings relating to the certification of the Electoral College vote. Inspector Hawa's testimony proves that Vice President Pence and his wife and daughter, all Secret Service protectees, were temporarily visiting the U.S. Capitol on January 6, 2021. Inspector Hawa's testimony establishes that the Vice President presided over the entirety of the certification, and he remained at the U.S. Capitol during the riot. Inspector Hawa also testifies that the certification stopped because of rioters at the Capitol.

### 2.   Daniel Schwager (United States Senate)

In *United States v. Timothy Hale-Cusanelli*, 21-cr-00037 (TNM) (May 24-26, 2022), this Court heard the testimony of Daniel Schwager, who, on January 6, 2021 was the general counsel to the Secretary of the United States Senate. Mr. Schwager testified regarding Congress's certification of the Electoral College vote, including an explanation of the provisions governing the certification proceeding. Mr. Schwager also testified about the certification proceeding as it occurred on January 6 and 7, 2021. His testimony, and the exhibits accompanying that testimony (including a video montage of the Joint Session), establishes that the certification was an official proceeding, that it was obstructed by the riot on January 6, and provides the details of the timing of the Joint Session, its interruption, and its resumption.

### 3.   USCP Captain Carneysha Mendoza

In *United States v. Erik Herrera*, 21-cr-619 (BAH), the government called Captain Mendoza to testify as an overview witness regarding January 6, 2021. Her testimony, and the exhibits accompanying her testimony, address the timeline of January 6, 2021; the perimeter of the restricted grounds and the barriers, such as bike racks, snow fencing, and "Area Closed" signs;

the fact that the Capitol was closed on January 6; the security procedures normally in place for visitors to the Capitol; the layout of certain parts of the Capitol; and the threat caused by unauthorized individuals in the building.

### 4.  Testimony of FBI UCE

In *United States v. Hatchet Speed*, 22-cr-165-MSN (E.D. Va, Jan. 17, 2023), the United States Attorney's Office for the Eastern District of Virginia presented testimony from an FBI UCE who testified under a pseudonym at a trial against Speed for firearms charges. The parties have agreed to stipulate to a portion of this testimony. The UCE's stipulated testimony consists largely of the authentication of recordings and transcripts created during three meetings between the UCE and Speed on March 15, March 22, and April 7, 2022. The UCE also briefly describes how the FBI began investigating Speed.

### B.  Trial Stipulations

In effort to streamline the trial, the government and defendant have discussed various stipulations, in addition to the stipulated testimony summarized above. The government believes agreement has been reached (or will likely be reached) on the following stipulations: (1) an overview of the timeline and events of the certification of the Electoral College vote; (2) the operation and maintenance of the U.S. Capitol Police closed circuit video monitoring; (3) the authenticity of certain third-party videos; (4) the defendant's identity and presence on the U.S. Capitol grounds and in the U.S. Capitol building on January 6, 2021; (5) the authenticity of the recordings and transcripts from the UCE's meetings with Speed on March 15, March 22, and April 7, 2022; (6) the chain of custody of physical evidence recovered from Speed's residence; (7) the authenticity of the examination report and items recovered from Speed's cellular telephone and Google account . The parties have also agreed that certain exhibits are admissible.

The list of witnesses below reflects the assumption that the parties will finalize the stipulations to which they have agreed in principle.

### C. Live Testimony

#### 1. Inspector Thomas Loyd (U.S. Capitol Police)

While the stipulated testimony of USCP Captain Mendoza will provide many overview facts regarding the Capitol, Inspector Loyd will provide discrete piece of additional testimony regarding security measures in place at the Capitol on January 6. Inspector Loyd will also describe his experience at the riot, including his personal experience in at least one area where the defendant was present. He will also describe locations relevant to this case, introduce videos depicting the riot in those areas (CCV, limited, focused portions of a CCV montage, and third-party videos), and establish a timeline for certain relevant events. Finally, he will provide information regarding the threat and disruption that the riot caused.

#### 2. Testimony of Officer Daniel Amendola (U.S. Capitol Police)

Officer Amendola responded to the Senate Wing Door corridor on January 6, 2021 at around 2:30 p.m. after hearing calls for officer assistance come over his service radio. He aided officers in clearing the first breach of the Senate Wing Door and was at the Door when it was breached a second time around 2:48 p.m. He was present in the area when the defendant entered, less than two minutes after this breach. Officer Amendola will testify primarily about what he witnessed in and around the Senate Wing Door corridor from when he arrived until Speed left through a window in the corridor at around 3:34 p.m. He will also introduce video of the area.

#### 3. Special Agent Mariam Hanna (FBI)

Special Agent Hanna is one of the case agents assigned to Speed's case. Special Agent Hanna is expected to testify regarding evidence from the defendant's cell phone and Google

account, which is relevant to topics including the defendant's intent to obstruct the proceeding, consciousness of wrongdoing, knowledge of the official proceeding, and presence at the Capitol, consistent with the defendant's statements to the undercover FBI agent. Special Agent Hanna will also identify the defendant in certain videos taken at the Capitol on January 6 and will introduce evidence regarding items recovered from the defendant's residence.

### 4. Analyst Jay Rushing (FBI)

Jay Rushing is a Collections Operations Analyst with the FBI. He leads geospatial analysis and data management for his unit at Washington Field Office and the FBI's Operational Technology Division. Analyst Rushing plotted Google location data associated with Speed's Google account and produced visual depictions of the location data tracking Speed's journey into and around the Capitol on January 6, 2021. He will provide brief testimony relating to the defendant's location on January 6.

### D. Elements of the Crimes Alleged

The Indictment charges five offenses. The offenses are as follows[2]:

Count One

Count One of the Indictment charges the defendant with obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and (2). In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1. First, the defendant attempted to or did obstruct or impede an official proceeding;

2. Second, the defendant intended to obstruct or impede the official proceeding;

---

[2] Unless otherwise noted, the elements here reflect the jury instructions used by the Court in *United States v. Hale-Cusanelli*, 21-CR-37 (TNM).

3. Third, the defendant acted knowingly, with awareness that the natural and probable effect of his conduct would be to obstruct or impede the official proceeding; and

4. Fourth, the defendant acted corruptly.

To act "corruptly," the defendant must use unlawful means or act with an unlawful purpose, and act with consciousness of wrongdoing." Verdict, *United States v. Bauer*, No. 21-cr-386-2 (TNM), 1/24/23 Tr. at 13 (citing *United States v. Reffitt*, 602 F. Supp. 3d 85, 93 (D.D.C. 2022)).

The government further alleges that the defendant aided and abetted others in committing the obstruction of an official proceeding. To satisfy its burden of proof in proving that the defendant aided and abetted others in committing this offense, the government must prove the following beyond a reasonable doubt:

1. First, that others committed obstruction of an official proceeding by committing each of the elements of the offense charged;

2. Second, that the defendant knew that obstruction of an official proceeding was going to be committed or was being committed by others;

3. Third, that the defendant performed an act or acts in furtherance of the offense;

4. Fourth, that the defendant knowingly performed that act or acts for the purpose of aiding, assisting, soliciting, facilitating, or encouraging others in committing the offense of obstruction of an official proceeding; and

5. Fifth, the defendant did that act or acts with the intent that others commit the offense of an obstruction of an official proceeding.

The term "official proceeding" includes a proceeding before the Congress. The official proceeding need not be pending or about to be instituted at the time of the offense. If the official

proceeding was not pending or about to be instituted, the government must prove beyond a reasonable doubt that the official proceeding was reasonably foreseeable to the defendant. As used in Count One, the term "official proceeding" means Congress's Joint Session to certify the Electoral College vote.

A person acts "knowingly" if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident. In deciding whether the defendant acted knowingly, the Court may consider all the evidence, including what the defendant did or said.

Count Two

Count Two of the Indictment charges the defendant with entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1). In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1. First, that the defendant entered or remained in a restricted building or grounds without lawful authority to do so; and

2. Second, that the defendant did so knowingly.

The term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting.

The term "person protected by the Secret Service" includes the Vice President and the immediate family of the Vice President.

A person acts "knowingly" if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident. In deciding whether the

13

defendant knowingly entered or remained in a restrict building, the Court may consider all of the evidence, including what the defendant did or said.

Count Three

Count Three of the Indictment charges the defendant with disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2). In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1.  First, that the defendant engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building or grounds;

2.  Second, that the defendant did so knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions;

3.  Third, that the defendant's conduct occurred when, or so that, his conduct in fact impeded or disrupted the orderly conduct of Government business or official functions.

"Disorderly conduct" occurs when a person is unreasonably loud and disruptive under the circumstances, or interferes with another person by jostling against or unnecessarily crowding that person.

"Disruptive conduct" is a disturbance that interrupts an event, activity, or the normal course of a process.

The terms "restricted building or grounds" and "knowingly" have the same meanings as previously defined.

<u>Count Four</u>

Count Four of the Indictment charges the defendant with disorderly or disruptive conduct in a U.S. Capitol building or grounds, in violation of 40 U.S.C. § 5104(e)(2)(D). In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1. First, that the defendant engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings;

2. Second, that the defendant did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress; and

3. Third, that the defendant acted willfully and knowingly.

The term "United States Capitol Buildings" includes the United States Capitol located at First Street, Southeast, in Washington, D.C.

The term "disorderly or disruptive conduct" has the same meaning described in the instructions for Count Two defining "disorderly conduct" and "disruptive conduct."

A person acts "willfully" if he acts with the intent to do something that the law forbids, that is, to disobey or disregard the law. "Willfully" does not, however, require proof that the defendant be aware of the specific law or rule that his conduct may be violating.

The term "knowingly" has the same meaning as previously defined.

<u>Count Five</u>

Count Five of the Indictment charges the defendant with parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1. First, that the defendant paraded, demonstrated, or picketed in any of the United States Capitol Buildings;

2. Second, that the defendant acted willfully and knowingly.

The term "parade" has its ordinary meaning. For example, "parade" means "to take part in a march or procession organized on a grand scale in support of some political object." "Parade" can also mean "to march in or as if in procession." Verdict, *United States v. Chan,* 21-cr-668 (TNM), 1/24/23 Tr. at 13, citing *United States v. Rivera,* No. 21-cr-60 (CKK), --- F. Supp. 3d ---, 2022 WL 2187851, at *7 (D.D.C. June 17, 2022) (citing dictionary definitions).

The term "demonstrate" refers to conduct that would disrupt the orderly business of Congress. To "demonstrate" means "to take part in a public manifestation by a number of persons of interest in some public question or sympathy with some political or other cause, usually taking the form of a procession or mass meeting," or "to take part in a public display of group feeling toward a person or cause." *Id.* at 14.

The term "picket" has its ordinary meaning.

The terms "United States Capitol Buildings," "knowingly," and "willfully" have the same meanings as previously defined.

## III. STATEMENT OF THE CASE

### E. The Parties' Evidence and Anticipated Defenses

The parties are committed to trying the case expeditiously and without lengthy arguments about objections. In addition to the stipulations described above, the parties have agreed to the admissibility of certain exhibits and the authenticity (if not admissibility) of others. Defendant has

not disclosed any exhibits or witnesses to the government. The government may object to the defendant's introduction of certain exhibits.[3]

The government anticipates that the defense will focus on the defendant's actions and his *mens rea* in committing the charged offenses. The government's evidence of Speed's actions on January 6, together with evidence of Speed's statements describing those actions, will establish that Speed joined the mob to accomplish the goal of obstructing the certification and fully understood he took part in an collective effort that overran police and forcibly occupied the Capitol.

**F. List of Government Witnesses**

1. Daniel Schwager (Senate)– Stipulated testimony
2. USSS Inspector Lanelle Hawa – Stipulated testimony
3. USCP Captain Carneysha Mendoza – Stipulated testimony
4. FBI UCE– Stipulated testimony
5. USCP Inspector Thomas Loyd
6. USCP Officer Daniel Amendola
7. FBI Special Agent Mariam Hanna
8. FBI Analyst Jay Rushing

**G. List of Prior Convictions**

On January 18, 2023, a jury convicted the defendant of three counts of unlawful possession of an unregistered firearm (a silencer).  Verdict Form, *United States v. Speed,* 22-cr-165 (MSN), ECF No. 141 (E.D. Va. Jan. 18, 2023).  Speed will be sentenced for these crimes on April 13, 2023.

**CONCLUSION**

---

[3] For example, the government may offer statements that defendant made to an FBI UCE during the FBI's investigation into Speed. Because the defendant is an opposing party, his statements are not hearsay pursuant to Fed. R. Evid. 801(d)(2)(A). There is no similar rule allowing the defendant to admit his own statements. Barring an exemption from hearsay (e.g., Rule 801(d)), an exception to the hearsay rule (e.g., Rule 803), or statements made admissible by the Rule of Completeness (Rule 106), the defendant's own statements, when offered by him, are inadmissible hearsay.

Acting together and with others around him, Speed joined rioters who occupied the Capitol to stop the certification of the Electoral College vote. At trial, the evidence will prove beyond a reasonable doubt that the defendant committed each offense charged in the Indictment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

By:   /s/*Alexis J. Loeb*
Alexis Loeb, CA Bar No. 269895 (Detailed)
Kyle M. McWaters, D.C. Bar No. 241625
Tighe Beach, CO Bar No. 55328
Assistant United States Attorneys
601 D Street NW
Phone: (202) 252-6983
Email: alexis.loeb@usdoj.gov