**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | ) **Case No. 22-cr-00244** |
| | ) **Hon. Trevor N. McFadden** |
| **HATCHET M. SPEED,** | ) **Sentencing Date: May 8, 2023** |
| *Defendant.* | ) |

## MEMORANDUM IN AID OF SENTENCING

Hatchet Speed, as a 41-year-old military veteran, has spent his life in service – to his church, to his community, to the underserved, and to his country. For those who know him and describe him as thoughtful, caring, and considerate, his recent involvement with the criminal justice system and attendant publicity is shocking. He comes before the Court having been found guilty of various counts of participating in the events of January 6, 2021. Mr. Speed respects the Court's verdict and understands that, at this point, the Court is required to impose a sentence.

Pursuant to Rule 32 of the Federal Rules of Criminal Procedure, Section 6A1.3 of the United States Sentencing Guidelines (the "Guidelines"), Mr. Speed states that he has received and reviewed the Presentence Report ("PSR") prepared in this case. Mr. Speed has two objections to the PSR, detailed below, and submits that the appropriate advisory guideline range is 18-24 months of confinement, but submits that a six-month term of confinement, to run concurrent with Mr. Speed's undischarged term of imprisonment from his Eastern District of Virginia ("EDVA") case, is sufficient, but not greater than necessary, to accomplish the goals of

sentencing in light of Mr. Speed's background, the nature and circumstances of the offense, the collateral consequences of his convictions, and comparable sentences in similar cases.

## BACKGROUND

On June 21, 2022, a complaint was filed in the instant case charging Hatchet M. Speed with four misdemeanor offenses: Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). The following day, Mr. Speed was arrested. On June 23, 2022, Mr. Speed appeared for an initial appearance, whereinafter Mr. Speed was released to the High Intensity Supervision Program and ordered to remain on home detention for the pendency of the case. At his arraignment, Mr. Speed requested a bench trial, and trial was set for February 14, 2023.[1]

On September 6, 2022, an Indictment was filed against Mr. Speed in the EDVA, charging him with three counts of Possession of an Unregistered Firearm: to wit, a silencer, in violation of Title 26, United States Code, Sections §§ 5841, 5861(d), and 5871. He was continued on the same conditions of release imposed by the Court in the District of Columbia. Mr. Speed commenced his EDVA jury trial on December 12, 2022. The trial resulted in a hung jury and a mistrial was

---

[1] Trial was later advanced to February 6, 2023 and then continued to March 2, 2023.

declared on December 16, 2022.  The retrial was scheduled for January 17, 2023.

On January 18, 2023, Mr. Speed was found guilty on all three counts.  On the same

day, the Court revoked his conditions of release and remanded Mr. Speed to the

Alexandria Detention Center ("ADC").   At his April 13, 2023 sentencing, Mr. Speed

received a total sentence of 36 months of imprisonment, a $15,000 fine, and 36

months of supervised release.

In the instant case, upon defense motion, the Court continued trial to March

2, 2023.  By the time of trial, the charges also included felony obstruction of justice,

in violation of 18 U.S.C. §1512(c)(2).   On March 7, 2023, this Court found Mr. Speed

guilty of all counts in the Indictment and set sentencing for May 8, 2023.

## ARGUMENT

### I.      Objections to the PSR

#### A. The PSR incorrectly applies two USSG § 2J1.2 specific offense characteristics enhancements.

The PSR adds eleven levels to Mr. Speed's total offense level for two

instances of interference with the "administration of justice" under USSG §

2J1.2(b).  In another January 6 case, this Court has already held that these specific

offense characteristics do not apply because the certification of the vote does not

involve the "administration of justice."  Mr. Speed respectfully adopts and

incorporates the reasoning in that decision here.  The Court's ruling applies with

equal force to Mr. Speed's case.  Therefore, for the reasons set forth in this Court's

opinion in *United States v. Hunter Seefried*, 1:21CR287 (TNM), 2022 WL 16528415

(D.DC Oct. 29, 2022), application of these enhancements would be a legal error and

should not be applied in this case.  Without these enhancements, the applicable
guideline range is 18 -24 months.[2]

### B. Mr. Speed has remaining factual objections to the PSR.

In paragraph 15, Mr. Speed objects to the statement saying that Mr. Speed
was "joining a raucous and violent mob that overran the police."  The evidence in
this case is that Mr. Speed arrived at the Capitol alone, traveled through the
Capitol alone, and left the Capitol alone.  It would be more accurate to state that "as
Mr. Speed breached the U.S. Capitol building, a raucous and violent mob overran
the police."

In paragraph 17, Mr. Speed objects to the second sentence that reads:
"According to Speed, he observed toppled fencing as he entered Capitol Grounds."
In Mr. Speed's conversations with the UCE, he indicated that at the time, he did not
realize that what he stepped over was toppled fencing, and that statement was
made after the events of January 6.  The sentence as it reads now is factually
inaccurate, and we request its removal.

In paragraph 20, Mr. Speed objects to the first statement in this paragraph
that Mr. Speed entered the Capitol building just two minutes after it was breached.
The Senate Wing doors of the Capitol building were first breached at 2:13 p.m. and
then secured.  Mr. Speed did not enter until after the second breach of the Senate
wing doors which occurred at 2:48 p.m.  *See* below.  The statement as written is

---

[2] Mr. Speed concedes that now that he has been sentenced in the EDVA, his
Criminal History Category ("CHC") is Category II, rather than Category I.  With an
offense level of 14 and CHC II, the resulting guideline range is 18-24 months.

factually inaccurate and Mr. Speed requests that this paragraph be edited to reflect the correct series of events.



In paragraph 23, Mr. Speed objects to the last sentence of the paragraph which reads: "In other words, because Speed thought he succeeded in obstructing the certification, he left the U.S. Capitol Building."  This statement is the argument made by the government in its trial brief and not factually accurate.  As an impartial document, the PSR should only include factual statements and not arguments, so we request the removal of this statement.

In paragraph 25, Mr. Speed notes that the email in question was drafted and never sent.  We ask that the first sentence reflect that fact.

In paragraph 28, Mr. Speed objects to the statement in the second to last sentence on page 8, which reads: "Speed wanted to stop that certification."  Mr. Speed entered the Capitol to witness the objections and to support the objecting senators.  This statement is factually inaccurate and Mr. Speed requests its

removal.

## II.  A Sentence Is Meant To Be "Sufficient, But Not Greater Than Necessary" To Promote The Goals Of Sentencing, Notwithstanding the Applicable Guideline Range.

After *United States v. Booker*, the Sentencing Guidelines range is advisory, and courts must consider it as just one of more than a half-dozen statutory sentencing factors enumerated in 18 U.S.C. § 3553(a).[3]  *See* 543 U.S. 220, 259-60 (2005); *see also Kimbrough v. United States*, 552 U.S. 85 (2007) (Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory considerations set forth in § 3553(a)); *Gall v. United States*, 552 U.S. 38 (2007) (same). The primary directive in the actual language of § 3553(a) is to "impose a sentence sufficient, but *not greater than necessary*, to comply with the purposes" of sentencing. (Emphasis added).

The Court must keep in mind that, as the Department of Justice recently noted, determining the guidelines range is no substitute for an independent determination of a sentence that is "appropriate [and] serve[s] the interests of justice."  *See Gov't Supp. & Amend. Sent. Mem.*, *United States v. Stone*, Case No. 19-cr-18-ABJ, Dkt. No. 286 (D.D.C. Feb. 11, 2020) (requesting a sentence "far less" than the "technically applicable" Guideline range, which can result in advisory sentencing ranges that are

---

[3] Those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the following: the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

"unduly high," "excessive and unwarranted under the circumstances," and insufficiently reflective of the other § 3553(a) factors). Imposing a sentence that is sufficient, but not greater than necessary, is not just another factor for the Court to consider along with the others set forth in § 3553(a). Rather, it sets an independent limit upon the sentence.

## III. Mr. Speed's Personal History Warrants a Six-Month Sentence

Hatchet Speed is a 41-year-old man whom friends describe as caring, contemplative, and compassionate as well as curious, well-read, and respectful. *See* Exhibit A, Letters from Loved Ones. Mr. Speed was raised in Salt Lake City, where his family belongs to the Church of Jesus Christ of Latter Day Saints. PSR ¶¶ 64-65. Mr. Speed was raised Mormon, and his family raised him to value volunteerism, civil disobedience, and education.

At a young age, it became apparent that traditional schooling did not provide a curriculum rigorous enough to challenge Mr. Speed. His parents decided to homeschool him beginning in third grade. Even with a more demanding curriculum, Mr. Speed excelled in school – skipping grades and earning straight As. With parents whose educational backgrounds were in languages and sciences, Mr. Speed learned a great deal about those subjects. But the home was also replete with books about history – including military history – and political science. Mr. Speed eagerly absorbed material from all the subjects, and he graduated from high school early at age 16. PSR ¶ 75.

In addition to focusing on his studies, Mr. Speed also participated in extracurricular activities. He was a Boy Scout, and he ran track. In fact, Mr. Speed earned his nickname, Hatchet, from his track teammates. Mr. Speed's older brother, who also ran track, was nicknamed Axe. Eventually "Little Axe," as Mr. Speed was initially called, became known as Hatchet. He legally changed his name years later. PSR ¶ 63.

After graduating from high school, Mr. Speed attended Brigham Young University. Mr. Speed attended the university for three years before attending a two-year church mission in Venezuela. PSR ¶ 65. Upon returning from Venezuela, Mr. Speed resumed his studies. He graduated from BYU in 2008 with a degree in Applied Physics. He later completed coursework towards a Masters' degree in computer engineering. PSR ¶ 73.

While at BYU, Mr. Speed demonstrated the volunteerism instilled in him by his family. In addition to his mission trip, Mr. Speed volunteered with the Even Start Program, where he assisted Spanish-speaking adults to complete secondary education requirements. Furthermore, he enlisted in the military. He joined the Navy Reserves in 2002. PSR ¶¶ 66, 80.

Mr. Speed has had a decorated military career spanning several reenlistments and three deployments. PSR ¶ 66. Whether it be through formal education or self-teaching, Mr. Speed developed at least elementary proficiency in several languages – Spanish, French, Latin, Portuguese/Brazilian, and Hebrew. PSR ¶ 80. With his knack for languages, Mr. Speed initially served as a military linguist. His military

records commend him as a "world-class linguist."  Further honors were bestowed upon Mr. Speed for his deployments to Iraq in 2009 (Army Achievement Medal, Iraq Campaign Medal, Navy Overseas Service Ribbon), Afghanistan in 2011 (Afghanistan Campaign Medal, NAVY/MC Overseas SVC Ribbon, Joint Services Commendation Medal, Armed Forces Reserve Medal) and Africa in 2016.  *Id.*

Meanwhile, Mr. Speed worked full time as a software engineer and developer. PSR ¶¶ 77-79. When he was not working or fulfilling his military duties, Mr. Speed nurtured several hobbies, including maintaining and fixing old trucks, and he remained actively involved with the Mormon Church until approximately 2022.  Mr. Speed tithed, and until recently, Mr. Speed attended church functions, participated in group motorcycle rides, and engaged in community service activities.  Through the Church, Mr. Speed and fellow congregants planted trees with the Arlington Regional Master Naturalists, worked to gather materials for emergency food and supply kits for families in need, and bagged rice for the Arlington Food Assistance Center (AFAC).  *See* Exhibit A, Letters from Amber McCraw and Andrew Jensen

Disillusioned with the results of the 2020 election, however, Mr. Speed's beliefs became more extreme, and as they did, he drifted away from his involvement with the Mormon church. Despite his more fringe beliefs, Mr. Speed enjoyed discussing current events, eagerly debated policy, and appreciated hearing differing viewpoints. And, he did so respectfully.  *See* Exhibit A, Letters from Derek Bloom and Andrew Jensen.   Notwithstanding his beliefs, his respectful nature and the valued

relationships he cultivated over time have prompted several close friends to offer support to Mr. Speed through the pendency of his case and beyond.   *Id*.

## IV.  The Nature of the Offense Conduct Does Not Warrant a Lengthy Prison Sentence

The events that took place at the Capitol on January 6, 2021, were unlike anything this country has seen before.  What happened that day was indeed shocking and should certainly be taken seriously by the Court.  However, every person who went to the Capitol on January 6 did not go with the same purpose.  And every person who entered the Capitol did not have the same goals in mind.  Mr. Speed, unlike many others, was not there to obstruct the electoral voting process, but rather to see it through.

Just eight days after the events at the Capitol on January 6, Mr. Speed wrote a private email to his brother where he talked about what happened that day – what he saw and the things he heard.  But most importantly, he told his brother why he was there.  Mr. Speed went "…there to await the results of the joint session, not to interrupt the proceedings."  *See* Exhibit B.[4]  And while the mood changed for Mr. Speed when he learned that former Vice President Pence had not chosen the Republican elector slates, his hope was to view the remaining proceedings from the public gallery.

There is no denying that Mr. Speed is a well-read man and understood the

---

[4] The email in question could not be introduced at trial because it is a prior consistent statement that did not fall into any exception.  However, the Court may consider the contents of the email for sentencing purposes.

electoral vote procedure.  The Court has found that the evidence of Mr. Speed's obstruction is "the strongest and most damning" due to his extensive knowledge of the process.  But there are three key points that should be acknowledged.  First, that Mr. Speed knew that there were six senators who intended to lodge objections to the electoral vote.  Second, that Mr. Speed knew that the Senate chamber contained gallery seating for spectators.  And third, that Mr. Speed committed no destructive, assaultive, or violent acts while inside of the Capitol.

Mr. Speed entered the Capitol on January 6 to support the six senators who intended to lodge objections to the certification of the electoral vote.  The 2020 election was a truly polarizing, once-in-a-lifetime event, which came with extensive media coverage.  Prior to the certification of the electoral vote, several senators publicly announced that they intended to object to the electoral votes for their respective states.  Inspector Thomas Lloyd testified at trial that the United States Capitol Police even prepared for protests prior to January 6 because of those announcements.  Mr. Speed knew that these objections would be happening and believed that they could make the difference in who would ultimately become the next president.  If the objecting senators were successful, he believed that former President Trump would be reelected.  So, when he entered the Capitol, his goal was to show support for those senators, but not to stop the process altogether.

Mr. Speed also entered the Capitol hoping to observe the meeting of the joint session.  January 6, 2021 was not the first time that Mr. Speed visited the Capitol. He had been there years before with his brother, so he was aware that both the

House and Senate chambers had gallery seating available for spectators.  In the email to his brother, just days after January 6, Mr. Speed recalled being present at the Capitol during some of the Kavanaugh hearings, witnessing protestors in the halls of the Senate building.  *See* Exhibit B. On January 6, Mr. Speed hoped to observe the joint session from the gallery, but the chaos ultimately prevented him from achieving that objective.

Finally, Mr. Speed, unlike many others, did not commit any destructive, assaultive, or violent acts while he was inside of the Capitol.  On January 6, a woman died, officers were attacked, and the property damage was extensive.  But Mr. Speed was not involved in any of those acts.  The government introduced numerous videos of Mr. Speed as he moved around the Capitol between 2:51 PM and 3:34 PM.  In those mere 43 minutes, Mr. Speed walked around, observed what was going on, and ultimately followed the direction of officers to leave.  In those videos, Mr. Speed is not seen chanting with the masses, he does not carry any flags or other paraphernalia, he is not in possession of any weapons, he is not encouraging people to commit violence, and he does not touch any property inside of the building – Mr. Speed was merely present.  The government highlights the fact that Mr. Speed wore a hat with a hard interior shell, but that hat is a defensive, as opposed to offensive, item and does not indicate that Mr. Speed intended to initiate or engage in any violent behavior that day.

Mr. Speed's conduct on January 6 was minute compared to some of the actions that took place that day.  Even given the Court's finding that Mr. Speed had more

knowledge regarding the electoral voting process than others, his actions and lack thereof, on that day warrant a variant sentence.

### V.   The Court Should Consider the Collateral Consequences of Mr. Speed's Convictions in Assessing Whether the Sentence Meets the Directives of 3553(a)

The imposition of a felony criminal conviction alone would be an adequate deterrent for someone like Mr. Speed - someone with no convictions prior to this year. In addition to the loss of his ability to vote and to possess a firearm, valuable rights that he will no longer have, Mr. Speed faces a significant loss of future employment prospects.  Although Mr. Speed was unemployed just prior to his incarceration, in part due to neck and back pain, PSR ¶ 76, as a servicemember with a high-level security clearance, he had ample potential job opportunities.   His convictions, however, mean the loss of his security clearance and diminished employment opportunities in his field.   Further, the impact of his status as a felon on his military benefits remains unclear.

When a defendant suffers consequence for his criminal conduct—apart from the sentence imposed through the criminal court process—the sentencing court can take this collateral punishment into account in fashioning a sentence.  *See* e.g., *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was already punished by the loss of his business as a result of his EPA-related charges).  In *United States v. Samaras*, for example, the district court granted a variance from the Guidelines in part because the defendant had lost a good public sector job as a result of his conviction.  *Samaras*, 390 F. Supp.

2d 805, 809 (E.D. Wis. 2005).   *See also United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009)(despite guidelines of 78-97 months, district judge imposed sentence of 20 months in part because conviction "made it doubtful that the defendant could pursue his career as an academic translator, and therefore that the need for further deterrence and protection of the public is lessened because the conviction itself already visits a substantial punishment on the defendant"); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (loss of the defendant's "teaching certificate and his state pension as a result of his conduct" is appropriate sentencing consideration consistent with requirement that "the sentence reflect the need for just punishment and adequate deterrence").

With this case, however, there is more than just the imposition of a felony conviction.  Not only has Mr. Speed lost rights that he held dear, had his job prospects plummet, and had his military career come to a halt, but because of the nature of his cases and the publicity that has been associated with Mr. Speed in particular, he has also served his pre-sentence incarceration in administrative segregation.

Courts have made clear that the circumstances of detention are an appropriate factor to consider under 3553(a).  *See United States v. Peters*, 394 Fed.Appx. 665, 2010 WL 3394478, *2 (11th Cir. 2010) (implicitly stating that a court may consider the harshness of protective custody under 3553(a) factors).  Because protective custody or administrative segregation imposes greater restrictions and harsher conditions, it has had a more punitive effect on Mr. Speed than ordinary detention.

In general, it is indisputable that conditions in administrative segregation or protective custody, even when imposed for non-punitive purposes, are significantly harsher than conditions in normal jail population. *See e.g.* Kim Shayo Buchanan, Our Prisons, Ourselves: Race, Gender and the Rule of Law, 29 YALE L. & POL'Y REV. 1, 28 (2010) ("Conditions in protective custody...can be so harsh that victims [of prison assaults] are deterred from reporting [them]" to avoid being sent to protective custody). In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court considered the conditions of administrative (non-punitive or protective) segregation at the Ohio State Penitentiary. The Court described the segregation as "quite harsh" and noted that the conditions included the prohibition of almost all human contact, no conversation allowed even cell to cell, and exercise for only one hour a day. *Id*. at 911. The Court had little difficulty finding that these conditions imposed "an atypical and significant hardship" beyond the normal incidents of prison life. *Id*.

Mr. Speed was placed in the segregation unit as a protective measure - not as punishment - because his case is "high-profile". He has been detained in this unit since January 18, 2023, with the exception of a short period of time spent in booking. At the ADC, protective custody amounts to lockdown 22 hours a day. This is a drastic difference compared to the conditions in general population, where detainees are permitted to leave their cells for approximately 8 to 10 hours a day. Mr. Speed is permitted only two hours a day to leave his cell for exercise, during which he can go into the unit. Administrative segregation prisoners are granted their free time only two by two, to prevent communication between them. Although these conditions have

been imposed to protect and not to punish Mr. Speed, the reality is that protective custody has made his jail time worse than it is for general population prisoners, and accordingly less jail time is necessary for Mr. Speed to accomplish the purposes of sentencing.

The collateral consequences that Mr. Speed has already experienced and will continue to experience are severe and should be considered by this Court in assessing what would constitute a "just punishment" and "adequate deterrence."

## VI.   Mr. Speed's Sentence Should Run Concurrent to his EDVA Sentence

United States Code, Title 18 Section 3584 is entitled "Multiple sentences of imprisonment" and states, in part, "…if a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively, except that the terms may not run consecutively for an attempt and for another offense that was the sole objective of the attempt." 18 U.S.C. § 3584(a).  The Code goes on to state, "[m]ultiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently."  *Id.*  The plain reading of the statute thus includes only one specific limitation on the Court's discretion, and does not explicitly provide any impediment to this Court's ordering the sentence imposed "on a defendant who is already subject to an undischarged term of imprisonment" to run concurrent to the pre-existing sentence.  *See id.*  Consequently, because Mr. Speed is serving an undischarged federal term of imprisonment, the Court has the authority to decide whether this sentence should "run concurrently, partially

concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense." USSG § 5G1.3(d).

Application Note 4 to USSG § 5G1.3(c) states that in determining whether to impose a concurrent sentence or a consecutive sentence, the court should consider the factors set forth in 18 U.S.C. § 3584, which refers to the factors in 18 U.S.C. § 3553(a).

As stated above, 18 U.S.C. § 3553(a) requires a court to impose a sentence that is sufficient, but not more than necessary to, *inter alia*, deter criminal conduct and protect the public. Because Mr. Speed received a substantial sentence for his EDVA conviction, he has already received a sentence designed to deter future misconduct and protect the public. Adding additional imprisonment based upon the principle that he should receive additional time just because of the January 6 offenses presumes that people distinguish between and compartmentalize such sentences. This is not the case.

Furthermore, with respect to deterrence, research has shown that more incarceration does not necessarily result in greater deterrent effect. Rather, it is the certainty of being caught and punished that has the deterrent effect; "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[5] Here, Mr. Speed is already serving a sentence sufficient to accomplish the

---

[5] Michael Tonry, Purposes and Functions of Sentencing, 34 CRIME & JUST. 1, 28 (2006) ("Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."); see also National Institute of Justice, Five Things About Deterrence, at 1 (May 2016),

goals of deterrence, both specific and general.  Additional time, or a consecutive

sentence, for the instant case will have limited, if any, additional deterrent impact.

Moreover, avoiding disparities is one of the factors the Sentencing Commission

identified in determining whether to impose a concurrent or consecutive sentence.

*See* App. n. 4, USSG § 5G1.3.  The majority of January 6 defendants who were

charged with felony obstruction are serving sentences that fall above Mr. Speed's

advisory sentencing guideline range.  However, Mr. Speed's case is unique in that

his conduct is vastly different and relatively minor compared to others charged with

the same offense.  In fact, in reviewing each of the January 6 cases where the

Honorable Trevor N. McFadden was the presiding judge, there does not appear to

be even one defendant who was charged with the felony obstruction charge under 18

U.S.C. § 1512(c)(2) who did not commit some other aggravating act, i.e., charging at

officers, damaging property, chanting throughout the Capitol building, entering

---

https://www.ojp.gov/pdffiles1/nij/247350.pdf (stating, among other things, that
"[i]ncreasing the severity of punishment does little to deter crime," and "[t]he
certainty of being caught is a vastly more powerful deterrent than the
punishment"); Ellen Raaijmakers et al., Exploring the Relationship Between
Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected
Element in Testing Deterrence Theory, 54 J. OF RSCH. IN CRIME AND DELINQ.
1, 4 (2017) ("[T]he available evidence points toward a null or a slightly criminogenic
effect of imprisonment but has rarely found support for a clear specific deterrent
effect."); Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 CRIME &
JUST. 199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect
arising from the experience of imprisonment compared with the experience of
noncustodial sanctions such as probation. Instead, the evidence suggests that
reoffending is either unaffected or increased."); Zvi D. Gabbay, Exploring the Limits
of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8
Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is
empirically known to be a far better deterrent than its severity").

congressional offices, etc.  Still, there are other cases handled by this Court where the accused's conduct was relatively minor and more aligned with the conduct of Mr. Speed.

The charges and sentences in the Capitol breach cases have been documented and updated by the Department of Justice and made available to the public, allowing the Court to ensure that individuals who commit similar conduct are treated similarly.[6]  The sentences of similarly situated defendants supports Mr. Speed's request for a sentence of six months of imprisonment, to run concurrently with his sentence in *United States v. Hatchet Speed*, 1:22-cr-165 (E.D.V.A.):

- *United States v. Paul Hodgkins* (RDM), 1:21-cr-188: Sentenced to eight months incarceration followed by 24 months of supervised release.  The defendant entered the Capitol carrying a red Trump 2020 flag, wearing a backpack containing protective eye goggles, rope, and white latex gloves.  He breached the Senate chamber, took "selfie-style" photographs, and saluted others who were shouting and cheering from a nearby raised platform in the well of the chamber. Defendant had a guideline (GL) range of 15 to 21 months and criminal history category (CHC) of I.

- *United States v. Richard Michetti* (CRC), 1:21-cr-232: Sentenced to nine months incarceration followed by 24 months of supervised release.  The defendant entered the Capitol two minutes after the initial breach, was seen

---

[6] Capitol Breach Cases, Department of Justice (last accessed Apr. 28, 2023), https://www.justice.gov/usao-dc/capitol-breach-cases

among a mob of rioters trying to enter the Senate side of the Capitol, confronted and shouted at MPD officers, and did not leave until officers had to fire tear gas at him.  Defendant had a GL range of 15 to 21 months and a CHC of I.

- *United States v. Matthew Wood* (APM), 1:21-cr-223: Sentenced to 36 months of probation, with the special conditions of 12 months of home confinement and 100 hours of community service.  The defendant climbed the media tower and encouraged others forward, incited others to violence, called rioters forward while waving a blue Trump flag he found on the ground, and inspiring the crowds to continue their siege of the Capitol. Once inside the Capitol, Wood joined the likes of Doug Jensen, Jacob Chansley, Kevin and Hunter Seefried, and Greg Rubenacker in pursuing police officers and later pushed against MPD officers attempting to clear the Rotunda.  Defendant had a GL range of 51 to 63 months and a CHC of I.[7]

- *United States v. Anthony Puma* (PLF), 1:21-cr-454: Sentenced to nine months of incarceration followed by two years of supervised release.  The defendant urged rioters in front of him to move forward and clear the way for others attempting to scale the wall, he scaled a wall himself, and walked around the building and into Senator Merkley's office.  Defendant had a GL range of 15 to 21 months and a CHC of I.

---

[7] This calculation includes enhancements requested by attorneys for the government.  Defense counsel is unaware of the final guideline calculation imposed by the Court.

- *United States v. John Andries* (RC), 1:21-cr-93:  Sentenced to 12 months and one day, followed by 36 months of supervised release.  The defendant was part of the initial wave of rioters to breach the building. He recorded himself yelling throughout the Capitol and once outside, had to be forcibly moved away from the building by police. Andries walked up to and gesticulated towards the USCP officers several times, getting within inches of them on occasion.  While leaving the building, he saw another rioter in a scuffle with a police officer, turned back and rushed to the scuffle, and pushed the officer.  Defendant had a GL range of 30 to 37 months and a CHC of III.[8]

- *United States v. James Rahm* (RJL), 1:21-cr-150: Sentenced to one year of imprisonment followed by 36 months of supervised release.  The defendant recorded himself inside of the Capitol while parading with a flag, where he loudly and disruptively proclaimed, "We're in. We're taking our fucking house back. We're here. Time to find some brass and kick some friggin' ass." He was seen with a group of rioters outside the House Chamber as they attempted to gain access to the House Chamber where members of Congress were sheltering. Rahm later lied to the FBI during his interview.  Defendant had a GL range of 15 to 21 months and a CHC of I.

No two individuals or cases are alike, but the examples above support the consideration of a downward variance for Mr. Speed.  As such, a six-month

---

[8] The government argued for a GL range of 21 to 27 months in their sentencing memorandum.  *See United States v. Andries*, 1:21-cr-93, ECF No. 70.

concurrent sentence is consistent with the sentences of similarly situated defendants, but also acknowledges that deterrence and protection of the public have already been accomplished by the EDVA sentence of imprisonment.  In sum, imposing a consecutive sentence would not be the minimum sentence sufficient to accomplish the purposes of sentencing in this case.

## VII.   Conclusion

For the foregoing reasons, Mr. Speed respectfully requests that this Court sentence him to no more than six months confinement, to run concurrent with his undischarged term of imprisonment from the EDVA.

Respectfully Submitted,

**HATCHET SPEED**
by counsel:

Geremy C. Kamens
Federal Public Defender for the
Eastern District of Virginia

by: /s/_____
Courtney Dixon
DC Bar No. 1766415
Assistant Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0800
Facsimile: (703) 600-0880
courtney_dixon@fd.org

Brooke Rupert
VA Bar No. 79729
Assistant Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0800
Facsimile: (703) 600-0880
brooke_rupert@fd.org