## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-244 (TNM)** |
| **HATCHET M. SPEED,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Hatchet M. Speed to 48 months' imprisonment (to run consecutive to Speed's recently imposed 36-month sentence in *United States v. Speed,* 22-cr-165 (MSN) (E.D. Va)), 36 months' supervised release, $2,000 restitution, and the mandatory $170 special assessment.

## I.      INTRODUCTION

On January 6, 2021, Hatchet Speed broke into the U.S. Capitol as part of a violent mob, committing a "textbook case of obstruction of an official proceeding." 3/7/23 Oral Ruling Tr. at 5. Moments earlier, Speed had learned that Vice President Pence was not going to submit alternate electors pledged to support Donald Trump. He took matters into his own hands. Undeterred by obvious signs of conflict between the police defending the Capitol and the rioters forcing their way in, Speed joined the mob that overran the police through "sheer force of numbers." *Id.* at 6 (quoting Trial Ex. 410). He understood both what was at stake—the precise details of the proceeding

1

underway and its role in transfer of presidential power—and the power of the mob that disrupted it. As Speed later told an FBI undercover employee (UCE), there was "nothing the cops [could] do…"it's impressive." Trial Ex. 319A; *see also* 3/7/23 Oral Ruling Tr. at 4 (noting evidence of "the defendant's extensive understanding of the electoral vote certification process"). He hoped the mob's resistance would spark a larger uprising that would so intimidate Congress that then-Speaker Nancy Pelosi to would "resign out of fear for her life." Trial Ex. 324. Speed remained inside the Capitol for over 40 minutes, leaving only because he believed that then-Speaker Pelosi had done what he wanted: postponed the certification of the electoral college vote. 3/7/23 Oral Ruling Tr. at 5.

Convicting Speed of obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2), the Court observed that the evidence of Speed's intent to obstruct was "the strongest and most damning" of the obstruction-related before the Court to date. 3/7/23 Oral Ruling Tr. at 4. Speed's obviously obstructive conduct on January 6 merits a lengthy sentence. But that conduct, however serious, is but one part of the full context that the Court must consider at sentencing. That context shows that January 6 was but one manifestation of Speed's embrace of violent revolution, of a desire for like-minded individuals to rise up against the government and intimidate and kill their enemies—including the country's entire Jewish population. Indeed, January 6 was not the only instance where Speed disregarded the law when it stood in his way. After January 6, he began stockpiling firearms, including three illegal silencers, which he told the UCE would come in useful in his murderous plans.

It is not clear why this military veteran with a TS/SCI clearance became enamored with

Hitler, began to embrace street fighting, and call for the execution of the country's entire Jewish population. Why, after living a law-abiding life, he chose to commit a felony on January 6, with full consciousness of wrongdoing—and then continued to break the law when it got in his way. Why he began to study the work of two of the most notorious domestic terrorists in this country and try to "come up with a better game plan." What is clear, though, is that this defendant committed a serious offense and continues to threaten the safety of the community, posing a serious danger. The nature of Speed's crime, his history and characteristics, and the need for specific deterrence to promote respect for the law all call for a lengthy term of incarceration in this case.

The government recommends that the Court sentence Speed to 48 months' incarceration for obstructing an official proceeding, in violation of 18 U.S.C. § 1512(c)(2), and related misdemeanors. Based on this Court's prior jurisprudence, the government expects that the Court will calculate Speed's guidelines range as 18-24 months. As the Court has acknowledged, an upward variance is appropriate because the sentencing commission likely would have intended the guidelines range for this "textbook" case of obstruction to be higher, and because Speed's conduct on January 6 was one step on a disturbing path toward racially motivated criminal conduct—that ultimately featured plans for the kidnapping and mass murder of civilians.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the PSR, ¶¶ 8-14, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**B.     Before January 6: Speed's Embrace of Violence**

Before January 6, Speed displayed support for the use of violence for political ends. Around June of 2020, he joined the Proud Boys.  Exhibit 1 (Dec. 10, 2020 email). He embraced the violence in which the Proud Boys group was involved. When discussing *Mein Kampf* (which he described as "incredible"), the defendant favorably drew parallels between the Proud Boys and pro-Nazi paramilitary forces that Hitler used when rising to power, asserting that both groups were used to stop Antifa. *See* Exhibit 2 (excepts from meetings between Speed and UCE) at 17-20.[1] The defendant told the UCE that "on the streets [the Proud Boys are] actually really good," which they have to be because they "are generally outnumbered by Antifa." *Id.* at 38. The defendant praised that the "Proud Boys are good at fighting because they literally just enjoy fighting." *Id.* at 39.

Over the fall of 2020, Speed participated in numerous "stop the steal" rallies with the Proud Boys. *See, e.g.,* Trial Ex. 407. He saw these as an opportunity for violent confrontation. For example, he told the UCE about participating in a "November rally here in DC" where "there were almost 500 Antifa" and "100 of us Proud Boys." *Id.* at 38. That was the rally that took place in Washington, D.C., on November 14, 2020, which ended with a violent clash between protestors and counter-protesters in the night.[2] As reflected in text messages, Speed traveled into D.C. that

---

[1] The page numbers refer to the exhibit page, not the original page numbers in the bottom center.
[2] *See* Marissa J. Lang et. al, *After Thousands of Trump Supporters Rally in D.C., Violence Erupts When Night Falls*, Washington Post (Nov. 15, 2020), *available at* https://www.washingtonpost.com/dc-md-va/2020/11/14/million-maga-march-dc-protests/ (last visited Apr. 5, 2023); Jason Slotkin, *Trump Supporters, Counterprotesters Clash at D.C. Rally Contesting Biden's Victory*, NPR (Nov. 14, 2020), *available at* https://www.npr.org/2020/11/14/934957728/trump-supporters-descend-on-d-c-for-events-contesting-election-results (last visited Apr. 5, 2023).

night after hearing that "[b]ig boss told us we are going back in" and expressed a fear of missing

out when he was told that things were "[p]retty quiet we stomped them out." Trial Ex. 406.

Other evidence also shows that the defendant prepared for and enjoyed these violent

confrontations. For example, on January 1, 2021, Speed sent a text message describing where he

lived as a "[s]uburban environment, but close enough to the city for those days when I just wanna

be part of a riot." Trial Ex. 407. Consistent with that mentality, law enforcement officials recovered

from Speed's residence a tactical "Make America Great Again" hat that had a hard interior shell.

Trial Ex. 2 (hat). Photographs of Speed from a December 2020 rally reflect him wearing the hat,

as do photographs of Speed on January 6.

 

*Figure 1*

*See also* Ex. 802 (identity stipulation with multiple photographs of Speed on January 6).

As noted above, Speed's admiration for Adolf Hitler—whom he called "one of the best

people that's ever been on this earth"—also developed before January 6. Ex. 2 at 43. As Speed

explained to the UCE in March of 2022, about two years earlier (*i.e.,* around March of 2020), Speed had read *Mein Kampf* after someone had posted an e-book version to a Telegram group. Ex 2 at 16-17. Speed had originally "hated Hitler," but, as he explained it, reading *Mein Kampf* changed everything. *Id.* Speed thought it was "incredible," that the fights between Hitler's brown shirts and the communists were exactly what was "happening now" between the Proud Boys and Antifa, with Speed on the side of Hitler. *Id.* at 16-17; *see also* Trial Ex. 307. The parallels Speed saw did not stop there: for example, he lauded the Nazis' book burning, arrests of "Rothschilds," persecution of the transgender community, and defense of "white Christians" from Jewish-instigated slaughter in Ukraine. *Id.* at 16-21. As he would later explain to the UCE (described further below), these beliefs would motivate Speed's criminal activity and embrace of violence. Speed believed he was fighting a version of Hitler's battle against the "moral incineration of the western world" in the modern era, locked in a race war pitting white Christians like Speed against the Jewish community, whose tools Speed believed included Antifa, Black Lives Matter, and President Biden. *Id.* at 7, 17, 42, 55-60.   Speed remarked on the parallels between Hitler's campaigns and conflict today—with Speed firmly on the side of Hitler. *Id.* As described further below, Speed believed that he (and other white Christians) were at war with the Jewish community, whom he detested, and whose tools he believed included President Biden and Antifa.

### C.   Speed's Role in the January 6, 2021 Attack on the Capitol

#### *Approach to the Capitol*

Speed went to the Capitol on January 6 with other members of the Proud Boys. Ex. 2 at 30-31. He carried a tactical backpack and wore his reinforced hat. After attending part of the rally

at the Ellipse, Speed marched to the Capitol. As he explained, "that was always the plan…you would listen to Donald Trump, then all of us would go to the Capitol. Now the reason we were going to the Capitol was to protest what was going on in the Capitol….counting the ballots." Trial Ex. 305.

Speed approached the Capitol from the west, walking past downed fencing and bike racks pushed aside. Trial Ex. 701. By 1:30 p.m., he had arrived at the West Plaza, an area where, as Inspector Loyd described, a brutal battle between rioters and a vastly outnumbered police force was underway. *Id.* Speed saw—and got hit with—tear gas. *See, e.g.,* Trial Exs. 302, 702; 703. Approximately an hour later, Speed made his way under a tarp, through scaffolding erected for the inauguration, and to a staircase leading to the Northwest Courtyard, closer to the Capitol. Trial Ex. 207. Nearby, rioters climbed on the banister and stood in decorative pots. *Id.* He knew the staircase was "off limits." Trial Ex. 318. He arrived at the Northwest Courtyard, where he saw rioters commandeer a window-washing platform, ascend to an upper-level window, and try to break in. Trial Ex. 705. He also stood at the base of a small staircase and watched another rioter use a large crowbar to bash through the window of the door at the top. Trial Ex. 705D.



*Figure 2*

That rioter reached inside and opened the door. *Id.* Capitol Police rushed forward to defend the doorway but rioters rushed the stairs and overtook them. Speed also saw more tear gas, which he believed was the work of the police. Trial Ex. 319.

Once at the Northwest Courtyard, Speed heard that Vice President Mike Pence had "validated" certain ballots he considered "invalid." *Id.* He viewed Pence's act as a betrayal. No longer content to stay outside, Speed thought, 'I'm going in there. Like I have no respect for people in this building. They have no respect for me. I have no respect for them.'" *Id.* Speed stated, "[S]o we all went in and we took control. Like, when you have that many thousands of people, like there's nothing the cops can do…it's impressive." *Id.*

Indeed, at approximately 2:49 p.m., rioters violently breached the Senate Wing Door for

the second time, assaulting officers with flagpoles, flashing disorienting bright lights in their eyes, and pushing them back from the door. Trial Ex. 211. Less than two minutes later, Speed entered the building, walking through an emergency-exit door whose glass panes had been shattered. He had donned a face mask to avoid detection.[3]  *Id.*



*Figure 3*

Broken glass was on the floor and alarms blared. Trial Ex. 708. Speed moved forward, close to the police line, standing shoulder to shoulder with his fellow rioters as they faced the line of officers. Around him, other rioters yelled "traitors!", "1776 motherfucker!" "let's push," and "they can't stop us!"  *Id.*  Speed appeared to confer with a small group of individuals standing near him. Trial Ex. 211. After other members of the mob yelled, "let's go!" and pointed toward the Crypt, the mob began to move in that direction. Trial Ex. 709. Stepping around an overturned display,

---

[3] While COVID-19 concerns led many individuals to wear masks at the time, Speed was "never worried about" COVID and thought that the pandemic was a "scam." Trial Exs. 338A, 523.

Speed did too. Trial Ex. 211. Speed spent most of the next 30 minutes in the Crypt, which rioters essentially controlled, as a small number of police officers focused on protecting certain exits. Trial Exs. 212-214. He then returned to the area of the Senate Wing Doors, briefly removed and replaced his mask, and climbed out the building through a window. Trial Ex. 217.

Speed then walked around the outside of the Capitol Building, taking photographs that included a line of riot gear-clad police and the inaugural stage, now flooded with rioters. Trial Ex. 470-476. He also sent text messages describing what he accomplished. About 20 minutes after Speed left the Capitol Building, a friend of Speed's from the military, M.R., sent Speed a text message asking, "Are you okay? I heard protesters stormed the capital and someone got shot??" Speed replied: "We made it to the crypt with sheer force of numbers. Then we heard that the capitol had been evacuated, the vote postponed. So I backed out, but some are still in there, riot cops are streaming in on the south side." Trial Ex. 410. Speed would later tell the UCE that a friend from his service in Iraq had asked him about the "protests" on January 6, and that Speed "told him some things…I wish I hadn't done that over text." Trial Ex. 315A. Speed next wrote to M.R., "Some people made it to the senate [sic] chambers. America spoke today. I hope washington [sic] listens." *Id.* Around the same time, Speed texted another contact: "Haha yep, I got some tear gas too. We made it to the crypt, then heard the vote had been postponed. So I backed out." Trial Ex. 412.

While Speed was still on Capitol Grounds, M.R. sent another text: "People are talking in the halls saying 'they're just trying to start a civil war.' I'm guessing that's an exaggeration." Trial Ex. 411. Speed replied, "Well, if they steal the election, that's the only other place to go. We came on the day of the count to [put] pressure on congress to do the right thing, because if they don't

they won't like what happens next." *Id.* M.R. asked Speed if he had any "inside information" about the presidential election. Trial Ex. 413. Later that night, Speed sent M.R. a long string of text messages detailing Speed's view that former President Trump had "won by a historic landslide," but the election had been stolen by voter fraud (including tactics such as reprogrammed Dominion machines, ballot shredding, misprinted ballots sent to Republican voters), judges who illegally changed state election laws, and illegitimate electors. Trial Ex. 414. The next night, Speed texted M.R., "Yesterday's vote count was the last opportunity to stop the Steal, we thought the count had been delayed and a 10 day Investigation would happen, but Pelosi fooled us, after we all left, she decided to do the vote that night, with 800 soldiers surrounding the capitol." Trial Ex. 416.

In the following weeks, Speed discussed the January 6 attack over email, expressing concern about the lack of resistance to the transition of power. On January 12, he complained that Trump "surrendered on Wednesday after some people in the media called him an instigator and blamed him for some broken windows." Trial Ex. 524. When asked, on January 23, what the Proud Boys were saying about January 6, Speed wrote, "[a]bout anything in particular, or just the coup in general? They're lying low, letting all the conservatives who criticized the events of the 6th learn for themselves that surrendering to the communists will only mean more violence." He continued, "Conservatives need to overcome their aversion to direct action, but we can't take that journey for them. We'll see how much oppression they need to experience before they wake up." Trial Ex. 526.

Speed later told the UCE that more people should have joined the mob on January 6, and "[I]t should have gotten to the point where the – Nancy Pelosi should've resigned out of fear for

her life." Trial Ex. 324A. The reason why that didn't happen, Speed said, "is because too many Americans have this idea that we have to be peaceful at all costs….Oh, as soon as we're violent then we lose the moral authority. Who told you that? I'll tell you who tells you that. Every superhero movie made by Jews." *Id.* He described the idea that the civil rights movement "was a triumph of nonviolence" was a "myth," stating the "nonviolent effort worked . . . because the government wanted it to." Ex 2 at 32-33. The defendant asserted that "[t]here's no such thing as a nonviolent revolution with a noncooperative government." Trial Ex. 325A. In Speed's view, "if you go to war to win, you got to win." Trial Ex. 326A.[4]

### D.    Speed Begins Stockpiling Weapons, Including Illegal Silencers

Following President Biden's inauguration, Speed went on a firearm-buying spree from February 11, 2021, to May 26, 2021. During that period, he purchased at least twelve firearms (rifles, shotguns, and handguns) and spent more than $40,000 at stores that sold firearms, firearm accessories, and ammunition. *See* PSR ¶ 57. He later made comments to the UCE and a coworker that he was "panic buying" around that time. *See id.* ¶ 17; Ex. 2 at 4.

As described in the government's sentencing memorandum in Speed's recent criminal case in the Eastern District of Virginia, Speed initially purchased four silencers and completed the necessary registration paperwork. Gov. Position in Aid of Sent., *United States v. Speed,* 22-cr-165 (MSN), ECF No. 152, at 4-6 (E.D. Va. filed Apr. 6, 2023). Speed then learned that his approval

---

[4] Speed drew this lesson from what he believed was Hitler's decision to allow the Allied evacuation of Dunkirk in World War II. Ex 2 at 34. Speed thought that moment was "Hitler's chance to win the war and he didn't do because he didn't want to kill all those people," as he "loved the British people, he loved the French people. He didn't want to kill a million of his potential allies." *Id.* at 34.

from the Bureau of Alcohol, Tobacco, and Firearms for the silencers would be delayed. *Id.* at 5. Faced with that delay, he turned to a Georgia company, Hawk Innovative Tech, and purchased three more silencers—this time, unregistered. *Id.* Speed received them less than a week later, on March 23, 2021.[5] *Id.* The unregistered silencers Speed purchased were marketed as "solvent traps." They did not have a completed hole in the front for a bullet to exit, they were designed so that a hole could be easily completed using a simple commercial hand drill, at which point they would function as highly effective silencers. *Id.* at 6. Speed later discussed the use of these devices as silencers with the UCE. *Id.* at 7.

### E.    Speed Meets the UCE and Describes a Violent Racial Conflict

In February 2022, the UCE met the defendant for the first time at a coffee shop in Vienna, Virginia, presenting as a like-minded individual. Speed and the UCE met again on multiple occasions. As discussed above, Speed gave the UCE a thorough account of his understanding of the certification process and his actions on January 6. He also described his subsequent firearm purchases (including the illegal silencers), and the ideology that had led him to take these illegal steps and to study and plan for more violent action in the future.

That ideology is essentially that Jewish people are at war with Christianity and control world leaders (including President Biden), media, international banking, Antifa, and other entities to serve their purposes. For example, as noted above, Speed blamed the Jewish community for

---

[5] [Intentionally left blank].

making action movies that brainwashed Americans into supporting nonviolence against the government on January 6. Speed also explained that Antifa—whom he viewed as the modern analogue to the 1930's anti-fascist left—"is the military wing of the communist movement which is Jews" and that it is "almost purely Jewish." Ex. 2 at 55, 57-58.

Speed also told the UCE that President Biden is "being operated" by the "same people" that run Antifa—i.e., members of the Jewish community. *Id.* at 60. Further linking his anti-Semitism to his dislike for the government, Speed told the UCE that he had undertaken a study over the past year and a half in which he traced back many of the country's "incredibly bad polic[ies]" to Jewish judges and politicians. Trial Ex. 309. He explained that "Biden and his handlers" (i.e., his Jewish handlers) wanted to go to war in Ukraine to "to put as many Americans in there to get slaughtered as he possibly can…as a meat grinder…where he gets to dump millions of Americans" – but "not fat Americans, and not Jewish-Americans. All these people, they're not going to war." *Id.* at 43-45. Speed saw the war in Ukraine as the modern equivalent to World War I's trench warfare, in which he believed, echoing Hitler, that "the Jews put the non-Jews in the trenches." *Id.* at 34.

Speed also noted that the current Secretary of Homeland Security and Attorney General are Jewish. Trial Ex. 309. The UCE responded, "I can see why they're trying to stomp down, uh, Christianity," and Speed replied, "you can't expect them to do less…if they didn't try to do that they'd be bad Jews." *Id.* He continued, "but we're not going to have non-Christians ruling over us." *Id.* He explained, "if I'm in a Christian country…and they're fighting for anti-Christian principals in my country, you better believe I'm going to have a problem with that." Ex. 2 at 13.

Comparing Christians and Jews, Speed said, "we're literal opposites." *Id.* at 8. In summary: "It's overtly anti-Christian like to be a Jew." *Id.* at 7. The Jewish religion, Speed said, "specifically calls out an attempt to destroy Christianity." *Id.* at 8. Separately, he commented, "Jews, for some reason love gang raping people. It doesn't matter what they're doing, they always have time to gang rape . . . white girls." *Id.* at 51-52.

Speed made several comments demonstrating a proclivity to use violence in furtherance of his anti-government and anti-Semitic beliefs. At one point during his April 7 meeting with the UCE, he confirmed to the UCE that he maintained the illegal silencers (the "solvent traps") to potentially use in an act of violence in furtherance of his anti-Semitic ideology. Ex. 2 at 67-69. he discussed trying to figure out how to identify potential targets who were "in [his] neighborhood" and "reachable by someone like [him]," even suggesting that he was thinking of Anti-Defamation League people who were "pretty high up." *Id.* at 67-68. He suggested using a "mock trial" in which he would "write down the arguments for and against . . . and come to a decision, then say, okay, now this person' . . . 'I can put this person on the list and I know I'm sure.'" *Id.* at 68. The UCE asked the defendant, "You think at that point your . . . solvent traps would come in handy?" *Id.* Speed asked, "My what?" *Id.* at 69. The UCE asked again, "your solvent traps would come in handy at that point?" *Id.* Speed responded, "Yeah. Yeah, that's the idea." *Id.* (emphasis added).

After that exchange, Speed praised the approach of jihadists and suggested that their methods would be an effective way to "wipe out" the opposition, referring to Jewish people. *Id.* at 69-71. Speed explained that because two percent of the U.S. population is Jewish, if just "three percent" of the country took action against the Jewish population, "we can literally win just on the

numbers." *Id.* Speed told the UCE that "as soon as we pull our trigger against the fucking person, you will succeed" and "have done more than your fair share." *Id.* at 71. He advocated to "just take out one here, one there . . . [m]aybe every few months" and that "[i]t doesn't necessarily have to be a full-time thing," "but we're doing something that's going to have a big impact." *Id.* at 72. Speed continued by describing how kidnappings would be "harder" but "more effective" than simply killing people. *Id.* at 72-73. He told the UCE, "What I would love to see is you take somebody out, and they simply disappear. Nobody knows what happened to them." *Id*. at 72. Speed explained, "That means we can't report on it, the media doesn't know how to spin it. . . . And all of those people who were left behind have . . . no way to close that bridge, no way to know if they're in danger. . . . We need to foster distrust within the opposite side, just like they do for us . . . If you leave nothing behind, they never find the body." *Id.* at 72-73.

In other meetings with the UCE, Speed commented that he was trying to learn from convicted domestic terrorists Eric Rudolph and Ted Kaczynski (also known as the "Unabomber") by reading their manifestos. Decl. of Special Agent Christon Turner, ECF No 6-1, ¶¶ 12-15. He stated that he was "trying to find more books like that," from which he took away "yeah, you're assassinating bad guys, that's cool, but if it's approved . . . you're always killing the small fry, you're never actually going after the people who actually," before trailing off. *Id.* ¶ 13. He stated that "as people who can see their country fall deeper and deeper into wherever we're going, we all know we have to do something[,] so it's useful to see what worked and what didn't work. So, it's useful to get into these people's heads and . . . try and come up with a better game plan than they had." *Id.* ¶ 14.

After discussing his disappointment that more Americans, brainwashed by Jewish-produced movies into supporting nonviolence, had not attacked Congress on January 6, Speed complained that he was taught nonviolence when he was growing up. *See* Ex. 2 at 2. Nonetheless, when he grew up, he "wanted to join the military and go shoot guns and kill people." *Id.* Speed said, "It's innate. Imagine how much more could have been accomplished if I hadn't been steered away from that my entire life." *Id.*

## III.   THE CHARGES, TRIAL CONVICTIONS, AND SENTENCING

On June 21, 2022, Speed was arrested on a complaint charging him with four misdemeanors in connection with the breach of the Capitol (violations of 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G) . ECF No. 1. On July 18, 2022, the government filed an information charging Speed with four misdemeanors. ECF No. 20. After Speed declined a misdemeanor plea offer, the Court set the case for trial.

Meanwhile, on September 6, 2022, a grand jury in the Eastern District of Virginia returned an indictment charging Speed with three counts of unlawful possession of a silencer that was not registered to him, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871. Indictment, *United States v. Speed,* 22-cr-165 (MSN), ECF No. 1 (E.D. Va. Sept. 6, 2022). The next day, Speed was arrested, had his initial appearance, and was released on the same conditions as imposed in this district.

Speed proceeded to trial in the Eastern District of Virginia first, in December 2022. After the jury hung, he was retried on January 17, 2023. The jury deliberated less than two hours before convicting Speed of all three counts in the indictment. Judge Nachmanoff ordered Speed detained

pending sentencing.

In the instant case, the grand jury returned a superseding indictment on January 11, 2023, charging Speed with obstruction of an official proceeding in violation of 18 U.S.C. §§ 1512(c)(2) and (2), in addition to the four misdemeanors. ECF No. 38. This Court held a bench trial on March 2 and 3.

On March 7, the Court delivered its verdict, convicting Speed on each of the five counts. It summed up its factual findings as follows:

> Mr. Speed had initially gone to the Capitol to remain outside to pressure Vice President Pence and other Republican legislators to pick the Republican elector slates, but once he learned the vice president had, in his words, "betrayed them," he broke into the Capitol building with other rioters and occupied it to prevent the Congress from completing the certification until they got what they wanted: A delay and investigation into alleged voting improprieties.

3/7/23 Oral Ruling Tr. at 5. "This amounts to a textbook case of obstruction of an official proceeding. *Id.* The evidence that Speed intended to obstruct or impede the official proceeding was, "of all the obstruction-related cases I have considered to date…the strongest and most damning here." *Id.* Moreover, Speed's "actions such as pushing past multiple lines of fencing and police officers using pepper spray and then working with a mob to force their way into the Capitol building are self-evidently wrong and done with a wrongful purpose." *Id.* at 8.

On April 13, 2023, Judge Nachmanoff sentenced Speed to three concurrent terms of 36 months' imprisonment, three years' supervised release, a $15,000 fine, and a $300 special assessment for his three firearms convictions in the Eastern District of Virginia. *United States v. Speed,* 22-cr-165 (MSN), ECF No. 155 (E.D. Va. Apr. 13, 2023). Judge Nachmanoff expressly noted that his sentence did not account for any of Speed's conduct on January 6, 2021: "The Court

does not impose sentence today for anything having to do with January 6th -- that is for Judge McFadden to address." *United States v. Speed,* 22-cr-165 (MSN) 4/13/23 Sent. Hrg. Tr., at 25 (Exhibit 3).

Judge Nachmanoff called Speed's case "deeply disturbing" and found that Speed had, "adopted views and taken actions that reflect that you pose a grave danger to others." *Id.* at 24, 26. Judge Nachmanoff found that Speed was "perfectly serious and sincere in his views, including his interest, ability, and willingness to consider assassination, kidnapping, and the use of political violence against those with whom he disagrees." *Id.* at 25. Despite being "well educated, intelligent, and intellectually curious," with the capability to "engage in critical thinking to separate fact from fiction," Speed had, for "inexplicable" reasons, come to embrace violence and saw himself as above the law. *Id.* at 25. Speed's case, the court concluded, involved "the most heinous betrayal of everything he pledged to defend by joining and serving in the military." *Id.*

## IV.    STATUTORY PENALTIES

Speed now faces sentencing on five counts, with the following maximum penalties:

- obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count One) (up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100),

- entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Two) (up to one year of imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25);

- disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three) (same penalties as for Count Two);

- disorderly conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four) (up to six months of imprisonment, a fine up to $5,000, and a mandatory special assessment of $10); and

- parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § § 5104(e)(2)(G) (Count Five) (same penalties as for Count Four).

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The offense level calculation here is driven by Count One, obstruction of an official proceeding. The government understands that this Court has ruled that two specific offense characteristics (an eight-point enhancement under U.S.S.G. § 2J1.2(b)(1)(B) and a three-point enhancement under U.S.S.G. § 2J1.2(b)(2)) do not apply to conduct, like the defendant's, on the ground that the offense conduct did not interfere with the "administration of justice." *See United States v. Hunter Seefried*, No. 21-cr-287 (TNM), __ F. Supp. 3d __, 2022 WL 16528415, at *11 (D.D.C. Oct. 29, 2022). The government sought these enhancements in its communications with Probation and preserves its objections regarding the applicability of these enhancements here,[6] *see, e.g.,* Gov. Sent. Mem., *United States v. Kevin Seefried*, 21-cr-287 (TNM), ECF No. 135 at 20-

---

[6] For example, in *United States v. Hale-Cusanelli,* the government argued for the application of the +8 enhancement under U.S.S.G. §2J2.1(b)(1)(B) for causing or threatening injury in part based on the defendant's intent to join a civil war. Gov. Sent. Mem., *United States v. Hale-Cusanelli,* 21-cr-37 (TNM), ECF No. 110 at 25-26 (D.D.C. filed Sept. 15, 2022).

Here, similarly, Speed hoped to spark a larger uprising that would lead Speaker Pelosi to resign out of fear for her life, and he joined a mob that that had breached the Senate Wing Door and succeeded through "force of numbers." Trial Exs. 324, 410. As for the +3 enhancement under U.S.S.G. §2J2.1(b)(2) for substantial interference with the administration of justice, this Court has found that rioters "were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources." *United States v. Hunter Seefried*, 21-cr-287 (TNM), 10/24/22 Sentencing Hearing Tr. at 54.

24 (D.D.C. filed Feb. 2, 2023), but for the purposes of the Guidelines calculation below, does not include them.

The draft PSR does not include a full Guidelines analysis for all three Counts to which the Guidelines apply—Counts One, Two, and Three. Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The draft PSR does not follow these steps. It concludes (see PSR ¶ 49) that Counts One, Two, and Three group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

That Guidelines analysis—again, without the enhancements under U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2)—is as follows:

Count One: 18 U.S.C. § 1512(c)(2)[7]

| | | |
|---|---|---|
| U.S.S.G. §2J1.2(a) | Base Offense Level | <u>14</u> |
| | **Total** | **14** |

Count Two: 18 U.S.C. § 1752(a)(1)

| | | |
|---|---|---|
| U.S.S.G. §2B2.3(a) | Base Offense Level | 4 |

---

[7] As the draft PSR properly notes, pursuant to U.S.S.G. § 1B1.9, the Guidelines do not apply to counts of conviction that are Class B misdemeanors, and so do not apply to Counts Four or Five here.

| U.S.S.G. §2B2.3(b)(1)(A)(vii) Restricted Building or Grounds[8] | | +2 |
|---|---|---|
| U.S.S.G. §2B2.3(c)(1) | Cross-reference[9] | |
| U.S.S.G. §2X1.1(a) | Base Offense Level | <u>14</u> |
| | **Total** | **14** |

Count Three: 18 U.S.C. § 1752(a)(2)

| U.S.S.G. §2A2.4(a) | Base Offense Level | | <u>10</u> |
|---|---|---|---|
| | | **Total** | **10** |

| **Combined Offense Level** | **14** |
|---|---|
| Acceptance of Responsibility[10] | 0 |
| | |
| **Total Offense Level:** | **14** |

Now that he has been sentenced in the Eastern District of Virginia for his firearms crime,

Speed is in Criminal History Category II; a 36-month sentence of imprisonment results in three

---

[8] Section 2B2.3 gives "restricted building or grounds" the meaning that the phrase is given in 18 U.S.C. § 1752. U.S.S.G. §2B2.3 cmt. n.1.

[9] The cross-reference applies since the Section 1752(a)(1) offense was committed with an intent to commit a felony (18 U.S.C. § 1512). *See* U.S.S.G. § 2B2.3(c)(1) and § 2X1.1 n.2.

[10] Speed contested essential factual elements of guilt at trial; principally, whether he acted corruptly and with the intent to obstruct. *See, e.g.*, 3/3/23 Trial Tr. at 42 (Speed's "actions did not impede or obstruct the vote"), 45 ("He believed that he could go in and observe the proceedings,"), 47 (denying that Speed had the intent to obstruct); 51 ("he believed he could go in and exercise a constitutional right…Speed believed he had lawful authority [to enter the building]"); 52 ("there's nothing about his actions specifically that are disorderly or disruptive"). *See also id.* at 54 (arguing that the defendant did not parade or demonstrate because "he's not wearing any colors that identify him as part of a specific group" – despite the fact that the defendant wore a reinforced "Make America Great Again" hat). Moreover, post-conviction, he has not accepted responsibility or expressed remorse. Accordingly, the adjustments for acceptance of responsibility in U.S.S.G. §§ §§ 3E1.1(a) and (b) should not apply. U.S.S.G. §3E1.1 Application Note 2; U.S.S.G. §3E1.1(b).

criminal history points.[11] U.S.S.G. §4A1.1(a). Accordingly, without the enhancements under U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2), Speed's guidelines range would be 18-24 months.[12]

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration, and an upward variance is appropriate here. Speed's guidelines are substantially lower than what they would have been were the Court to apply the +3 and/or +8 enhancements under U.S.S.G. § 2J2.1. As this Court has stated, "Regardless of whether the 'administration of justice' language actually applies to this situation, I have no doubt that the Commission would have intended for this to apply to substantial interference with an official proceeding like a certification process, which is itself more significant than almost any court proceeding." *United States v. Hale-Cusanelli*, No. 21-cr-37 (TNM), 9/22/22 Sentencing Hrg. Tr. at 86. And, as described below, Speed's accelerating disrespect for the law and his alarming plans for racially motivated kidnapping and murder support a lengthier term of incarceration than the Guidelines range—to protect the public, promote respect for the law, and to specifically deter Speed.  And because Judge Nachmanoff expressly did not account for Speed's January 6 conduct when imposing a sentence in the Eastern District of Virginia, this Court's sentence should run consecutive to the 36-month sentence in that case.

### A.    Nature and Circumstances of the Offense

---

[11] The draft PSR issued before Speed was sentenced, and thus placed him in Criminal History Category I.

[12] If this Court were to apply those enhancements, the offense level would be 25 and the Guidelines range of imprisonment would be 63 to 78 months.

As shown in Section II(B) of this memorandum, Speed's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of presidential power, and throwing the United States into a constitutional crisis. The evidence that Speed intended to obstruct the peaceful transfer of power by breaking into the Capitol was, in the Court's words, the "strongest and most damning" of the all obstruction-related cases that have come before the Court. The nature and circumstances of Speed's obstruction was of the utmost seriousness, and fully supports the government's recommended sentence of 48 months' imprisonment.

## B. Speed's History and Characteristics and the Need to Protect the Public From Further Crimes

Speed is now a multiple-convicted felon. Sentencing Speed recently for his first felony convictions, Judge Nachmanoff observed that it is difficult to square Speed's actions before approximately 2020 and those after. Before 2020, Speed served in the military, obtained a TS/SCI clearance, learned multiple languages, earned a degree in computer science, and held a lucrative position with a defense contractor. He spoke multiple languages.

Around 2020, however, Speed became enamored with Hitler and apparently developed a world view where he and other Proud Boys were modern-day Nazis fighting to save white Christians from multiple "enemies." He came to view world Jewry (and their communist army) as his enemy, the root of all ills. He began studying the work of domestic terrorists (as well as Hitler), brainstormed a plan to annihilate the country's Jewish population, and left his government contractor job in 2022, believing that he was "lending [his] skillset to evil." Decl. of Christon Turner, ECF No. 6-1, ¶ 11. In this context, he saw allowing President Biden to take power as

"surrendering to the communists," who had made Biden their puppet.

Speed, who had previously taken an oath to defend the Constitution, lost all respect for the rule of law when it stood in the way of his political ends. He stormed the Capitol when the political process refused to anoint his preferred presidential candidate, and then skirted firearms-registration requirements to obtain illegal silencers—devices he thought would be useful to carry out kidnappings of his political enemies.

Speed has expressed no remorse for any of his conduct. On the contrary, over a year later, he told the UCE that he wished that the uprising on January 6 had been even larger and more threatening than it was, such that then-Speaker Pelosi would resign in fear for her life. Trial Ex. 324A. Rather than regretting his actions, he told the UCE he regretted admitting what he had done over text. Trial Ex. 315A. And in other excerpts from his conversations, which Speed himself introduced at trial, he blamed Antifa and the police for the violence on January 6. See Def. Trial Exs. 2A (blaming Antifa for knocking over fencing); 4A (claiming that police funneled rioters upstairs toward the Upper West Terrace and entrances to the Capitol Building). None of these statements suggest a modicum of remorse or acceptance of responsibility.

Speed's turn toward criminality, unfortunately, was not a momentary aberration. It was an expression of Speed's growing desire to inspire a revolution—a revolution that would include the murder of Jewish civilians and extrajudicial kidnappings—in service of racial supremacy. These were not passing thoughts or flippant comments; Speed devoted himself to the study of domestic terrorists and white nationalist ideas and explained his detailed plans at length to the UCE. Nor was it idle talk: Speed committed multiple felonies and spent $40,000 stockpiling weapons in a

short period of time in service of his goals. Speed's military training and intelligence, once an asset to this country, exacerbate the threat, enhancing his ability to make carry out his plans. Speed's recent history and characteristics are alarming, reflecting an unabated danger to public safety that supports a substantial term of imprisonment.

In Speed's sentencing memorandum in the Eastern District of Virginia, he argued that "a sentence based to any degree on activity or beliefs protected by the First Amendment is constitutionally invalid." Def. Sent. Mem., *United States v. Speed,* No. 22-cr-165 (MSN), ECF No. 153 at 10 (citing *United States v. Lemon*, 723 F.2d 922, 943 (D.C. Cir. 1983). Speed also acknowledged 18 U.S.C. § 3661, though, which provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." The Supreme Court has likewise "long recognized that sentencing judges 'exercise a wide discretion' in the types of evidence they may consider when imposing sentence and that '[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 480 (2011) (citation omitted). "[T]he sentencing authority has always been free to consider a wide range of relevant material." *Payne v. Tennessee*, 501 U.S. 808, 820–821 (1991).

To the extent Speed intends to suggest that the Court cannot consider a criminal defendant's otherwise-protected statements at sentencing, he is wrong. Indeed, since the D.C. Circuit's decision in *Lemon,* the Supreme Court has rejected the notion that the Constitution erects

"a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Dawson v. Delaware,* 503 U.S. 159, 165 (1992).[13]

The Court may not consider a defendant's "abstract beliefs, however obnoxious to most people," if they have no bearing on any issues being decided in the proceeding. *Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993). In many cases, however, First Amendment-protected activity "might serve a legitimate purpose in showing that a defendant represents a future danger to society." *Dawson,* 503 U.S. at 166. A court may impose a sentence "based on" a defendant's protected beliefs as long as those beliefs are "relevant to the issues involved," *id.* at 164, just as a court may permit "the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Mitchell*, 508 U.S. at 489. As the Second Circuit has recognized, the Court is "*required* to sentence a convicted defendant based in part on his or her 'history and personal characteristics,' and "a person's history and personal characteristics can often be assessed by a sentencing court only or principally through analysis of what that person has said –in public, in private, or before the court." *United States v. Stewart*, 686 F.3d 156, 166 (2d Cir. 2012) (concluding that a defendant's First Amendment rights were not abridged where the sentencing

---

[13] *Lemon* is also factually distinguishable. There, the district judge based the sentence on "little more than an attempt to establish guilt by association through an accumulation of uncorroborated suspicions" suggesting that a fraud defendant was a member of the Black Hebrews organization, and therefore committed his crime to benefit that group. *Lemon*, 723 F.2d at 941. Here, the evidence of Speed's desire to perpetrate acts of violence in support of his anti-Semitic beliefs, and his accompanying belief that Jewish interests control Antifa and President Biden, is established by Speed's own statements. *Cf. Lemon,* 723 F.2d at 937 (a defendant's affiliation may be considered where he intended to further "illegal aims of the organization").

judge considered defendant's statements to determine her history and characteristics); *see also United States v. Schmidt*, 930 F.3d 858, 865 (7th Cir. 2019) (recognizing that "courts of appeals also have upheld a sentencing judge's consideration of the defendant's protected associations, beliefs, or statements because that evidence was relevant to the sentencing factors set forth in 18 U.S.C. § 3553(a)"). Judge Nachmanoff accordingly rejected Speed's First-Amendment argument, finding that he was "required" under Section 3553 to consider "the defendant's statements regarding his admiration for Adolf Hitler, for Eric Rudolph, for Ted Kaczynski, the Unabomber, his interest in the use of violence, assassination, kidnapping, his belief that such activities could be justified and appropriate." Ex. 3 at 8.

Similarly, in sentencing Timothy Hale-Cusanelli, this Court correctly found that the defendant's "degrading statements" about "Jews, women, and minorities" were "aggravating factors in [defendant's] sentencing that go to [his] dangerousness." *Hale-Cusanelli,* No. 21-cr-37, ECF No. 120 (9/22/22 Sent. Hrg. Tr.) at 80-81. Moreover, they were "particularly relevant" where, as here, defendant's "animus toward racial and religious minorities was at least in part responsible for [his] desire to obstruct the certification process." *Id.* at 81. Likewise, in *Dawson,* the Supreme Court referenced with approval an earlier decision permitting a sentencing judge's consideration of "elements of racial hatred" in a defendant's crime, as well as his "desire to start a race war," *Dawson,* 503 U.S. at 164 (citing *Barclay v. Florida*, 463 U.S. 939, 949 (1983)). Speed's violent anti-government, anti-Semitic beliefs (including his own talk of a race war) both informed his motive and intent on January 6 and are evidence of the ongoing danger Speed poses, which is an important part of the 3553(a) assessment.

28

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. As Speed himself told the UCE, when he decided to break into the Capitol, he had "no respect for the people in this building." Trial Ex. 319A. Indeed, Speed's criminal conduct on January 6 was the epitome of disrespect—for Congress, and, more generally, for the rule of law. This is particularly so given Speed's extensive understanding of the certification process. He knew precisely how it was supposed to unfold, and he fully understood what he was doing when he joined the mob that disrupted it.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[14] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Speed committed felony firearms offenses after January 6, and his history and characteristics demonstrate his inclination to commit

---

[14] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

further crimes in the future. There is also substantial evidence that Speed is willing to use violence or support or facilitate the violence of others to commit such crimes. His enthusiasm for a violent racial war, his well-documented history of violent rhetoric, and his criminal record demonstrate that Speed remains a danger and demands a significant term of incarceration to specifically deter him.

In addition, Speed never accepted responsibility and he remains remorseless, further increasing the likelihood that he would be willing to engage in similar—or even worse—conduct in the future. Moreover, given the terrifying nature of the acts Speed has contemplated, such as kidnapping and mass murder, specific deterrence is vital here.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the

offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[15]

It may usually be true, in cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[16] Here, though, the Court has found that, while Speed committed a "textbook case" of obstruction, two specific offense characteristics do not apply based on the definition of "administration of justice," despite was what likely the Commission's intent. Just as the Court has varied upward in other obstruction cases after reaching the same conclusion, to avoid unwarranted disparities, it should

---

[15] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[16] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

do so here.[17] Moreover, Speed's disturbing plans for racially motivated violence (crafted after careful study and a desire to emulate Hitler, the Unabomber, and others), Speed's repeated willingness to blatantly disregard the law, his stockpiling of weapons, illegal and legal, and his lack of remorse, set his case aside from most.

While no previously sentenced case contains the same balance of aggravating and mitigating factors, Speed's case contains many striking parallels with the case of Timothy Hale-Cusanelli, sentenced by this Court to 48 months' imprisonment after being found guilty at trial of obstruction of an official proceeding and four misdemeanors. Like Speed, Hale-Cusanelli's obstruction was at least partially motived by animus toward racial and religious minorities, with the Jewish population as a primary target. In recorded conversations, both defendants expressed intolerance for the Jewish community, believed that President Biden was under Jewish control, and hoped for violent civil war. Gov. Sent. Mem., *Hale-Cusanelli*, No. 21-cr-37 (TNM), ECF No. 110 at 17-18. Both had a deep understanding of the certification process. *Id.* at 18. Both men also served in the Navy (which the Court treated as neither aggravating nor mitigating when sentencing Hale-Cusanelli). And neither Speed nor Hale-Cusanelli destroyed property or personally committed an assault inside the Capitol.

Each defendant, however, has certain unique aggravating factors. Unlike Speed, Hale-Cusanelli testified falsely at trial and, also unlike Speed, he was captured on camera yelling at the

---

[17] Although factually different in some ways, this Court's sentence in *United States v. Kevin Seefried*, 21-cr-287 (TNM), demonstrates the appropriateness of an upward variance to account for the aggravating factors in Speed's sentence that the government believes would be captured by the U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2) enhancements.

Capitol Police and pulling a rioter away from an officer attempting an arrest. Gov. Sent. Mem., *Hale-Cusanelli,* 21-cr-37 (TNM), ECF No. 110 at 6, 16, 31-33. Also unlike Speed, however, Hale-Cusanelli had no scorable criminal history points. And, while Hale-Cusanelli was convicted of obstruction of an official proceeding, his trial did not involve the same overwhelming evidence that he entered the Capitol for the purpose of obstructing the certification and left only when he believed he had accomplished his goal, as Speed's did.

Moreover, while there are many parallels in the two men's rhetoric and belief—admiration for Hitler, a wish that January 6 had led to revolution—Speed's statements are arguably even more indicative of a potential danger. Hale-Cusanelli dreamed about what he would do if he were President, for example, giving "some groups" 24 hours to leave the country. Gov. Opp. To Def.'s Mot. for Cond'l Release, *Hale-Cusanelli,* 21-cr-37 (TNM), ECF No. 18, at 20 (D.D.C. filed March 12, 2021). Speed's plans for violence, however, were more calculated—and even more chilling. Speed considered targets who would be "reachable by someone like me," thought through a certain type of mock trial he would conduct and weighed the merits of murdering his enemies versus kidnapping them first. While Hale-Cusanelli was at one point been arrested with a homemade potato gun made from PVC pipe and shooting frozen corn, *id.* at 19, Speed spent tens of thousands of dollars stockpiling firearms, including the illegal silencers, which he told the UCE would come in useful in kidnappings.[18] Finally, Hale-Cusanelli expressed remorse, which the Court credited,

---

[18] While the Court found that it was not a basis for a variance, it also noted that Hale-Cusanelli described a "very difficult and traumatic childhood" that encouraged his "instinct to lash out and say hateful things to others." *Hale-Cusanelli*, ECF No. 120 at 83. Speed has not described facing any similar challenges.

noting, "your sentence would have been more severe but for your comments now." *Hale-Cusanelli,* ECF No. 120 at 83. Speed has expressed no such thing.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[19] Here, the VWPA applies, but the MVRA does not.

The applicable procedures for restitution orders issued and enforced under these two

---

[19] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664). Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h). That latter approach is

appropriate here.

More specifically, the Court should require Speed to pay $2,000 in restitution for his convictions. This amount fairly reflects Speed's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 48 months' imprisonment, to run consecutive to the sentence imposed by in the Eastern District of Virginia, 36 months' supervised release, $2,000 restitution, and the mandatory $170 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    /s/ Alexis J. Loeb
       Alexis J. Loeb, CA Bar No. 269895
       Assistant United States Attorney (Detailed)
       Kyle M. McWaters, D.C. Bar No. 241625
       Tighe Beach, CO Bar No. 55328
       Assistant United States Attorneys
       United States Attorney's Office
       601 D Street NW
       Washington, DC 20001
       Alexis.Loeb@usdoj.gov
       Tel. (415) 436-7200