<pre>
 1                UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                     ALEXANDRIA DIVISION


 3
      UNITED STATES OF AMERICA,        :
 4                                      :
                     Plaintiff,         :   Criminal Action
 5                                      :   No. 1:22-cr-165
             v.                         :
 6                                      :
      HATCHET M. SPEED,                 :   April 13, 2023
 7                                      :   10:18 a.m.
                                        :
 8                   Defendant.         :
                                        :
 9    ............................. :


10
              TRANSCRIPT OF SENTENCING PROCEEDINGS
11        BEFORE THE HONORABLE MICHAEL S. NACHMANOFF,
               UNITED STATES DISTRICT COURT JUDGE
12
     APPEARANCES:
13
       For the United States:     UNITED STATES ATTORNEY'S OFFICE
14                                 Thomas W. Traxler, AUSA
                                   Amanda Lowe, AUSA
15                                 2100 Jamieson Avenue
                                   Alexandria, VA 22314
16
       For the Defendant:         OFFICE OF THE FEDERAL PUBLIC
17                                 DEFENDER
                                   Courtney Dixon, AFPD
18                                 Brooke Sealy Rupert, AFPD
                                   1650 King Street, Suite 500
19                                 Alexandria, VA 22314

20     Court Reporter:            Diane Salters, B.S., CSR, RPR, RCR
                                   Official Court Reporter
21                                 United States District Court
                                   401 Courthouse Square
22                                 Alexandria, VA 22314
                                   Email: Dianesalters.edva@gmail.com
23                                 Telephone:  (301) 338-8033

24
     Proceedings reported by machine shorthand.  Transcript produced
25   by computer-aided transcription.
</pre>

*Proceedings*

1          THE COURTROOM DEPUTY:  *United States v.  Hatchet Speed*,

2   Case Number 22-cr-165.  Will the parties please note their

3   appearances for the record.

4          MR. TRAXLER:  Good morning, Your Honor.  Thomas Traxler

5   and Amanda Lowe on behalf of the United States.

6          THE COURT:  Good morning.

7          MS. DIXON:  Good morning, Your Honor.  Courtney Dixon

8   and Brooke Rupert on behalf of Mr. Speed.

9          THE COURT:  Good morning.

10          This matter comes before the Court for sentencing.  Are

11   the parties ready to proceed?

12          MR. TRAXLER:  Yes, Your Honor.

13          MS. DIXON:  We are, Your Honor.

14          THE COURT:  Very good.  I've received a copy of the

15   presentence report, and I have received a sentencing memorandum

16   from the government, which includes 14 exhibits, including the

17   transcript of the findings by Judge McFadden in the case from the

18   District of Columbia, transcripts from the trial, various emails

19   and texts sent by the defendant.

20          I've received the defendant's sentencing memorandum,

21   which includes five letters, including letters from Amber McCraw,

22   Sean Graham, Danelle Graham, Derek Bloom, and Slade Horacek.

23          I've also received the government's reply brief.  Are

24   there any other documents that either party wishes to present or

25   be considered before we proceeded with sentencing?

*Proceedings*

1          MR. TRAXLER:  Nothing from the government, Your Honor.

2          MS. DIXON:  Not at this time, Your Honor.

3          THE COURT:  Very good.  Let me confirm with the

4    government that you have received a copy of the presentence

5    report and have no objections to either the guidelines

6    calculations or the factual information contained in the report;

7    is that correct?

8          MR. TRAXLER:  That's correct, Your Honor.

9          THE COURT:  And, Ms. Dixon, let me confirm that you

10   have received the presentence report, that you've had the

11   opportunity to review it with your client.

12         MS. DIXON:  We have, Your Honor.

13         THE COURT:  And I understand that you have an objection

14   to the failure to award two points for acceptance of

15   responsibility, and that there are objections to the inclusion of

16   certain factual information in the presentence report,

17   specifically the inclusion of information in paragraph 16

18   regarding the purchase of neo-Nazi items and the inclusion of

19   statements that are contained in paragraphs 35 to 51 which

20   address topics regarding his political views and other topics

21   that have been discussed both in connection with the trial and

22   otherwise.

23         There's also an objection to the inclusion of

24   paragraph 24, which the defendant argues is inaccurate regarding

25   the defendant's knowledge that the HIT devices were for silencing

*Proceedings*

1    or for muffling sound.  Is that a correct summary of the

2    outstanding objections that need to be resolved?

3              MS. DIXON:  Yes, that's correct, Your Honor.

4              THE COURT:  Very good.  I will hear from you first with

5    regard to the two-level acceptance of responsibility.

6              MS. DIXON:  Yes, Your Honor.  Thank you.

7              So I won't belabor the points that I think we know from

8    experience that you have read everything before we get to court,

9    so I just want to point out a few things.  As to the acceptance

10   of responsibility, as the Court is aware, there were four

11   elements that went to the actual offense:  The knowing possession

12   of the devices; the devices being defined as firearms under

13   18 U.S.C. § 921; the defendant's knowledge that the devices had

14   the characteristics of a silencer, per 18 U.S.C. § 921; and then

15   also that the devices were not registered.

16             Mr. Speed did stipulate to Counts 1 and 4, so I will

17   focus on Counts 2 and 3.  Element 2 is what we would say is a

18   constitutional challenge to a statute which, I believe, in the

19   comments, in the guidelines, as well as acknowledged in the

20   government's response, is a basis where someone can still ask for

21   acceptance where they are challenging a constitutional aspect of

22   a statute.  As you know, in our motion to dismiss, it was

23   something that we raised as far as the statute as well as

24   throughout the trial.

25             And then as to Element 3, I believe Element 3, while

*Proceedings*

1   not necessarily a constitutional challenge, does really go to

2   Mr. Speed's intent, and that he did not intend to own a device

3   that met the characteristics of what is defined as a silencer

4   under 18 U.S.C. § 921.  I believe, actually even prior to the

5   first trial, we proposed to clarify that specific element,

6   thinking that the way that it was phrased may not actually

7   encapsulate the state that the devices were in when Mr. Speed

8   possessed them; and that was in ECF Number 40.  So we did

9   challenge that element and, really, whether that element applied

10  to Mr. Speed's conduct as opposed to the conduct which is his

11  possession of the devices themselves.  So for those reasons, we

12  do believe that the Court should at least consider a two-point

13  departure for acceptance of responsibility.

14          THE COURT:  Thank you.  I will hear from you,

15  Mr. Traxler.

16          MR. TRAXLER:  Your Honor, we don't have anything,

17  really, additional to add than what we stated in our response

18  brief.  At trial, Mr. Speed's defenses were not purely legal in

19  nature; he was also denying factual guilt.  He said -- in regards

20  to whether the devices were silencers, which is an essential

21  element of the offense, he said that they were not silencers,

22  that they were solvent traps for cleaning the barrel of a

23  firearm.  And on the third element, he denied that he knew that

24  the devices had the characteristics of a silencer.  And he then

25  went one step further and said that he thought that they were

*Proceedings*

1    solvent traps.

2          So under these circumstances where the defendant has

3    denied essential elements and did so in a way that relates to

4    factual guilt, not just raising legal questions, we do not

5    believe acceptance of responsibility is appropriate.

6          THE COURT:  Thank you.

7          Well, I've reviewed the objections and looked carefully

8    at the presentence report.  I find that the probation officer has

9    correctly assessed that acceptance of responsibility is not

10   appropriate here.  It certainly is true, as defendant has argued,

11   that the defendant conceded with regard to some of the elements,

12   but not all of them, and there was no dispute that the devices

13   were not registered, and Mr. Speed did not contest that he

14   knowingly possessed or owned the devices.  And it is also true

15   that simply going to trial does not automatically mean that a

16   defendant loses acceptance of responsibility in all cases, but

17   those circumstances where you can both go to trial and receive

18   acceptance of responsibility are narrow; and in this case, the

19   defendant has not established that that narrow exception is

20   appropriate.  The defendant appropriately exercised his

21   constitutional right to go to trial, and he vigorously contested

22   whether he knew that the devices had the characteristics of a

23   silencer, and those were factual arguments; they were not purely

24   legal arguments.  And this is not a case where the defendant has,

25   in a post-conviction circumstance, accepted responsibility or

*Proceedings*

1    expressed remorse.  He challenged the elements, declared his

2    innocence, lost before the jury.  The cases cited by the defense

3    are all distinguishable, and I find that the guidelines correctly

4    do not award that two-level reduction.

5         The remaining objections don't affect the guideline

6    calculation.  They refer to the inclusion of factual information.

7    I don't know if you wish to be heard on that again.  I think

8    these issues have been fully argued in writing, but, Ms. Dixon, I

9    will give you a chance if there's anything you wish to add.

10        MS. DIXON:  Your Honor, I think -- you know, again, I

11   believe it's been briefed.  I would still just point out to the

12   Court that the statements contained in paragraphs 35 to 51, I

13   believe only paragraph 50 and parts of paragraph 49 were actually

14   introduced at trial.  All the rest are conversations that were

15   essentially done privately between Mr. Speed and an individual he

16   believed to be a friend of some sort.  So I would just continue

17   our point that these are statements protected by the First

18   Amendment, that they are free speech, that they were not

19   expressed into the masses, were not posted on, you know, a site

20   that was sent out to the world.  It was private conversations

21   between two individuals, as well as his purchase of the items off

22   of Amazon.

23        THE COURT:  Thank you.

24        Mr. Traxler, do you wish to be heard?

25        MR. TRAXLER:  Your Honor, the government would rest on

*Proceedings*

1    its brief, and I would just note that I believe it's proper for

2    the Court to consider these statements when assessing the factors

3    under § 3553(a).

4            THE COURT:  Thank you.

5            Well, again, I've looked carefully at the presentence

6    report.  The defense is correct that there is information

7    contained in the presentence report, including paragraphs 35 to

8    51, which were not introduced at trial and, frankly, were not

9    even part of the motions practice regarding 404(b).  That, of

10   course, is not dispositive as to whether or not it's potentially

11   relevant for purposes of sentencing.

12           The argument that because these conversations were made

13   in private, they somehow have some First Amendment protection or

14   should be considered differently than if they were expressed

15   publicly, I don't find persuasive.  The defendant's statements

16   regarding his admiration for Adolf Hitler, for Eric Rudolph, for

17   Ted Kaczynski, the unabomber, his interest in the use of

18   violence, assassination, kidnapping, his belief that such

19   activities could be justified and appropriate are all highly

20   relevant to sentencing, and the Court is required to consider

21   them, because the Court, under § 3553(a), has to take into

22   consideration the history and characteristics of the defendant in

23   addition to the offense conduct, and there clearly is a

24   connection between the offense conduct and these views which he

25   shared, frankly, in a setting in which he felt most comfortable

*Proceedings*

1   and able to express views that he clearly thought about deeply

2   and come to the conclusion were correct, from his perspective.

3          Likewise, I find that with regard to paragraph 24 and

4   paragraph 16, that that information is relevant; his collection

5   of neo-Nazi memorabilia or items is relevant to paragraphs 35

6   through 51.  And, of course, the conclusion that he knew the HIT

7   devices were capable of muffling sound was the essence of the

8   case and reflects exactly why the defendant went to trial, to

9   challenge that issue, and the jury concluded that he was aware of

10  those characteristics and understood what those devices could do,

11  and so the objections are overruled.  I will adopt the

12  presentence report in the form that it was submitted both with

13  regard to the factual information and with regard to the

14  guidelines calculation.

15         Accordingly, the advisory guideline range that is

16  applicable in this case is a total offense level of 20, with a

17  criminal history category of 1, and that produces an advisory

18  range of 33 to 41 months of imprisonment, a supervised release

19  range of 1 to 3 years, and a fine range of 15,000 to $150,000.

20  There's a mandatory special assessment of $100 per count, which

21  would be $300 for all three counts.  And so the Court has adopted

22  the findings of the presentence report and adopted the advisory

23  guideline range.

24         We can now turn to consideration of the § 3553(a)

25  factors, and I will hear arguments from counsel at this time.

*Proceedings*

1          Mr. Traxler?

2          MR. TRAXLER:  Thank you, Your Honor.

3          The government recommends 41 months of imprisonment,

4    and as the Court noted just a moment ago, the guidelines range

5    here is 33 to 41 months.  The government's recommendation is at

6    the high end of that guidelines range, and we believe that the

7    factors under 18 U.S.C. § 3553(a) all point in the direction of

8    imposing a sentence not only within the guidelines range in this

9    case, but a sentence at the high end of the guidelines range.

10          The defendant has committed a serious firearms offense,

11   and he has committed that offense under exceptionally serious

12   circumstances, and as we mentioned a moment ago when discussing

13   his statements to the undercover, he has shown that he is a

14   substantial danger to public safety.  And with the Court's

15   indulgence, I would like to briefly summarize the circumstances

16   of the defendant's offense, because the context here in which the

17   defendant committed this firearms offense is very important to

18   understanding just how serious it was.

19          As we discussed in our position paper, the defendant --

20   and I believe this was conceded in the defendant's paper -- the

21   defendant believed that fraud occurred in the 2020 presidential

22   election and that the election was stolen.  As he stated in his

23   sentencing memorandum, his beliefs became more radical, infringed

24   during that time.  In the government's sentencing paper, we

25   produce evidence of rallies he attended at the end of 2020.  And

*Proceedings*

1    there's nothing wrong with just attending political protest

2    rallies.  That's not why the government included that information

3    in its position paper.  We included that information because, as

4    the government pointed out, the defendant embraced the violence

5    that accompanied some of those rallies.  Our sentencing paper

6    describes the evidence showing that he viewed his participation

7    in the group the Proud Boys as akin to a Nazi paramilitary wing,

8    also known as the Brownshirts, that helped Hitler's rise to

9    power.  He thought that the Brownshirts and the Proud Boys were

10   both fighting a similar enemy, Antifa, and the evidence shows

11   that he embraced the Proud Boys' use of violence and sought to

12   participate in their activities.  With the government's

13   sentencing paper, we've included a text message from a rally in

14   November 2020 that the defendant attended where, when it turned

15   violent in the evening, the defendant received a text message

16   saying that the "big boss says we are going back in."  And the

17   defendant, upon receiving that text message, asked if things were

18   still happening; and when he was told that it was "pretty quiet,

19   we stomped them out," the defendant expressed regret that he had

20   missed out and said, "I'm coming in."  And the text messages

21   showed that he drove back into D.C. that night.  And the

22   inference from those text messages is that the defendant wanted

23   to be a part of any violence that was occurring in the aftermath

24   of that rally.

25           Likewise, we included pictures from a rally in

*Proceedings*

1    December 2020 that shows the defendant in tactical gear -- a

2    tactical vest, a red *Make America Great Again* hat that had

3    tactical shelling on the inside -- and he was there wearing Proud

4    Boys colors; and as the government noted in its position paper,

5    he looks like he's ready for a brawl, not just to protest

6    peacefully.

7            Less than a month later, on January 6, 2021, the

8    defendant participated in the mob at the U.S. Capitol and sought

9    to obstruct Congress' certification of the Electoral College

10   vote.  As the Court has seen from the transcript, where Judge

11   McFadden rendered the verdict convicting him of that felony

12   obstruction charge, Judge McFadden said that the evidence that

13   the defendant intended to obstruct or impede the official

14   proceeding was "the strongest and most damning" "of all the

15   obstruction-related cases" that Judge McFadden had considered to

16   date.  He will be sentenced for that conduct in D.C. on May 8th.

17   But it's important, for the context of this offense, to recognize

18   that during this time, the defendant was anticipating civil war

19   if the obstruction efforts were unsuccessful, and the Court has

20   seen the text message from January 6th where he expresses that

21   sentiment.

22           In the weeks following, he advocated for political

23   violence, telling a friend over email that the Proud Boys, of

24   which the defendant was a member, were "lying low, letting all

25   the conservatives who criticized the events of the 6th learn for

*Proceedings*

1   themselves that surrendering to the communists will only mean

2   more violence."  The defendant told his friend that

3   "conservatives need to overcome their aversion to direct action,

4   but we can't take that journey for them.  We'll see how much

5   oppression they need to experience before they wake up."  That

6   was an email sent at the end of January 2021, and it shows the

7   defendant's mindset leading into February of 2021, and it was

8   against that backdrop that the defendant went on a firearm buying

9   spree from February 11, 2021, to May 26, 2021, purchasing 12

10   firearms and spending more than $40,000 at stores that sold

11   firearms, firearm accessories, and ammunition.

12          As the Court heard at trial, the defendant initially

13   sought to buy 9mm and .45 silencers, legally, from Silencer Shop

14   on February 15th, but then he was faced with delay in obtaining

15   ATF approval for that transfer of those silencers, so on

16   March 17th, he purchased the three Hawk Innovative Tech silencers

17   to circumvent the wait time for getting that NFA approval.  As

18   the Court knows from hearing the evidence at trial, Hawk

19   Innovative Tech marketed these devices as solvent traps,

20   purportedly for cleaning a firearm barrel, but they were really

21   designed as silencers, and the defendant's comments to the FBI

22   undercover employee showed that he knew that they were actually

23   silencers even if they were called "solvent traps."  The

24   defendant purchased those unregistered silencers and put them in

25   a storage unit where he had, at the time of his arrest in June of

14

Proceedings

1    2022, eight firearms, more than 18,000 rounds of ammunition, and

2    numerous firearm accessories, including three silencers that he

3    had purchased in June 2020 for a different caliber firearm.

4              Now, it's true that the defendant did not modify the

5    Hawk Innovative Tech silencers to make them fully functional, but

6    we also heard evidence that he did not use other firearms that

7    were sitting in that stockpile.  It was the essence of

8    stockpiling.  He had them at the ready.

9              In the year following his purchase of the Hawk

10   Innovative Tech silencers, the defendant's violent inclinations

11   appear to only have intensified.  From February to April of 2022,

12   just a few months before the defendant was arrested and a year

13   after he purchased the Hawk Innovative Tech silencers, he met

14   with the FBI undercover employee.  He thought he was talking to a

15   friend.  As the Court noted a moment ago, this was not a time for

16   him to be -- this was a time where he was going to be more

17   forthright in what he said.  And you've read the statements that

18   the defendant made to the undercover.  They're extremely

19   alarming.  The defendant made statements showing that he knew the

20   Hawk Innovative Tech devices, while described as solvent traps,

21   were actually silencers, but he also made statements showing that

22   he was actively thinking about carrying out a violent attack.  He

23   talked about studying Eric Rudolph's and the unabomber's

24   manifestos to come up with a better game plan than they had.  The

25   defendant talked about how to wipe out the Jewish population; and

*Proceedings*

1    his comments were not theoretical or, as he calls them in his

2    sentencing paper, mere "musings."  He talked about how he was

3    trying to identify worthy targets in his neighborhood, people who

4    were reachable by someone like him, such as members of the

5    Anti-Defamation League.  He talked about using a mock trial to

6    determine worthy targets to add to the list; and when asked by

7    the UCE, the defendant even confirmed that he had so-called

8    solvent traps for that purpose, and he talked about kidnapping

9    people so that their bodies would not be discovered and it would

10    sow confusion and distrust on the other side.

11            Your Honor, we submit that under these circumstances,

12    there's no reason to vary from the guidelines downward.  The

13    circumstances of the offense are extremely serious.  This is not

14    some isolated infraction that was committed for benign purposes.

15    For example, to take one of the cases that the defendant asked

16    the Court to compare this one to, *United States v. McCullagh*,

17    this is not a circumstance where the defendant possessed

18    a damaged Tommy gun to hang in his house as an homage to his

19    great-grandfather.  The defendant purchased these unregistered

20    silencers here as part of a broader course of action where he is

21    advocating for violence and was talking about using violence to

22    carry out his political and ideological beliefs.  The defendant

23    deliberately sought to circumvent the NFA registration

24    requirements during that time.

25            We submit that the defendant is a clear danger to the

*Proceedings*

1   public, and that there's a real need for general deterrence here

2   as well.  As we highlighted in our sentencing paper, these

3   solvent traps are a real problem.  People are making or

4   purchasing silencers and marketing them as solvent traps,

5   thinking that they can somehow circumvent the NFA registration

6   requirements.  It's a too-clever-by-half attempt to circumvent

7   the law, and the Court's sentence should send a message that this

8   is a serious violation.

9         I would also like to emphasize for the Court that

10  there's really no excusing the defendant's conduct here.  He's

11  highly educated, worked for a cleared defense contractor, and

12  served in the Navy Reserves.  He had a top-secret security

13  clearance.  There's no evidence of any extenuating circumstances,

14  no history of mental illness that's been advanced.  The letters

15  submitted in support of the defendant, in fact, described him, as

16  defense puts it, contemplative, curious, and well-read.  The

17  defendant knew well what he was doing, and a sentence at the high

18  end of the guidelines range is especially appropriate to reflect

19  the seriousness of the offense, protect the public from further

20  crimes of the defendant, and afford adequate deterrence to

21  criminal conduct.

22        And, Your Honor, before I sit down, I would like to

23  address just a few points raised by the defense in their paper,

24  and the first point I want to address is that the defendant's

25  comments suggesting that he thought the time to register the Hawk

*Proceedings*

1    Innovative Tech devices was when the hole was drilled does not

2    warrant leniency in this case.  As we pointed out in our paper,

3    this is not a situation where the defendant did not know what he

4    was possessing.  The defendant knew full well that these devices

5    were to be silencers.  His comments to the undercover and the

6    context of this purchase proved that.  No evidence suggests that

7    the defendant owned these devices to clean his firearm or for any

8    other purpose.  What the defendant's statements to the undercover

9    suggested most is that he thought he had found a loophole in the

10   law and he could exploit that loophole to avoid complying with

11   the NFA's registration requirements.  The defendant should not

12   receive leniency for such efforts to circumvent the law.

13           I would also note that it's not accurate to assume that

14   the defendant would have filled out a Form 1 when he drilled the

15   hole in the devices.  In paragraph 27 of the presentence

16   investigation report, it describes how the defendant told the

17   undercover that a Form 1 must be submitted to make a silencer

18   legally, but then the defendant said, and I quote, "That would be

19   the legal way of doing it, you know.  If you forget to fill out

20   Form 1, nobody ever finds you on the form."  The defendant made

21   this comment during the April 7, 2022 meeting, the same one where

22   he talked about using those devices to carry out an attack.  So I

23   would say it's not fair at all, even taking the defendant at his

24   word that he thought the time to register was when you drilled

25   the hole and you submit a Form 1, that the defendant actually

1    intended to submit a Form 1.  His comments to the undercover

2    suggest otherwise.

3         The defendant has also emphasized that he never

4    modified the Hawk Innovative Tech devices or carried out any of

5    these attacks, but I would submit to the Court that that's really

6    just a small measure of comfort here.  He made his statements to

7    the undercover a year after purchasing the Hawk Innovative Tech

8    silencers and merely months before he was arrested.  Clearly,

9    using the devices as silencers and engaging in this violence was

10   still fresh on his mind at the time he was arrested.  What this

11   goes to show here is that law enforcement did an outstanding job

12   in making sure that the defendant did not have an opportunity to

13   put his violent inclinations into practice.

14        And, finally, Your Honor, I would just emphasize that

15   the defendant has cited five cases from the division to support

16   his request for a sentence of a year and a day, and as we

17   explained in our response paper, none of these cases are remotely

18   comparable here, and the Fourth Circuit has expressly cautioned

19   district courts in engaging in the type of analysis that compares

20   separate cases to one another, because sentencing, obviously, has

21   to be individualized and take into consideration the particular

22   circumstances of the offense and the characteristics of the

23   defendant.  And, Your Honor, I would just say that none of the

24   cases that are relied on by the defense involve circumstances

25   that are remotely comparable here or that involve a defendant

*Proceedings*

1    that has the attributes of the defendant and who poses a clear

2    threat to the public.

3            So with that said, Your Honor, I would again emphasize

4    that a sentence of 41 months is appropriate in this case.  It

5    falls within the guidelines, and it fulfills the purposes of

6    § 3553(a).  Thank you.

7            THE COURT:  Thank you.  Ms. Dixon?

8            MS. DIXON:  Thank you, Your Honor.

9            So first I'll start talking about just the actual

10   offense conduct that we're dealing with, which is the possession

11   of these three devices; and based on that conduct, it's clear

12   that a lengthy prison sentence is unwarranted.  This case is

13   so atypical from what you'd expect in terms of someone possessing

14   an unregistered weapon.  You know, you see this a lot in drug

15   cases; you see this where people are obliterating serial numbers;

16   you see this where people are buying guns off the street, things

17   like that.  Mr. Speed didn't buy these devices off the street; he

18   bought them off a website.  He didn't use them in connection with

19   any crime.  He didn't even modify them.  He merely bought these

20   things that he believed would be a project for him.

21           I'm sure the Court has been able to see the letters

22   from Mr. Speed's friends and people who support him.  It's not

23   odd for him to make a project out of something.  He has a hang

24   glider because he thought it would be something that was cool.

25   He buys different car parts or tools to fix cars because he wants

1    to learn a new skill.  He bought these things called -- I forget

2    -- pedal brakes or something like that to make music when he's

3    playing his guitar.  It is not out of the ordinary for Mr. Speed

4    to purchase something that he believes will be a project for him,

5    and I believe that's exactly what this would have been.

6            As we pointed out in trial, Mr. Speed is a gun

7    enthusiast.  He owned many different weapons and weapon

8    accessories, but what's most important is that he purchased all

9    of those things legally.  He filled out the proper paperwork, he

10   paid the appropriate taxes, and he followed the proper procedures

11   for every single weapon that he owned.

12           It's honestly more unreasonable to think that a man who

13   has always done everything by the book when it comes to his

14   weapons chose this one instance to do something sneaky.  If he

15   was really trying to circumvent the law, which is what the

16   government has been pushing for throughout this case, he could

17   have used a different name.  He bought these on a website.  He

18   didn't have to use his name.  He didn't have to use his own

19   credit card.  He didn't have to send them to his home address.

20   He didn't have to store them in a place that was leased by him.

21   He could have put these somewhere else.  He could have put them

22   under a false name, but he didn't.  And he didn't do any of those

23   things because he didn't believe that he had done anything wrong.

24           You know, both during our pretrial hearings and the

25   pleadings, we argued back and forth a lot about mistake of fact

*Proceedings*

1    versus mistake of law; and while we understand the Court's

2    ruling, I believe our sentiment is the same:  That it is clear

3    from Mr. Speed's statements that his understanding was that these

4    devices needed to be modified to be used as silencers, and until

5    modified, were not subject to the registration requirements,

6    requirements that he complied with for all other seven silencers

7    that he owned.

8         And I know the government says that this case is

9    different than the comparison cases of the district, but what we

10   can say is that these types of cases rarely receive lengthy

11   prison sentences.  In the five cases we cited to the Court, the

12   sentences range from two days time served to a year and a day.

13   And when we're looking at -- specifically, I want to talk about

14   the *Shaver* case briefly.  You know, the government learned about

15   that individual's unregistered firearms because he actually

16   killed someone.  Here, the government learned about Mr. Speed's

17   devices because of the January 6th investigation.  And,

18   certainly, where he did not actually cause any damage, where he

19   did not actually harm any person, he should not receive more time

20   than someone who did.

21         The Court can see in the letters that we submitted that

22   Mr. Speed has a history of being admired and respected and

23   supported by so many people, that people were in shock to hear

24   that he was here, that he is being charged with this, that he has

25   made these statements.  This is the guy who would go take care of

*Proceedings*

1    someone's pet bird and create a relationship with it.  This is

2    the guy who dropped everything and spent a ton of money buying

3    tools to fix someone's car so that he could drive his wife home

4    from the hospital after she had a baby.  This case is not

5    representative of who Mr. Speed has been for 40 years of his

6    life.

7          So, Your Honor, Mr. Speed, as a man with no record, as

8    a military veteran, as a man who has cared for a lot of people

9    and supported a lot of people, 41 months is too much.  A

10   guideline sentence would be too much.  And as the Court knows,

11   all of these conversations that are being brought into the PSR

12   that the government has consistently talked about stem from his

13   case in D.C., and a lot of those conversations, unlike in this

14   trial, were brought into the trial in D.C., and so he's already

15   had the draft PSR created for the D.C. case, and he's already

16   facing 57 to 71 months in that case.  And so I would ask the

17   Court to take all of that into consideration.

18         Again, Mr. Speed is more than just this and what his

19   thoughts have been in the last two years, and he should not be

20   punished for this thoughts.  He should not be punished for his

21   opinions.  It should be about the offense conduct; and, here, the

22   offense conduct was not as egregious as the government makes it

23   out to be.  So for all these reasons, we ask the Court for the

24   year and a day to cover this offense.

25         I do want to ask two things.  In our sentencing

*Proceedings*

1    memorandum, we asked for Mr. Speed to be -- the Court to make a

2    recommendation that he be sent to a prison close to the Northern

3    Virginia area.  We're just withdrawing that.  We think it

4    probably makes the most sense for the BOP to go through the PSR,

5    especially now that everything is included in that, and decide

6    where is an appropriate placement for him.  And we would ask that

7    if the Court is imposing any fine, that it could be held in

8    abeyance pending appeal.

9            THE COURT:  Thank you.

10           Mr. Speed, if you'll come to the podium.  This is your

11   opportunity to address the Court if you wish to do so.  You went

12   to trial and you have the right to appeal, and you retain the

13   right to remain silent if you wish to do so.  So I just want to

14   make sure that if you wish to speak, you now have that

15   opportunity.

16           MS. DIXON:  And, Your Honor, we have advised Mr. Speed

17   not to make any statements due to the appeal.

18           THE COURT:  Thank you.  I understand.

19           I've listened carefully to the arguments of counsel,

20   and I've reviewed the PSR, the sentencing memoranda that have

21   been submitted.  I've looked carefully at the attachments.  I've

22   looked carefully at the letters submitted as well by the defense.

23   I must consider all of the relevant factors set out by Congress

24   in the sentencing statute, § 3553(a), and ensure that I impose a

25   sentence that is sufficient, but not greater than necessary, to

1    comply with the purposes of sentencing.  Those purposes include

2    the need for the sentence to reflect the seriousness of the

3    crime, to promote respect for the law, to provide just punishment

4    for the offense.  The sentence must also deter criminal conduct,

5    protect the public from future crime by the defendant, and

6    promote rehabilitation.

7            In addition to the guidelines and policy statements

8    which I must consider, I must consider the nature and

9    circumstances of the offense, the history and characteristics of

10   the defendant, the need to avoid unwarranted sentence disparities

11   among similarly situated defendants, and consider the types of

12   sentences available.  I've considered all of those factors.

13           This is a deeply disturbing case, both because of the

14   nature of the offense and because of the history and

15   characteristics of the defendant.  There are circumstances where

16   the failure to register a firearm, whether it's a silencer, a

17   machine-gun, or a short-barrelled shotgun, is a serious offense,

18   but not one that necessarily squarely raises the need to protect

19   the public, but in this case, the defendant's own words reflect

20   the seriousness of the threat posed by the possession of these

21   devices and the danger that he possess.

22           It is difficult to understand how anyone could conclude

23   that the unabomber and Eric Rudolph and Hitler could be positive

24   role models, much less worthy of admiration and emulation, and,

25   yet, the transcripts submitted, the testimony of the undercover

*Proceedings*

1    agent, the snippets of the defendant's own voice on the

2    recordings played at trial reflect that he was perfectly serious

3    and sincere in his views, including his interest, ability, and

4    willingness to consider assassination, kidnapping, and the use of

5    political violence against those with whom he disagrees.  This

6    represents the most heinous betrayal of everything he pledged to

7    defend by joining and serving in the military.  And based on the

8    letters submitted from his friends from church and his former

9    landlord, it's inexplicable why he's adopted these views.

10         By all accounts, Mr. Speed, you are well educated,

11   intelligent, and intellectually curious.  You've served your

12   country honorably until you went down the path that has led you

13   to be here.  So why?  Why?  There's no hint of a traumatic event

14   in your life or a mental health issue or substance abuse.  There

15   seems to be no reason that you could not engage in critical

16   thinking to separate fact from fiction with regard to the ideas

17   to which you've been exposed, and, yet, you concluded that

18   violence can be justified, that the law doesn't apply to you,

19   whether it was on January 6th or whether it was with regard to

20   the collection of unregistered silencers in preparation for a

21   civil war.

22         The Court does not impose sentence today for anything

23   having to do with January 6th -- that is for Judge McFadden to

24   address -- and it does not impose a sentence based solely on

25   holding unpopular beliefs.  The Court must sentence you based on

*Proceedings*

1   the sentencing statute, which requires the Court to consider the

2   nature of the offense for which you've been convicted and the

3   characteristics of the defendant.  Your character is revealed

4   through your actions and your words, and the Court has to

5   consider the protection of the public; it has to consider

6   promoting respect for the law; and it has to consider deterrence,

7   specific and general, and that requires the Court to impose a

8   punishment that is just in light of all of these facts.

9          The Court has considered the advisory guidelines as

10  well as the government's request for a sentence at the high end

11  of those guidelines.  The Court has considered your counsel's

12  argument for a year and a day, and I've considered the other

13  cases that have been cited.  None of those cases are similar to

14  your case.  In some of those cases, there was compelling

15  mitigation, that people committed a crime involving a firearm

16  because of serious mental health issues or other compelling,

17  sympathetic reasons.  Here, there is none of that.

18         The Court has also considered the types of sentences

19  available and the need for rehabilitation.  The Court has done

20  so.  You are a person who has been, for most of your life, a

21  law-abiding citizen, arguably, a considerate person who's helped

22  others, and, yet, you've adopted views and taken actions that

23  reflect that you pose a grave danger to others; and for this

24  reason, the Court must impose the following sentence, having

25  considered all of the § 3553(a) factors.  It will be the sentence

*Proceedings*

1   of the Court that I impose a term of imprisonment of 36 months,

2   which falls within the guideline range, to be followed by a term

3   of supervised release of three years.  During that term of

4   supervised release, you will be subject to all of the mandatory

5   and standard conditions laid out in the presentence report at

6   pages 22 through 25 as well as the special conditions that are

7   laid out on page 25 of the presentence report.

8           I do find that you are capable of paying a fine, and I

9   will impose a fine of $5,000 per count in this case for the three

10  counts.  I'm also required to impose the special assessment of

11  $300, which is $100 per count.  As I understand it, your counsel

12  has withdrawn the request for a specific designation, and so I

13  will not make one.  I will specify that the fine can be paid upon

14  release from incarceration.

15          Your counsel argued at trial that this was a witch

16  hunt.  This was no witch hunt.  The government's most vital

17  mission is to protect the public; and your actions, your conduct,

18  your efforts to communicate with a person that you trusted about

19  your belief that taking the law into your own hands, that

20  potentially killing or kidnapping people was an appropriate way

21  to address whatever it is that you believe is wrong with this

22  country justified the government's investigation and prosecution

23  of you in this case.  This is a serious case, it's a serious

24  crime, and it calls for a serious punishment.  I only hope that

25  you can somehow find a way to use your intellect and your

*Proceedings*

1   critical thinking skills to evaluate how you came to be here

2   today and how you will be sentenced by Judge McFadden, and find a

3   way back to the person who is described in those letters who

4   bears no resemblance to the person on those tapes and in those

5   transcripts.

6          Is there anything I need to address with regard to this

7   matter that has not been addressed in imposing a sentence this

8   morning?

9          MR. TRAXLER:  Nothing from the government.

10         THE COURT:  Is there anything from the defense?

11         MS. DIXON:  Your Honor, I apologize for not raising it

12  previously.  I just want to note an objection to the -- I believe

13  it's the second special condition in the PSR, which I believe is

14  a mental health evaluation.  I believe everybody has conceded

15  that Mr. Speed does not have a history of that, so I just want to

16  note an objection to that.

17         THE COURT:  Thank you, and I will overrule that

18  objection.  To the extent that Probation concludes that it is

19  appropriate and necessary to recommend mental health treatment, I

20  will require that it be made a part of supervised release.  If

21  they do not conclude that's necessary, they are not required

22  to impose that condition, but this gives them the authority to do

23  so if they think it's appropriate.

24  /////

25  /////

29

*Proceedings*

1        You'll be returned to the custody of the marshals at

2   this time.  Thank you.

3                  *       *       *       *       *

4                    <u>CERTIFICATE OF REPORTER</u>

5        I, Diane Salters, hereby certify that the foregoing

6   transcript is a true and accurate record of the stenographic

7   proceedings in this matter.

8

9                                   /s/ Diane Salters

10                              _____

                                Diane Salters, CSR, RCR, RPR
11                              Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25